Filed 8/22/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S073316 |
| v. | ) | |
| | ) | |
| ROBERT MARK EDWARDS, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 93WF1180 |
| _____ | ) | |

Defendant Robert Mark Edwards was convicted of the first degree murder of Marjorie Deeble. (Pen. Code,[1] §§ 187, subd. (a), 189.) The jury also found true the special circumstance allegations of burglary-murder and torture-murder.[2] (§§ 190.2, subd. (a)(17), (18).) The jury was unable to reach a penalty verdict, and the trial court declared a mistrial. At the second penalty phase trial, the jury returned a death verdict, and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Before trial, the trial court dismissed a prior-murder special-circumstance allegation because of insufficient evidence, and a burglary count because it was barred by the statute of limitations.

# I. FACTUAL BACKGROUND

## A. Guilt Phase

### 1. Prosecution Evidence

#### a. Murder of Marjorie Deeble

##### 1) The crime scene and condition of the victim's body

In the late afternoon of Thursday, May 15, 1986, Marjorie Deeble was found dead in her single story apartment on Green Street in Los Alamitos, California. The front screen door was closed but unlocked, and the wooden front door was open approximately four inches. There was no sign of forced entry. The screen from a window next to the door had been removed, and was leaning against the building.

Inside the home, loud music was playing in the southeast bedroom. Deeble was discovered in this bedroom. She was lying face-down on the floor between the bed and a dresser. She was wearing a long nightgown that had been pushed up around her waist and no panties. The bottom of the nightgown had been either cut or ripped. Her hands were tied behind her back with material from the nightgown, and with torn telephone cord.

Deeble's neck was in a noose made from a thin belt. The end of the belt was tied to the top drawer handle of the dresser, so that her neck was suspended about eight inches above the floor. The drawer was open about six to eight inches. Blood had run out of her left ear and mouth, and there was blood around her nose. There were two wounds on her neck, one underneath the belt and one just below. Her left leg was bent and leaning against the bed. Her right leg was fully extended and underneath the bed. Inside Deeble's thigh was a stain that could have been dried semen. She was barefoot, and her ankles bore marks that might have been ligature marks.

2

A cylindrical mousse can was found in a bed covering on top of the bed. A substance underneath the ridge around the top of the can appeared to be blood, and gave a positive response to a presumptive test for blood. A cap found on the ground next to Deeble appeared to be one that could fit the mousse can. A substance that appeared to be blood was observed just inside the opening of the cap "in a position that if the cap had been placed upon the mousse can, it might have transferred."

On the floor, a pillowcase, a dress, and a scarf were wrapped together with adhesive tape. The dress was bloodstained. The pillowcase was also bloodstained. It was tied to resemble a hood, and appeared to have been cut with pinking shears. More blood was inside the pillowcase than was on the outside.

A sheet was found on the floor. A strip approximately 66 inches long and 15 inches wide had been cut and torn from the left side of the sheet. The irregular cutting was possibly made by the use of pinking shears. A telephone cord and an electrical cord were found tied together either on the floor or on the bed.

The bedroom had been ransacked. Garments lay in the middle of the room, items were knocked over on the credenza, dresser drawers were open, and the contents of a purse were strewn on the floor. A telephone that appeared to have its cord ripped off was against the wall.

Dr. Robert Richards, a pathologist, performed Deeble's autopsy. Because Dr. Richards had retired by the time of trial, his partner, Dr. Richard Fukumoto, testified regarding the autopsy findings. In light of defendant's appellate claims that this testimony violated his confrontation clause rights (see *post*, at pt. II.B.2.), that the trial court erred in admitting evidence of the uncharged murder of Muriel Delbecq (see *post*, at pt. II.B.3.), that the evidence is insufficient to support the murder conviction on a theory of torture murder or burglary murder, and that the evidence is insufficient to support the jury's true findings on the torture-murder

3

and burglary-murder special-circumstance allegations (see *post*, at pts. II.B.4., II.B.5.), we recount the autopsy findings in detail.

Deeble had bruises in her vaginal area, primarily on the labia and vaginal vault. There was bruising and tearing just inside the opening to the vagina, and a tear and hemorrhaging in the area of the posterior fourchette, or the bottom of the opening to the vagina. On one microscopic slide, Dr. Richards had noted an "underlying submucosal hemorrhage." Dr. Fukumoto testified that the "lining of the vaginal wall is called the mucosa, so a submucosa means the area below that lining of the surface." A "submucosal hemorrhage" means that "there is bleeding beneath the surface lining of the mucus membrane." No tissue response was noted, which Dr. Fukumoto said meant that the injury to the vaginal area was probably less than eight hours old. Deeble's anus was dilated, and bruising and small mucosal lacerations were observed just inside the anus. Dr. Fukumoto opined that the dilation of the anus could have been caused by a finger, penis, or any number of other objects.

Dr. Fukumoto agreed with the prosecutor that the vaginal and rectal areas are "full of lots of nerve endings," and so trauma to those areas is "highly painful." He opined the injuries were caused by an object that did not have sharp edges, and that exhibit No. 16, the mousse can found in Deeble's bed, was consistent with an object that could have caused the injuries. From the microscopic examination, Dr. Fukumoto opined that the injuries to the vaginal and rectal areas were inflicted before death.[3]

---

[3] The prosecutor asked Dr. Fukumoto if "[f]rom the microscopic examination" he could determine whether the injuries to the vaginal and rectal area "were caused before or after death," and Dr. Fukumoto replied "Yes," and subsequently stated without elaboration his opinion that the injuries occurred before death. The "microscopic examination" presumably refers to Dr. Fukumoto's examination of "microscopic slides," which he defined as "slide preparations of tissues from

4

There was bleeding in the tissues near the tail of Deeble's pancreas. Dr. Fukumoto testified that the pancreas is an organ located deep within the body, and it requires a "tremendous amount of . . . localized" blunt force to the area to damage the pancreas. In the stomach area, Dr. Richards had observed food that was virtually untouched by digestion. Dr. Fukumoto opined that such a finding would indicate that Deeble died within an hour after eating.

Blood was coming out of Deeble's left ear, and there was extensive hemorrhaging in the middle ears which extended from the middle ear into the bone of the skull. The right ear drum was torn, and the left ear drum had a break that according to the autopsy report was "incisional." Dr. Fukumoto explained: "[A]n incision to a forensic pathologist . . . . is not a tear. It is something that is caused by a sharp instrument or an instrument that has a point." Dr. Fukumoto said that "if the ear drums are torn, associated with massive bleeding in the middle ears, this could be due to a massive increase in pressure as a result of the struggle of the victim in his or her attempt to get a breath." Dr. Fukumoto opined that an amount of pressure that would tear an ear drum, and the infliction of an incisional injury to an ear drum would, in each case, be extremely painful.

Dr. Richards's most prominent finding from the neck up was "marked engorgement" — which occurs when blood vessels are dilated and filled with blood — in the neck, upper neck, and face area. Dr. Fukumoto testified that strangling can have this effect, and when there is venous but not carotid compression, the face becomes red and eventually bluish or purplish as well as

---

*(footnote continued from previous page)*
various organs which the pathologist has taken . . . for pathologists to look at in case somebody has to review the case." In addition, the prosecutor asked Dr. Fukumoto about the "microscopic examination that Dr. Richards did as well that you yourself did . . . on the area of the vagina."

engorged.[4]  The whites of Deeble's eyes had conjunctival hemorrhages, or bleeding, and there was a marked swelling of the eyelids.  There were abraded lacerations in the left chin area.  There was a crescent in the bridge area of the nose that was consistent to Dr. Richards with "fracturing of the bridge."  Dr. Richards palpated Deeble's nose and believed that it was broken, but no fracture was visible to him on an x-ray.  Dr. Fukumoto reviewed x-rays of the nose and testified that one showed "somewhat flattening" that "may reflect fracturing at the bridge of [the] nose."  An internal examination revealed numerous pinpoint hemorrhages in the scalp and muscle tissue which were evidence of trauma, and subarachnoid hemorrhaging inside the skull.  Dr. Fukumoto opined that the injuries above the neck were the result of blunt force trauma, and that Deeble had suffered at least one significant blow to her face.  A substance that appeared to be the residue of adhesive tape was observed in an area extending from the mouth over to the lower left cheek.

An autopsy photograph showed a deep furrow created by the ligature around Deeble's neck.  Dr. Fukumoto opined that features of the furrow indicated that there was an "abrasive sideways movement" either by the victim in an attempt to loosen the ligature, or by the perpetrator as he moved the ligature back and forth, and that the ligature and struggling against it would be extremely painful.

Dr. Fukumoto stated that when one is strangled, it takes five to six minutes for the brain to die, and the individual may lose consciousness well before then; in an extreme ligature or manual strangulation, loss of consciousness can occur in

---

[4] Dr. Fukumoto testified that engorgement differs from swelling, which is when there is fluid outside the blood vessels that makes tissue swell up, and has nothing to do with the presence of blood inside the blood vessels.  Swelling indicates that trauma has been inflicted, especially if it is associated with hemorrhaging.

less than a minute.  He opined that the cause of death was "asphyxiation due to ligature strangulation."  This opinion was consistent with that of Dr. Richards.

### 2) Circumstances surrounding the Deeble murder

Deeble was a real estate agent, and Rebecca Brown was the manager of the office at which Deeble worked.  On Monday May 12, 1986, Deeble mentioned to Brown that she was leaving for an appointment scheduled for about 5:00 p.m.  Brown understood that Deeble never arrived at the appointment, and she never saw Deeble alive again.  Deeble did not contact Brown on May 13, 14, or 15, which was highly unusual because Deeble was a top agent and the most active agent in the office.  Brown recalled that during this time period the real estate market was "[h]ot, hot."

Kathryn Deeble Valentine, Deeble's daughter, testified she met defendant in about March 1986.  They began dating shortly thereafter.[5]  For about two months before her mother's death, Valentine saw defendant every evening, but only witnessed him drinking once, and once saw him inject cocaine.  She never saw him passed out or "blacked out" on alcohol or drugs.

Valentine saw her mother for the last time on the morning of Monday May 12, 1986, between 7:00 and 7:30 a.m.  Valentine called Deeble several times between Monday and Thursday of that week and left messages on her answering machine, but never spoke with her.

In May 1986 Valentine owned a pickup truck to which only she and defendant had keys.  In early May 1986, defendant borrowed the truck for the weekend, and when the time came to return it, said it was not drivable.  Deeble became upset, and arranged for defendant to take the truck in for repair.

---

[5] At the time she was dating defendant, Deeble's daughter shared her last name. At the time of trial, Deeble's daughter's last name was Valentine.

7

Deeble would at times leave an apartment key out in a drain pipe in front of the apartment. Defendant knew the key was there. Valentine also told defendant that one could access the apartment through a screen window. Defendant had been inside Deeble's home on at least two occasions, once when Valentine introduced defendant to her mother (the only time they met), and once with Valentine while Deeble was away.

When Valentine met defendant, his leg was in a cast. During the week of May 11, 1986, his leg was no longer in a cast, and he could run with a limp, and "move fast if he needed to."

Valentine generally parked her truck in her driveway, positioning the truck so that it was either before or beyond some juniper bushes so that she could avoid standing in the bushes when entering or exiting the vehicle. On the night of May 12, 1986, Valentine parked the truck before the juniper bushes. The following morning, she had to stand in the juniper bushes to enter her truck, indicating that someone had moved the truck. Valentine had not given defendant permission to use the truck the night before.

Valentine and defendant continued to date for about a week after Deeble's body was discovered. Valentine asked defendant to attend Deeble's funeral, but he declined.

Valentine identified — by looking at photographs of Deeble while she was alive — certain jewelry that Deeble owned but that Valentine never saw again after Deeble's death.

### b. *Murder of Muriel Delbecq*

The prosecutor relied on the other crimes evidence of Muriel Delbecq's 1993 murder to demonstrate the identity, common design or plan, and intent of the killer of Marjorie Deeble.

8

On the evening of January 25, 1993, Peggy Ventura dropped off her 67-year-old mother, Muriel Delbecq, at Delbecq's first floor condominium on Kanoe Street in Kihei, Maui, Hawaii. The following morning, about 7:30 a.m., Ventura knocked at Delbecq's door and received no response. The front door was closed and locked, and Ventura used a key to enter. She observed blood on the carpet, and the living room telephone was missing. Delbecq's bedroom door was closed and locked. Ventura ran outside, alerted neighbors to call 911, and entered her mother's bedroom through a window. There was a comforter over the window, making the bedroom "pitch black." The light switch did not work, and Ventura opened the bedroom door to let in light.

Ventura discovered Delbecq on the bed under a pile of blankets. She was lying on her back, completely nude. Responding officers testified that Delbecq's legs were spread, and her hands and feet were not bound. Defendant's palm prints were found on the wall, and his bloody right footprint was found on a white T-shirt. Delbecq's bedroom was ransacked, and the carpet appeared soaked with blood. Cigarette butts were found on the floor of the bedroom and in the bathroom.

Ventura testified that Delbecq always wore her wedding ring. Maui County Police Lieutenant Lenie Lawrence, who examined Delbecq at the murder scene, did not observe any jewelry on Delbecq, but did see a white mark around her left ring finger indicating a ring had been there.

After being locked out in December 1992, Delbecq told Ventura she was going to hide a key under a rock outside her condominium. Ventura testified, apparently based on a photograph, that a window screen in the living room was

9

bowed, and more damaged than she recalled.**6** A responding officer testified that a corner of the window screen in the living room was slightly bent; it appeared the screen had been taken out and put back improperly. Pieces of dried grass were on the window sill and on the floor under the window sill.

In a dumpster near Delbecq's residence, police found a bloody pillowcase with a pattern that was consistent with Delbecq's bedding. In the pillowcase, police found a variety of items, including a check for an account held by Muriel Delbecq and Peggy Ventura, traveler's checks, two telephones Ventura identified as being her mother's, two pieces of telephone cord tied together, cut clothing, a flashlight, a wine bottle, two beer cans, a Seattle Seahawks game schedule, a golf tag, golf tees, dishwashing liquid, stain remover, shampoo, lotion, disposable razors, and scissors.

Ventura testified that Delbecq, wearing her swimsuit, walked to the beach about four blocks away nearly every morning. Lieutenant Lawrence searched defendant's apartment several days after the murder. He found binoculars on a small table located directly beneath a bedroom window that faced Delbecq's residence. Using the binoculars, he could clearly see what type of vehicle was entering and leaving the parking lot of Delbecq's building.

Dr. Alvin Omori, who conducted the autopsy on Delbecq, testified that her head and right ear were bruised. There was bruising to the scalp caused by blunt trauma. Her nose was fractured. There were bruises to her lips, and tears to the inner portion of her lips, indicating force or pressure was placed over the mouth area. Her neck was bruised, and her hyoid bone, or the bone located right above

---

**6** Ventura testified that before "we realized how the screens go in" and how to remove them, "we had used a knife to kind of pry open the side and lift them out . . . so there was one corner [where] . . . you could see . . . . it was kind of bent."

10

the voice box, was broken.  The skin over the voice box had an "incised type of abrasion," caused by a sharpened or pointed object being scraped horizontally across the skin.  Similar abrasions appeared on the lower portion of the left neck, the left anterior chest about the breast, and the breast area, including the nipples of both breasts.  Both breasts were bruised.  There was a puncture wound on the left lower chest.  Ligature marks on her wrists and ankles indicated she had been bound.

The genital area had a pattern of abrasions or scraping of the skin consistent with fingernail marks.  The entrance to the vaginal cavity was bruised, and there were internal injuries to both the vaginal and rectal areas.  There were two perforations in the vaginal cavity.  The first perforation extended into the rectal cavity.  The second perforation was to the right upper portion of the vaginal cavity, and extended into the abdominal cavity.  This perforation was caused by a mousse can that was found protruding into the abdominal cavity.  The rectum was torn, and the bowel was perforated "into the abdominal cavity."  There was visible bleeding in both the vaginal and rectal orifices, and approximately 100 cc's, or three and one-third ounces, of blood was in the perforated area of the rectum and the vaginal cavity.  The injuries to the rectal and vaginal area appeared to have been inflicted before Delbecq's death.

The most probable cause of death was "asphyxia or lack of oxygen due to strangulation and/or suffocation."  The injuries to the vaginal area as well as the rectal tear were a contributing factor, but were not life threatening by themselves at the time she was asphyxiated.

11

## 2. *Defense Evidence*

### a. *Testimony of defendant and defendant's family and friends*

Laura McFarland, defendant's mother, testified that she married William Edwards, Sr., in July 1959. Defendant was born in 1961, and had an older brother William, and a younger sister Elena. The family lived primarily in Florida until defendant was about nine years old. They then moved to Puerto Rico for about 11 months. Laura left defendant's father in July 1974, and she and the children returned to California. The couple divorced in 1975, and Laura remarried in about 1984. Defendant's father died in December 1992.

William, Sr., suspected that defendant was not his child. He first hit defendant when defendant was about six months old. When defendant was a child, his father hit or beat him almost daily. He nicknamed defendant and his brother "SFB-1" and "SFB-2," which stood for "shit for brains one and two." William, Sr., was also violent towards Laura.

When defendant was born, his father worked as a bartender and had an alcohol problem. Laura, who was a registered nurse, also had an alcohol problem, and in 1972 received a prescription for Valium. She continued to use prescription Valium off and on until about the late 1970's. When defendant was about 11, Laura was run over by a car while she was intoxicated.

Laura first saw defendant under the influence of drugs when he was 14 years old, in February 1975. Defendant continued using drugs and alcohol. He performed poorly in school, and he and his brother committed burglaries to support their habit.

Laura saw defendant's brother William drunk for the first time when he was 14 years of age. Many years later, defendant's sister Elena began to have problems with drugs and alcohol. Defendant's paternal grandmother was addicted to Ativan, and Laura's mother was addicted to prescription drugs such as Valium

12

and Percodan.  All four of Laura's siblings had problems with alcohol, and one of her sisters was also addicted to Valium.

Defendant testified.  He was born in 1961 in Long Beach, California, and was 35 years old at the time of trial.  He dropped out of school when he was in the eighth grade, and earned money doing day labor and odd jobs.  When defendant was in his late teens and early 20's, he and his brother William made money by selling what appeared to be paper LSD, but was actually nothing but paper with a design on it.  Defendant testified, "it was a safe way to make money without committing a crime."

Defendant recalled drinking a small amount of beer when he was about eight or nine years old and enjoying the effect of the alcohol.  Defendant had other experiences with alcohol after that.  Defendant moved back to California from Puerto Rico when he was 12 or 13.  His alcohol use "increased drastically" and he "drank continuously."  He started smoking cigarettes when he was 12 years old, continued to smoke through the mid-1980's, and had only recently quit at the time of trial.

Defendant's first experience with drugs was using marijuana when he was 11 or 12 years old.  He tried hashish and cannabinol when he was about 12 years old.  He then tried LSD, cocaine, peyote, methamphetamine, amphetamines, barbiturates, and heroin.  When defendant was about 14 years old, he began injecting drugs.  His drug and alcohol use increased throughout his teenage years.

Defendant frequently used a technique called "jacking off" when injecting drugs.  After injecting the drug, he would draw blood into the syringe, and then reinject it into his arm.  He also used a technique called "shooting water," which involved attempting to collect and use any residue of a drug that might be left in a bag.  When he was about 18, he injected an unknown drug, and "thought [he] was going to die."

13

Defendant experienced his first alcoholic blackout when he was about 16 years old. Defendant described various situations in which he had blacked out, such as being with friends and making plans to go somewhere, and suddenly finding himself walking apparently alone on the street in Long Beach at 5:00 a.m. and not knowing how he got there. On another occasion he found himself under a kitchen table in an unfamiliar residence. There was never a time when defendant became aware of his surroundings after blacking out and he never had reason to suspect he had been involved in a violent crime.

In December 1985, defendant was involved in a motorcycle accident, and had surgery on his right leg. As a result, his leg was in a cast. In the spring of 1986, defendant met Kathryn Valentine while he was selling fake LSD at a Long Beach bus stop. Valentine drove by in her pickup truck, saw defendant had a cast, and offered him a ride. The two began dating shortly thereafter. Valentine gave defendant a key to her truck, and told him that there was a spare key in a magnetic box hidden on the truck.

Valentine introduced defendant to her mother, Marjorie Deeble, at Deeble's house. He also saw Deeble when he helped her and Valentine load Deeble's car for a weekend trip to Palm Springs. Both meetings were cordial. Defendant borrowed Valentine's truck while she and her mother were in Palm Springs, and the generator died. When Valentine and Deeble returned from Palm Springs, defendant and Deeble discussed on the telephone what had happened to the truck, and Deeble told defendant to take it to the dealership for repair. During this conversation, Deeble did not raise her voice, and was firm and assertive, but not angry. Defendant was not bothered by the incident, nor did he have any ill will or hostile feelings toward Deeble or Valentine because of it. Defendant subsequently received a blank check from Deeble for the repair, and took the truck to the dealership.

14

Defendant and Valentine once went to Deeble's residence when she was not home. He and Valentine were intimate. Defendant was not aware of a key hidden outside Deeble's residence, and never had possession of a key to her home.

Defendant continued to use drugs and alcohol during the time he dated Valentine. Valentine did not know anything about drugs, and at her request, defendant once let her watch him inject cocaine.

When defendant learned of Deeble's death, he and Valentine were visiting his aunt and uncle. Valentine was told she had to go to the Los Alamitos Police Department because something had happened to her mother. Valentine and defendant drove to the police station. Defendant waited in the lobby, and after a few minutes he heard Valentine crying. Valentine and defendant continued to date for a "couple of weeks" after Deeble's death. They then "drifted apart," but remained on good terms. Defendant refused police requests for blood, urine, and hair samples.

Defendant denied killing Marjorie Deeble. In May of 1986, defendant had little mobility, could bend his right knee only a small amount, could not put his full weight on his leg, and could not run. On the night of May 12, 1986, defendant and his brother sold fake LSD outside a Judas Priest concert in Los Angeles. They left for the concert about 4:00 p.m., and returned home between 11:00 and 11:30 p.m. He drank alcohol throughout the concert. They then obtained drugs, and defendant went home to inject cocaine and heroin and to drink. At no time that week, including May 12, did defendant go to Deeble's residence.

Defendant testified he had been convicted of murder and burglary in Hawaii in 1994. He was also convicted of second degree burglary in California in 1984.

Janice Hunt testified that she dated defendant in Hawaii. Around December 1992, defendant moved in with Hunt and her 12-year-old daughter. That same month, defendant's father was killed in an airplane crash. Defendant's demeanor

15

changed, and he became quiet and depressed. He drank more heavily than before. At times, defendant became so intoxicated he had alcoholic blackouts. Hunt described two incidents, one when defendant left in his work truck at night, and the next morning she and defendant searched for the truck, and another when he apparently left a bag of groceries outside all night. She did not believe he was using drugs during the time he was living with her.

Hunt kept binoculars in her bedroom so that she could watch whales. She had a partial ocean view from her bedroom window. Hunt had difficulty focusing the binoculars, and never saw defendant look through or touch them.

On the evening of January 25, 1993, the night Delbecq was murdered, Hunt was at home with her daughter and defendant. Between 8:00 and 8:30 p.m., an acquaintance informed defendant that his dog had been killed. Defendant found the dog on the road, held it, and sobbed. They buried the dog at sea. Hunt returned home, and when she went to bed between 11:00 and 11:30 p.m., defendant was not yet home. Defendant returned home before morning. The next day Hunt learned of a murder that had occurred nearby and informed defendant; he seemed surprised.

David Long testified that he knew defendant for about a year before January 1993. He observed defendant ingest drugs and alcohol nearly every time he saw him. On the night of January 25, 1993, sometime between 8:30 and 11:00 p.m., defendant came to Long's apartment, talked about his dog, and injected half a gram to a gram of cocaine. When defendant left, he was more intoxicated with drugs and alcohol than Long had ever seen him.

Carl Stevens knew defendant in junior high school in Long Beach. He saw defendant outside of school approximately 10 to 25 times, and on each occasion defendant was drinking alcohol or using drugs. Stevens had had no contact with defendant for the last 13 years.

16

Vincent Portillo, defendant's cousin, lived in Maui for a month in 1991-1992. One night he, defendant, and defendant's girlfriend Brenda drank heavily. They got into a vehicle with defendant driving and Brenda in the passenger seat. Brenda and defendant argued, and Brenda hit defendant several times. Defendant did not hit her back, but blocked her hits to maintain control of the vehicle. The following day, defendant did not appear to be upset with Brenda over her behavior the night before.

### b.   *Testimony of other witnesses*

Orange County Sheriff supervising forensic specialist Sharon Krenz testified that on May 15, 1986, she observed baggies of pills on the dresser and the floor of Deeble's bedroom. She entered a different room and observed a TV Guide that was open to Monday May 12. She also observed pinking shears on the floor of the bathroom. She did not observe any cigarette butts in the apartment. None of the fingerprints lifted from Deeble's apartment matched defendant's.

Richard Brown, a criminalist with the Orange County Sheriff's Office crime lab, testified that comparison of defendant's pubic hair to pubic hair found at the crime scene eliminated defendant as a source of the crime scene hair. Brown was unable to compare the crime scene hair to that of seven men other than defendant because the hair standards submitted for those individuals contained too few hairs to make a comparison. He sent a report to the Los Alamitos Police Department stating that the hair standards were inadequate. He was never provided with adequate hair samples.

Sergeant James Jessen of the Los Alamitos Police Department testified that he was the lead investigator of Deeble's murder. He interviewed Deeble's daughter Kathryn Valentine on May 15, 1986. Valentine told Jessen that on Monday night (presumably Monday May 12, 1986), her brother had borrowed her

17

truck for a short period of time. Valentine also told Jessen that she kept a spare key in a magnetic lock box on the vehicle. Although Jessen had looked inside Valentine's truck, to his knowledge the truck had never been searched, nor had he requested it be photographed or processed for fingerprints or trace evidence. The parties stipulated that Sergeant Jessen's report did not state that Valentine had told him she had "shown [defendant] a hidden key, he knew where one was" at her mother's residence. When Jessen met with defendant on May 20, 1986, he observed defendant walked with a noticeable limp and appeared to have difficulty standing on his right leg for a long period of time. There was no indication in Jessen's report that he asked defendant for permission to search his living quarters.

On approximately October 21, 1987, Sergeant Jessen spoke with Maggie Black of the Orange County Sheriff's Office crime lab regarding elimination prints. Black was dissatisfied with the quality of the prints taken of five individuals other than defendant and said they would have to be redone.

Gloria Dangerfield, an employee of the facility manager for the Los Angeles Sports Arena and Coliseum, testified that on May 12, 1986, Judas Priest performed at a concert at the sports arena between about 8:00 and 11:00 p.m.

Paul Roy dated Deeble at some point after August 1985.[7] On May 12 or 13, 1986, Roy called Deeble at her home at 8:20 p.m. One or two days later, Roy went to Deeble's apartment and knocked on her door. When no one answered, he placed a greeting card for Deeble between the screen door and the closed wooden door. He did not recall a window screen leaning up against the wall of the house.

---

[7] Roy was a reluctant witness, and the parties agreed that Sergeant Jessen and Robert Courtney, the senior investigator for the Orange County Public Defender's Office, could testify as to his statements.

Alden Olson testified that he dated Marjorie Deeble during the eight weeks before her death.  He saw her do her laundry, including her sheets, three or four times.  Deeble always locked the doors to her apartment — including her front screen door — before going to bed.

Leonard Hirsch, who dated Deeble on a regular basis from about 1980 to 1983, and less frequently after that, testified that Deeble's sheets were generally fresh and clean.  She also vacuumed once a week, and often more than once a week.

Vivian Camp, who sold Avon products, went to Deeble's home on Thursday May 15, 1986 between 11:00 and 11:15 a.m.  The door to Deeble's residence was open about a foot, and Camp could see inside the residence.  She did not notice a screen off of the window that was facing the walkway.

### c.   *Expert testimony*

Defense expert Dr. Paul Wolf, a clinical professor of pathology, and a trauma and transplant pathologist at the University of California Medical Center in San Diego, and director of autopsy at the Veteran's Administration Medical Center in La Jolla, testified as an expert on pathology.  He had reviewed Deeble's autopsy report.  According to the report, Deeble had hemorrhaged from both ears. Dr. Wolf stated this is a common finding after ligature strangulation because the blood vessels in the ears are engorged, and the ear drums are perforated and bleed. There can also be tears in the middle ear that are either sharp or jagged. Strangulation, which causes asphyxia, creates pressure on the veins so great that small blood vessels in the nose, mouth, and ears will rupture.  Because Dr. Richards, the pathologist who performed Deeble's autopsy, had not taken any microscopic sections of the ears, there was no way to ascertain whether the damage to the right eardrum was caused by a sharp object or by the increased

19

pressure that followed the ligature strangulation. Moreover, "incisional" was not a term of art, and its use in an autopsy report did not ineluctably mean that the damage had been caused by a sharp object.

Dr. Wolf further testified that when an individual is strangled, he or she can lose consciousness within 15 to 30 seconds, and it takes about four minutes of lack of oxygen for the heart and "respiratory center" to die. Dr. Wolf agreed with Dr. Fukumoto that an incision, which Dr. Richards did not perform, "would have been the best procedure to confirm or disprove that there was a fracture" of the nose. He also agreed that the possible fracture was more likely from a blow rather than a fall. A blow to the head of sufficient force to break a nose could cause immediate unconsciousness. A person unconscious from either strangulation or a blow would not feel pain. Ligature strangulation and bleeding from the ears as a result of ligature strangulation were not necessarily consistent with extreme or prolonged pain. Nor were the ligature marks on Deeble's ankles consistent with extreme or prolonged pain.

Dr. Wolf stated that a "laceration" and a "hemorrhage" can be microscopic in size. He described the injuries to Deeble's vagina and rectum as microscopic and "[e]xtremely minor." He opined they could have been caused by a finger or a penis. Deeble was menopausal, and Dr. Wolf opined that was the reason the vaginal mucosa (or lining of the vaginal wall) was so thin. When the mucosa is thin, any kind of manipulation by a finger, penis, or other foreign object is more likely to cause microscopic lacerations. Although Dr. Richards reported lacerations and tears, he did not measure them. Dr. Wolf noted that there are "ruga folds" in the vagina that can be mistaken for a laceration, and that the only slide from the vagina showed "a very minor removal of a mucosa." Dr. Richards had reported submucosal hemorrhage (or bleeding beneath the surface of the lining of the vaginal wall) in the vagina, and Dr. Wolf confirmed this in his

20

examination of a slide of a vaginal tissue section. It was "such a small amount that it wouldn't be too visible," and Dr. Richards did not report seeing any blood in the vagina. For a criminalist to see a visible substance all the way around the top of a can that he thought might be blood was inconsistent with the microscopic quantity of blood that was reported in the vagina. Moreover, because no blood was observed in the rectum, there was not enough blood to go around the edge of a cap area.

Dr. Alex Stalcup testified as a specialist in addiction medicine. He did not interview defendant and had not diagnosed him, although he had interviewed members of defendant's family.[8] He had also received a record of defendant's contacts with police, and transcripts of interviews with family members and individuals familiar with defendant's drug use in the 1980's. He was not given any information about the Deeble and Delbecq murders.

Dr. Stalcup testified that alcoholism and drug addiction are illnesses. Signs of the disease of addiction include inability to control intake of the drug or alcohol and continued drug or alcohol use despite adverse consequences. He opined that predisposition based on genetics or child abuse, early drug experiences and the circumstances of the first experience, and whether the individual is in an enabling environment in which drugs are easily available, widely used, and not discouraged, are factors that contribute to certain individuals becoming addicts while others do not. Genetics were the most, and child abuse was the second most, prevalent risk factor for addiction or alcoholism. Considering defendant's hypothetical risk factors of genetic background, horrific childhood abuse, lack of

---

[8] The jury was instructed that Dr. Stalcup's testimony regarding statements by individuals such as defendant's family members was not admissible to prove the facts in the statements, but was admitted only to provide the basis for his opinion.

supervision, and an environment in which drugs were available, Dr. Stalcup opined: "I frankly don't see how he escaped being an addict. This fellow didn't have a chance."

Dr. Stalcup testified that one study indicated that individuals with a history on both sides of the family of alcoholism or drug addiction had half of the normal amount of endorphin. This meant "they are very different in their ability to feel normal. . . . Pleasure is hard to get. . . For them pleasure is b[l]unted." "[T]he term for the way they feel is called chronic dysphoria. Dysphoria is the opposite of euphoria. . . . A lot of these kids from a very young age feel off." "Once these kids discover alcohol and drugs, unless there is early intervention, it is all over. Because they feel pleasure, they feel satisfaction, they feel normal for the first time in their life." "[N]ow for the first time [they] don't feel dysphoria."

When drugs such as amphetamines are injected, they reach the brain instantly, and "there is such an explosive release [of] dopamine and endorphin that it damages the pleasure centers. It literally damages or overwhelms the part of the brain responsible for feeling normal pleasure. . . . [I]ndividuals who use drugs . . . will progressively injure their ability to feel normal pleasure." This explained why many individuals do not stay sober, and instead relapse.

Dr. Stalcup found use of alcohol and drugs at a young age significant. He also found it significant that defendant did not have a drug of choice, and that once he was exposed to alcohol and drugs, he immediately lost control. "[H]e is telling us that something was wrong with sobriety. Something was wrong with how he felt." Dr. Stalcup also noted that injecting drugs by the age of 13 or 14 was "quite unusual," and "indicative of extremely rapid progression of addiction." He said: "What I interpret when I hear these stories is . . . that something is really wrong with this kid. Something is really intolerable for him or her. That something is either happening in their home or as we mentioned earlier, they are chronically

22

dysphoric. They feel really bad." Based on these factors, Dr. Stalcup opined that defendant would fall in the 1 or 2 percent of the most severely affected drug addicts. Dr. Stalcup agreed with the prosecutor that he was "not saying that a person who is addicted to drugs or alcohol [was] not responsible for the violent crimes they commit."

Dr. Stalcup testified that anyone who drinks can have an alcoholic blackout. Such an individual has had enough alcohol that an average person can tell he or she is intoxicated because of slurred speech and unsteadiness on his or her feet. An individual who uses alcohol with cocaine is "far, far, far more likely to go into an alcoholic blackout." Sixteen is an early age for an individual to experience his first alcoholic blackout.

### 3. Rebuttal Evidence

Sergeant Jessen agreed with the prosecutor that he began to focus on defendant to the exclusion of individuals mentioned by the defense because defendant refused to supply the police with hair, saliva, and blood samples, and because in his mind, based on information he had received from laboratory personnel, the individuals who had provided inadequate hair and fingerprint samples were eliminated as donors of semen and fluids at the crime scene. It was not until Jessen learned of a 1993 murder in Hawaii that he felt he had enough evidence to arrest defendant.

## B. Second Penalty Phase[9]

### 1. Prosecution evidence

At the penalty retrial, the prosecution introduced much of the evidence from the guilt phase. The prosecution also introduced evidence that defendant had

---

[9] As noted above, defendant's first penalty trial ended in a hung jury and mistrial.

suffered murder and sexual assault convictions in Hawaii and a burglary conviction in California.

N.T., a former girlfriend of defendant's, testified that she met defendant on Maui. One night in 1990, after their romantic relationship had ended, defendant, who sounded drunk, called N.T. and asked to come over. N.T. said no. She later awoke to find defendant trying to insert a bottle into her vaginal and rectal areas. She ordered defendant out of the house.

Orange County Sheriff's Deputy Timothy Martin testified that on July 8, 1997, in the Orange County Men's Central Jail, he observed defendant sharpen a shank and hand it to another inmate.

Kathryn Valentine testified regarding the friendship with her mother that she had lost when Deeble was murdered, and the guilt she felt for bringing defendant into her family. She also testified regarding several family photographs. Lorraine Johnston, Deeble's sister, testified that she was eight years older than Deeble, and like a mother to Deeble when she was an infant. They were close as adults, spoke often on the telephone, and visited each other. Because of Deeble's murder, Johnston had been physically ill, had been through counseling, and had seen a trauma therapist.

### 2. *Defense evidence*

Fifty witnesses, including defendant, testified for the defense or their testimony was read into the record. Much of the evidence from the defense portion of the guilt phase was introduced.

#### a. *Testimony of defendant and other character witnesses*

Defendant testified that in 1983, he was convicted of second degree burglary in Los Angeles County after breaking into a vehicle. Around November 1988, he was convicted of taking or driving an automobile without the consent of the

24

owner. In 1993, he was convicted of the second degree murder and sexual assault of Muriel Delbecq in Hawaii, and was currently serving five consecutive life sentences in that case. He had never been sentenced for a violent act before his Hawaii sentence. In about September 1996, defendant was written up for heroin use in the Orange County jail.

At times, defendant feared for his life at the jail. The "worst time" was the summer of 1997 when racial tensions were exacerbated. Defendant saw an individual who had received medical treatment after his face was slashed. After that incident, defendant tried to make the shank described by Deputy Martin. Defendant reasoned that if an aggressor knew he was armed, he would be less likely to attack defendant. He did not plan to be an aggressor and assault anyone with the weapon. In defendant's approximately nine years of incarceration, he had never been written up for weapon possession before.

Defendant's father was a pilot in the Army, and served two tours of duty in Vietnam. Defendant moved frequently as a child – living in California, Florida, Georgia, and Puerto Rico – because of his father's work. When defendant was young, his father would strike him with his fist. He once knocked defendant out of his chair and drew blood because defendant had missed a number while counting. Defendant's father drank heavily, and became increasingly abusive as he drank more.

Defendant first got drunk when he was about eight years old. Defendant's parents separated when he was about 11 or 12 while the family was living in Puerto Rico. Defendant, his mother, and his siblings returned to Long Beach, where they had close relatives. Defendant's mother worked and attended night school. Defendant began to skip school, and dropped out of school in the eighth grade. He abused alcohol and drugs.

After his parents' separation, defendant had no contact with his father for several years. In about the summer of 1992, the two began communicating. In December 1992, defendant's father sent him a Christmas card, and signed it "Love, Dad," something he had not done for years. Defendant's father died on December 19, 1992, in a plane crash. Defendant subsequently suffered bouts of depression.

Defendant had experienced alcoholic blackouts, and described some of those experiences. At the time of Deeble's death, defendant was heavily abusing drugs and alcohol. Defendant was not in an alcoholic blackout when he committed burglary in 1983, or when he made the shank.

In about November 1989, defendant moved to Maui, Hawaii to be with his sister Elena and to stop his drug abuse. He attended Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings, remained drug and alcohol free for seven or eight months, and worked for a roofing company. He then began to use drugs again and became homeless.

Defendant's son, Robert Mark Edwards, Jr. ("Robbie"), was born on January 23, 1985. Defendant described his efforts since 1985 to visit with his son and to communicate with him by telephone and letters. Defendant had counseled his son to refrain from using drugs, and was proud that his son had refused offers to try them. Robbie had also sought his father's advice in other matters, and shared his achievements with his father. Defendant did not want Robbie to testify on his behalf in part because he did not want him to feel "maybe he said the wrong thing or something like that."

Defendant enjoyed reading while incarcerated, including books on parenting and spirituality. He had also written several short stories for Robbie. While incarcerated in Hawaii, he had attended GED classes and assisted other inmates with their schoolwork. Defendant also enjoyed art, and some of his work was

26

shown to the jury. He had participated in NA and AA meetings while in custody, and encouraged others who were not in custody to stay sober. Defendant could not guarantee that he would not be under the influence of drugs or alcohol while in prison, but said, "My sobriety I take one day at a time."

Defendant testified that he now believed he had killed Deeble and Delbecq, although he had no recollection of their murders. Defendant felt "horrible," fasted, meditated, and prayed on the dates of the murders, and "always pray[ed] for the families."

Laura McFarland, defendant's mother, testified to many of the details in her guilt phase testimony. In addition, she testified she married defendant's father, William Edwards, Sr., when she was 19 years old and had known him three months. At the time, Edwards was in the Marines. When defendant was born Edwards was a bartender and did not live at home. When defendant was about one, Edwards joined the Army. Edwards was gone nearly all of the time from defendant's birth until he was about 3 and a half years old.

After Edwards returned from being stationed abroad, his family joined him while he attended officers' candidate school in Georgia. Edwards was cruel to defendant, who was about four, and struck him at least once or twice a week. McFarland did not protect him from this abuse. Once, when defendant had a bowel movement during a bath, Edwards called him a "filthy little boy," and made defendant pick up the stool and rub it over defendant's chest. Defendant began to have night terrors. He said a puppet was trying to attack him, and described the puppet as wearing a sport coat similar to one his father had. Defendant had a G.I. Joe doll, and would leave it in the street and wait for cars to run over it. In December 1966, when defendant was about five and a half, Edwards left for Vietnam.

27

When defendant was six, after his father returned from his first tour of duty in Vietnam, defendant regressed in his development. He would have bowel movements in his pants, and if Edwards became aware of it, he would whip defendant, and make him wash out his shorts in the bathtub. If Edwards disapproved of a child's manners at the table, he would stab his or her hand with a fork. Once, when defendant was about 10 and had braces, Edwards punched him in the mouth, causing defendant's mouth to bleed and swell. Defendant frequently observed his father physically abusing McFarland. McFarland never observed Edwards praise defendant for anything he had done, or be nurturing in any way.

Edwards was unfaithful, and would drive by the house with a girlfriend and wave to his children. He once introduced defendant's little sister Elena to a woman he said was going to be her next mother.

After McFarland and Edwards divorced, Edwards told his children, "[N]ow you're out of my life and I've never been so happy. Don't bother me." After McFarland left Edwards, she took defendant to a psychiatric clinic in Long Beach "off and on" for a "long time." At one point defendant went to live with his father. Edwards was dissatisfied with everything defendant did, and sent him back to live with his mother. Defendant continued to try to establish a relationship with his father until his father died, and was "[a]bsolutely devastated" by his death.

McFarland described several incidents in which defendant had been kind to individuals less fortunate than himself, and to stray animals.

McFarland testified that for some period of time she received substantial child support. When Edwards married his second wife, he reduced McFarland's child support so that she could no longer afford to stay at home, and she began to work for a construction company. McFarland later married her current husband, Jack McFarland, who assisted her in attending nursing school.

28

At the time of trial, McFarland had cared for defendant's son, Robbie, for about four years. Once defendant was returned to California, he saw his son nearly every week, spoke to him on the telephone, and corresponded with him. Defendant took an active role in helping Robbie make decisions about his life, and was nurturing, loving, and very proud of his son.

McFarland testified that if defendant were to be given a sentence of life imprisonment without the possibility of parole, his life would have value to her. She begged the jury to spare her son's life.

Elena Edwards, defendant's sister, testified that their father was "very scary," and would hit her brothers and was often verbally abusive to them. Their father struck defendant about five times more than he struck defendant's brother. In Elena's opinion, their father's behavior "broke [defendant's] being before his being was established."

Elena had once been a substance abuser, but at the time of trial had been clean and sober for eight years. She found a new way of life at NA in Hawaii, and encouraged defendant to move there. Defendant did so, and began attending NA and AA meetings. After defendant was arrested in Hawaii, Elena visited him in jail every weekend. During one visit, defendant looked down and told Elena, "[I]f I did do this, I don't ever want to get out." Elena and defendant were still close at the time of trial.

Ana Guthridge, defendant's aunt, knew defendant as a child. Defendant was a sweet little boy, very quiet and gentle, who was often overlooked because he was well-behaved.

Scott Deeble, Marjorie Deeble's son, testified that at the time of his mother's death, he was a pilot in the Marine Corps. His mother's death was a huge loss. Deeble felt compassion for defendant, and said that in the nearly 12 years since his

mother's death, he had learned, "I cannot appreciate the ecstasy of my joy if I do not embrace the depth of my grief. I have learned the big lesson in forgiveness."

Bridget Briggs testified she was a childhood friend of defendant's sister Elena, and met defendant when she was about 11 years old and defendant was about 18 years old. When defendant arrived at the Orange County jail in 1994, he told Briggs that he "didn't remember doing any of the things that they were saying that he did. But if he did, . . . he should be punished accordingly."

Linda Lauer testified that she met defendant in late 1989 or early 1990 while she was working on a research project for the Hawaii Department of Health. Lauer was a community health outreach worker trying to prevent the spread of AIDS by educating and assessing intravenous drug users and their sexual partners. Getting intravenous drug users to answer a lengthy questionnaire was difficult because "of the nature of I.V. drug users and the illegal things they do." Defendant was the first person to agree to be interviewed. Lauer interviewed defendant at his apartment one evening, and did not feel threatened or vulnerable. Defendant appeared to be clean and sober, and responded thoughtfully to deeply personal questions. He then encouraged others to participate, and "it opened up the project for us on Maui."

Craig Furtado, a roofing contractor on Maui, met defendant when Furtado lost his briefcase containing valuables at an airport on Maui. Defendant found the briefcase, and called Furtado to return it to him. When the two met, nothing was missing from the briefcase, and defendant refused a reward. Furtado subsequently hired defendant in his business for about five months. Defendant worked hard, was prompt and honest, and got along with everyone. Despite his two murder convictions, Furtado would hire defendant again if he had the opportunity.

Geraldine Jakeway testified she met defendant on Maui in about 1992. Jakeway was in a wheelchair, and often swam at the beach. On one occasion,

when no lifeguards were present to carry her into the water, she asked a group of individuals if anyone could assist her. Defendant immediately volunteered, and also assisted Jakeway out of the water when she was done swimming. Jakeway saw defendant on other occasions at the beach when he again assisted her in and out of the water.

William Farmer testified he met defendant in 1989 on Maui at an NA dance. They immediately became friends, and Farmer hired defendant to perform construction. Defendant was a religious person, and a loyal and hard worker. For six to 12 months in 1992, defendant lived in Farmer's home. Farmer asked defendant to leave one night when he came home drunk, which was against the house rules. Defendant did not appear to be the same person, and Farmer felt threatened. The following morning, defendant returned to the house in a sober state, and had no recollection of the night before. He appeared surprised when Farmer informed him he was not welcome in the home.

Albert Terry met and became close friends with defendant in 1989 while participating in AA and NA programs. Defendant was a loving, caring, and respectful person. Terry visited the Maui Community Correctional Center to assist in AA meetings while defendant was incarcerated there. Defendant participated in the meetings, and appeared to be sincere in his comments about drug and alcohol abuse. Terry believed defendant would be of benefit to other recovering addicts in a custodial setting.

Orange County Sheriff's Deputy Robert Taft testified he worked at the Orange County jail. On two different occasions he was assigned to the administrative segregation area in which defendant was housed. He never saw defendant act disrespectfully to any deputies or have problems with any inmates.

Orange County Sheriff's Deputy Matthew Johnson testified he worked at the Orange County jail while defendant was incarcerated there. He wrote up

31

defendant once for possession of contraband, which consisted of extra clothing and pictures on the wall. Johnson otherwise observed that defendant followed the jail rules, was respectful toward and communicated well with Johnson, and got along with the other inmates.

Sergeant Robert Morris worked at the Maui Community Correctional Center, and testified that defendant was an "ideal inmate" who was respectful to guards, never gave "anybody problems," kept his cell clean and neat, and was helpful to new inmates. Defendant had no "write-ups" on Morris's watch, which was unusual for an inmate. During the time defendant was there, there were two escape attempts. Both times the individuals who escaped were in defendant's housing area, but he did not go with them. Defendant enjoyed drawing, and attended NA and AA meetings and church services while incarcerated.

Sergeant Herbert Aguiar, who worked at the Maui Community Correctional Center, testified that when defendant first came to the facility, he was dirty, very thin, had long hair, and his eyes were always moving like he was trapped somewhere. Aguiar was leery of him, and his first impression was "dirt bag." Defendant then started cleaning himself up, got a haircut, and started filling out. Aguilar described defendant as a "model inmate," whom he had never seen be disrespectful to anyone. Defendant engaged in many activities at the facility, including beginning work on his GED.

Reverend Diane Winter, a ministerial counselor, met defendant while conducting classes and counseling inmates in the Maui Community Correctional Center. Defendant took classes with Winter, and was respectful, kind, and interested in learning. Winters perceived defendant as genuine and not manipulative in class. Winters had observed defendant with his girlfriend, Janice Hunt, and he was kind, respectful, and loving. Winters said that defendant had cried sometimes and been very depressed. There were numerous occasions on

32

which defendant felt a lot of pain, and sometimes he would break down and cry because he said he did not remember what he had done. Defendant said that if he had killed Delbecq, he was a "monster." He also said, "if I had done that . . . it is horrible, I shouldn't be allowed to live in society." Defendant would ask Winter "to pray for the family," and "we would pray together, and he would cry." Defendant took full responsibility for his addiction, and did not offer drugs and alcohol as an excuse for his situation. Defendant was respectful and kind to guards and staff at the jail, and helpful to other inmates. During her years working in a jail setting, Winters had been asked 80-90 times to testify on a prisoner's behalf. She had only testified about four or five times, including once before for defendant.

Karen Phaneuf, an adult educator, testified she taught defendant in GED classes at the Maui Community Correctional Center. Defendant was friendly and helpful. He had a "great mind," and was interested in reading at a much higher level than a GED. Most of the students other than defendant were working at a very remedial level, and defendant would assist Phaneuf with those students so that they could pass their GED exam. Defendant was not shackled or handcuffed during class, but Phaneuf had no fear of him. Defendant was always cordial to other inmates, as well as to custodial officers who would walk though the classroom, and was a calming influence in the classroom. Phaneuf had corresponded with defendant since he left Maui, and assisted him on several stories defendant had written. She described defendant as a "gifted writer."

Dominic Bagarozzi testified he met defendant while they were both incarcerated at the Orange County jail in about August 1994. Bagarozzi agreed with counsel that at that time Bagarozzi was "a bad guy who had given up," and who had a drug problem. Bagarozzi and defendant were day room partners in administrative segregation, and knowing defendant made Bagarozzi a better

person and changed his outlook on life. Bagarozzi had appeared on television and in film as a child, and wanted to return to that profession, but did not think it was "cool." Defendant told him he could do anything he wanted to do, and while he could be a convict and stay in prison for the rest of his life, "it would be more of a challenge to try to achieve my goals." Bagarozzi was now out of jail, and in the past few months had appeared on *Ally McBeal*, a television pilot with Sam Elliott, and in a television commercial. Jean Bagarozzi, Dominic's mother, testified that when her son went to jail, he was a drug addicted, angry, and immature person. After he was placed in administrative segregation and met defendant, he began to "talk sense," and Jean heard about defendant and the advice he gave her son. Dominic followed defendant's advice, and was now an employed, mature, and drug-free person.

Charles Quesnel testified he met defendant in February 1993 while incarcerated in Hawaii. Quesnel had a history of drug and alcohol abuse, and defendant encouraged him to attend AA and NA meetings, and a self-awareness class. As a result of defendant's influence, Quesnel, who had previously been in and out of custody apparently because of his drug usage, had been clean for over five years.

Jimmy Ekstrom testified he met defendant in March 1993 while serving six months for vehicular manslaughter in the Maui Community Correctional Center. Ekstrom had never been in custody before, and was frightened. Defendant talked to him about how to get along with other inmates and the guards, and had his sister Elena give Ekstrom money so that he could purchase items at the jail store. Defendant also encouraged Ekstrom to attend GED classes, and helped him with the assignments.

Mark White testified that he met defendant while he was incarcerated on Maui pending trial on a robbery charge. When White arrived, he went through

34

withdrawal from heroin and cocaine. After he was brought to the general population he was still sick, and defendant would talk to him, bring him sweets which White craved, and share cigarettes. Defendant also helped White get along with the other inmates. White never saw defendant argue with anyone, and he once was able to calm an aggressive inmate who was upset at White. Defendant encouraged White to attend NA and AA meetings. White was struck at the meetings by how defendant shared from his heart his experiences, and White subsequently continued his involvement in the NA and AA programs when he went to prison.

Lynn Pendzik, a retired schoolteacher, testified she began to correspond with defendant while he was incarcerated in the Maui Community Correctional Center. After several months, defendant asked her to visit, and the two became friends. Once while defendant was on trial in Hawaii he refused a visit with Pendzik. Defendant subsequently wrote to her: "Remember during the trial when it was at the most horrible testimony? You came up that weekend and I refused your visit. Do you know why I did that? I did it because I was utterly appalled by what they had shown in court and that I was responsible for it. And I hated myself, and I felt that you certainly must hate me. I was ashamed and I did not want to face you."

### b. *Expert testimony*

Dr. Roberta Falke, a clinical psychologist, testified that she was asked to observe the nature of the relationship between defendant and his son Robbie, and defendant's ability to parent effectively while incarcerated. Falke had visited defendant in jail about every other week for two years. She had spent about 70 hours with defendant, and 50 hours with Robbie. On four occasions Falke had also taken Robbie to visit defendant and observed their interaction. Defendant and Robbie were separated by glass and spoke to each other on the telephone. In

addition, Falke met with Laura and Jack McFarland, Robbie's grandmother and her husband and Robbie's custodians, defendant's sister Elena, Robbie's biological mother Gina Stevens, and Gina's mother Bernice.

Dr. Falke believed defendant and Robbie had a strong relationship. Defendant knew a great deal about what Robbie was studying in school, what problems he was having in school, and what his special needs were. Robbie had been attending the Sylvan Learning Center before Falke was hired, and defendant requested that she meet with individuals there and take notes about what Robbie was working on. Defendant then requested Falke facilitate contact between the Sylvan tutors and Robbie's school teachers so they could coordinate their efforts. Falke became defendant's arms and legs in the community, and he "constantly" kept her running on issues concerning Robbie's academics.

Defendant was also concerned about Robbie's low self-esteem. He sought Dr. Falke's advice as to what to say to Robbie when he made self-deprecating remarks, and Falke advised defendant about techniques for speaking with Robbie in other situations.

Dr. Falke opined that defendant was a "remarkable" parent because of his "unflagging devotion." "[T]hat man put me to work for his son, and I barely got a break." In her view, defendant was at the top of the list of individuals who were important to Robbie in terms of support systems, and it was essential their relationship continue.

Dr. Kara Cross, a clinical psychologist and Robbie's therapist, testified that when she began to treat Robbie about three years earlier, when he was about 10, he was very depressed, had learning disabilities, and had an adjustment disorder. The treatment plan was to incorporate Robbie's relationship with defendant, which was the "strength" in Robbie's life that affected him the most, and use that relationship to help Robbie overcome depression and learn better coping skills.

36

Cross gave Robbie assignments to complete with defendant from workbooks designed to improve psychosocial communication within a family. Defendant would frequently telephone Cross and tell her how he had addressed a particular assignment and ask if he had done it correctly and how he could do it better next time. Although contact visits were generally not allowed, Cross was able to arrange a 30-minute contact visit between defendant and Robbie. After that visit, Robbie was a changed child; he was animated and would reach out and touch others in a teasing manner. Cross opined that defendant's relationship with Robbie was the "bedrock of Robbie's emotional stability," and that it was vital that the relationship continue.

Father John McAndrew, a Roman Catholic priest, testified that he was a recovering alcoholic, and about a third of his ministerial time was devoted to working with individuals in recovery. McAndrew testified that blackouts are often symptomatic of the disease of addiction. McAndrew had experienced alcoholic blackouts, and was ashamed of things he was told he had done during them.

Father McAndrew knew defendant, and had visited him many times at the Orange County jail. McAndrew gave defendant assignments to complete with regard to a 12-step program, and was defendant's only regular contact for an alcohol or drug recovery program. McAndrew was aware that about a year and a half earlier defendant had been found to be under the influence of heroin in jail. It is much harder to return to a recovery program after a relapse, and so when an individual returned, that told McAndrew "there is a willingness there." McAndrew found defendant inspirational, and believed he had "an awful lot to offer to other people in recovery."

Dr. Stalcup testified as a specialist in addiction medicine in a manner similar to his testimony at the guilt phase. In addition, he testified that a blackout is referred to as "anterograde amnesia," which means that "from the time of onset of

the drug until the time the drug effect wears off, there is no recording in memory of the events that happened during that time." "[T]here's immediate memory," and "[t]hen you have long-term memory, which is where thing are stored. There is a transfer step, and alcohol and tranquilizers and barbiturates block the transfer step. So immediate memory is happening, but it's not written down in permanent memory." Acts performed during a blackout are immediately remembered and intentionally done, such as walking down a beach, seeing the waves, and hearing a seal bark, but are not recorded. In mild blackouts, individuals have brief images in their mind of what they were doing. In moderate blackouts, individuals wake up the next day and cannot remember what they did the previous day. In severe blackouts, individuals cannot remember what they are doing now. Generally, to have a blackout, one has to drink enough to appear and know one is intoxicated. Dr. Stalcup also agreed with the prosecutor that there are individuals who would try to counter dysphoria by sexually causing suffering in others.

### 3. *Rebuttal evidence*

Dr. Park Dietz, a clinical professor of psychiatry and biobehavioral sciences at the University of California at Los Angeles School of Medicine, testified. He had reviewed defendant's testimony in this case, crime scene and witness reports of the crimes, witness and background statements, and crime scene and autopsy photographs from the Deeble and Delbecq homicides. An alcohol blackout is the term "used to refer to loss of memory during periods of intense drinking, especially among people who are very heavy chronic alcohol users. A blackout is a period of time "for which an individual no longer has the memory because while they were doing what they were doing, their brain did not permanently record the information into" long-term memory. Assuming defendant committed both murders, and that he now had no memory of either homicide because of the effect

of alcohol, this would mean that he "is now in a blackout for both homicides." Dr. Dietz added, "But it doesn't tell us anything about his mental state at the time of the homicides except that he was drunk." He also opined, "looking at what happened in each homicide, . . . that shows if intoxicated he wasn't too intoxicated to engage in a very orderly sequence of complicated behaviors." These included the "things done to gain access to each victim, to do things to the victims and their property and to leave the scene." Dr. Dietz agreed with the prosecutor that "the blackout does not affect his mental state while he was perpetuating the acts," noting that the "blackout doesn't begin until later." The blackout "begins at least seconds after each action, maybe minutes, but the blackout is what he is later in. It is not something he is in while he is doing it." Dr. Dietz agreed with the prosecutor that "the blackout simply means that short-term memory has not been recorded into long-term memory." Dr. Dietz stated: "[A]s he is committing the homicides, . . . he is behaving intentionally [and] voluntarily. He knows where he is, what he is doing, who he is with, why he is engaging in each action, what he wants to do next, which things please him and which things don't. . . . Now, he may not know what he did five minutes ago or ten minutes ago. He may be in a blackout already for those. But for what he just did and what he is going to do next, he is not in any blackout at all. He is right there in the present tense in the moment doing as he pleases." Dr. Dietz agreed with the prosecutor that the circumstance that defendant placed a comforter over Delbecq's window demonstrated that "at that moment he knows what he is doing is wrong. He is trying to hide it from the outside world."

## II. DISCUSSION

### A. Pretrial Issues

#### 1. Asserted Wheeler error

Defendant contends that the prosecutor exercised a peremptory challenge in a discriminatory manner to exclude a Black prospective juror in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments of the federal Constitution, and article I, section 16 of the state Constitution. (*Batson v. Kentucky* (1986) 476 U.S. 79, 89; *People v. Wheeler* (1978) 22 Cal.3d 258, 272, 276-277.) We agree with the trial court that defendant made no prima facie showing that Prospective Juror M.M. was challenged because of her race.

#### a. Factual background

On Prospective Juror M.M.'s questionnaire, when asked her general feelings about the death penalty, she responded: "I've thought about it on a personal level without coming to a conclusion as to whether society should or should not have the death penalty. As the law now states we have it so therefore I am prepared to obey the law of the land. On a personal level I will continue to ponder." On voir dire, the prosecutor read part of this response, and asked M.M., "Have you resolved that issue in your own mind since you [have] been here the last few days?" She responded, "Not really." The prosecutor asked no other questions and passed M.M. for cause. The defense accepted the panel, and the prosecutor exercised a peremptory challenge against M.M.

Defense counsel made a *Wheeler* motion. Counsel stated that Prospective Juror M.M. was Black, there appeared to be only two Black prospective jurors in the panel, and only one Black woman, who was Prospective Juror M.M. He also observed that M.M. "clearly passed for cause." The court found no prima facie

case of discrimination, stating that it had not seen anything to indicate the prosecutor excused the prospective juror because of her race.

### b. Analysis

The use of peremptory challenges to exclude prospective jurors based on race violates both the federal and state Constitutions. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 (*Bonilla*).) "There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." (*Ibid.*) To do so, the following procedure applies: "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168.) Although the trial court here used the since disapproved "strong likelihood" standard, "[r]egardless of the standard employed by the trial court," we independently review the record and determine whether it "supports an inference that the prosecutor excused a juror on the basis of race." (*People v. Cornwell* (2005) 37 Cal.4th 50, 73.)

Here, to establish a prima facie case, defense counsel merely asserted that Prospective Juror M.M. was Black, and that there appeared to be only one other

41

Black prospective juror.[10]  That is insufficient.  (*People v. Box* (2000) 23 Cal.4th 1153, 1188-1189; see *People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 3 (*Bell*).)

On appeal, defendant asserts that the prosecutor asked Prospective Juror M.M. a single question.  Under certain circumstances perfunctory voir dire can be indicative of hidden bias.  (*Bell*, *supra*, 40 Cal.4th at p. 598.)  Here, however, the prosecutor's question focused on M.M.'s ambivalence about the death penalty, which she confirmed on voir dire remained unresolved.  Contrary to defendant's assertion, this inquiry does not constitute "powerful circumstantial evidence that the challenge was exercised upon a prohibited race basis."  Moreover, before voir dire, M.M. had completed a 14-page questionnaire containing 38 questions with subparts.  (*People v. Dement* (2011) 53 Cal.4th 1, 20-21 (*Dement*) [relying on circumstance that before voir dire, the prosecutor had reviewed a 21-page questionnaire containing 87 questions with subparts filled out by each prospective juror to reject claim that the prosecutor's limited or no individual questioning of challenged prospective jurors created an inference of discrimination]; *Bell*, *supra*, 40 Cal.4th at pp. 598-599, fn. 5 [noting the trial court's comment that " 'when you have a questionnaire, it can never be a perfunctory examination' "].)  "Under these circumstances, we place little weight on the prosecutor's failure to . . . more thoroughly question a prospective juror before exercising a peremptory challenge."  (*Dement*, at p. 21.)

Defendant also asserts that the prosecutor's single question to Prospective Juror M.M. must be contrasted with the prosecutor's more detailed questions to

---

[10]  As defendant acknowledges, neither the racial composition of the jury as sworn nor the exact number of Black prospective jurors is in the record.  Indeed, the day after defendant's *Wheeler* motion, the trial court observed that there were "at least four, maybe more" Black prospective jurors, and told defense counsel, "I don't know where you got two from."

Caucasian prospective jurors. The racial identity of each prospective juror is not in the record. Moreover, although it is true that the prosecutor questioned some prospective jurors at greater length than he did M.M., he also engaged in perfunctory questioning of other prospective jurors, and at times declined to ask any questions at all. The record therefore provides no indication that there was any discernible racial pattern to the prosecutor's questioning.

### 2. *Denial of motion to dismiss the panel*

Defendant contends the trial court erroneously denied his motion to dismiss the panel in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution, and article I, sections 15-17 of the state Constitution.[11] We disagree.

### a. *Factual background*

At the outset of Prospective Juror R.B.'s voir dire, which was conducted in front of other prospective jurors, the trial court observed that R.B. was a peace officer, and asked, "[C]an you be an objective juror in this type of case?" R.B. answered: "I am very fair. I can be objective, but . . . I am a correctional peace officer, so . . . I know a lot of murderers. I have dealt with a lot of people who have been convicted of murders, and I have seen a lot of people who are there . . .

---

[11] In this and certain other appellate claims defendant contends the asserted error infringed upon his constitutional rights. "In those instances where he did not present constitutional theories below, it appears that either (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution. 'To that extent, defendant's new constitutional arguments are not forfeited on appeal.' (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.) No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7.)

for death or 25 to life. And since I think I filled the questionnaire out . . . I sit at nighttime thinking about it. I deal with all these people, and . . . they are hard to deal with if they just have life, you know, because they are still affecting people. . . . [T]here are still victims inside correctional institutes . . . and prisons. But I see there are some people that can be in for life and they are fine, you know. It is hard because I have to deal with it. The thing we just had a few weeks ago someone in for 25 to life that beat one of us officers to death."

The trial court asked if the incident happened inside the California Youth Authority (CYA), and Prospective Juror R.B. responded: "Yeah, out there in Chino. So that is hard to deal with because I think that gentleman, young man, he is 24, 25, he . . . beat someone to death. So there is another victim he created while he was in. So it is hard to say, but I could make that decision. . . . I don't know what else to really say. I would have to listen to everything, hear everything. And if . . . he is found guilty, then it would be hard not to go for the death penalty, very hard because again I see the people that are locked up. I deal with hundreds of them that are in for life, and I know what it is like in there. And I know that it is a lot easier than these people know . . . it is not as bad as what these people think it is."

The trial court said, "[T]hat is a different view." Prospective Juror R.B. continued, "See, I am in there. I am locked up every day with them, and what society sees and what people. . . ." The trial court then cut R.B. off and said, "Let's stay to the bottom line. Can you be an objective juror in this case if you get to a penalty phase?" R.B. answered that he would have to listen to everything. When asked if he could conceive of voting for life imprisonment without the possibility of parole in this case, R.B. assured the court, "I would have to listen to the attorneys. I wouldn't say I would automatically jump to [a] conclusion. I don't jump to conclusions." The trial court said: "There is another problem. One,

we're not talking about the California Youth Authority here. We are talking about other places. And it wouldn't be proper for you to educate the jurors in the jury room what it is like to be incarcerated in a state prison. I know what the Youth Authority is, okay? I am not educating the jury either. [B]ut do you understand what I am saying? You would have to keep those thoughts to yourself?" R.B. said, "Exactly."

Subsequently, outside the presence of the prospective jurors, defense counsel moved to excuse the entire jury venire based on Prospective Juror R.B.'s statements regarding experiences in the CYA, and "what he knows about life without the possibility of parole." He asserted, "He basically said to them that LWOP isn't what these people think; I know it is not that hard." The trial court said: "First of all, you have no basis upon which to base your conclusion that anybody has been tainted or even that anybody understood. I knew where he was going, and I shut him off. And then I told him that we're not talking about C.Y.A. We are talking about other places. And that would be a quantum leap for jurors to think that prison is like C.Y.A. Now, it is, but they don't know that. They would assume that C.Y.A. is for the kids, and that state prison is for the bad guys, and there is harsher treatment in prison, I think your conclusion is wrong. And absent some showing, which means if you want to bring it up, I will probably permit some limit[ed] question[ing] in that regard and we can even do it one on one. I don't see a problem. I would be afraid about bringing attention to it —" Defense counsel said, "That is our concern, too." The court responded, "So that is a big concern." The trial court denied the motion to excuse the entire panel. Defense counsel then moved to excuse Prospective Juror R.B., and the court granted the motion.

That afternoon, the defense submitted a proposed admonition. Defense counsel requested that any questioning of prospective jurors would be done in

45

private, and the court agreed. The proposed admonition was modified by the court after discussion with counsel. The following admonition was given to the panel: "This morning you may recall hearing a prospective juror [R.B.], who was sitting in seat No. 3 . . . express some of his opinions and experiences as a counselor at the California Youth Authority. The custodial facilities for minors are far different than those for adults. [R.B.] has no experience as a custodial officer in the adult state prison system or with adult life without possibility of parole prisoners. The purpose of incarceration in a state prison for crime is punishment. Do any of you have any question regarding [R.B.'s] statement? If so, please raise your hand? Anybody with a hand. Do any of you wish to comment on [R.B.'s] statement, please raise your hand. How many of you don't recall what he said, please raise your hand. Okay. Several . . . hands went up, and no hand went up for the questions." Prospective Juror J.D. indicated that she had a comment. The court told her: "We are going to talk to you. We are going to do it in private." The court then told the entire panel: "Anybody else? If anything comes to mind, just let me know when you are called forward and we'll talk about it, but I want to talk about it in private. That makes sense, doesn't it ladies and gentlemen? In any event, for those of you who may recall what [R.B.] said, you are to disregard his statement regarding his personal experiences."

### b. Discussion

Defendant contends he was prejudiced by Prospective Juror R.B.'s remarks because he in effect "predicted that [defendant] might continue to pose a danger to others if he was sentenced to life imprisonment" without the possibility of parole, and the remarks "created a substantial danger that jurors would select the death penalty." However, R.B.'s comments occurred before the guilt phase, and a different jury was impaneled for the second penalty phase. No prejudice at the

second penalty phase was possible. Defendant further summarily contends that "the assumptions inherent in [R.B.'s] remarks struck at the heart of the presumption of innocence and [the] prosecution's burden of proof." It is not apparent – and defendant does not explain – how R.B.'s challenged remarks related to any issue at the guilt phase.

Defendant further contends the court erred in failing to ask the venire whether "there was a question or comment about its instruction or whether they could disregard [Prospective Juror R.B.'s] comments." Defense counsel proposed the instruction, and the trial court worked with both counsel at length in modifying it. At the end of the hearing, the trial court inquired, "Any further comments on any requested admonition as modified?" Defense counsel responded, "No, your honor." Defendant has therefore forfeited any claim that the instruction was incomplete. (See *People v. Wilson* (2008) 43 Cal.4th 1, 22.)

Defendant further contends the trial court erred in failing to "conduct a hearing to exclude those jurors who overheard [Prospective Juror R.B.'s] improper remarks and could not promise to ignore them during their deliberations." The trial court offered to allow limited questioning "one on one" regarding R.B.'s comments, but noted it was concerned "about bringing attention to it." Defense counsel responded, "That is our concern, too." Defense counsel subsequently requested that prospective jurors with questions or comments be questioned in private. Defendant thus chose not to question every prospective juror regarding R.B.'s remarks, and agreed to private examination of those who had comments or questions. This claim is therefore forfeited.

Moreover, the trial court instructed the panel that Prospective Juror R.B's experience was in a facility for minors that was "far different than those for adults," and that he had "no experience as a custodial officer in the adult state prison system or with adult life without possibility of parole prisoners." It further

47

instructed the jury to disregard R.B.'s comments, solicited any comments or questions the prospective jurors might have about R.B.'s remarks, and said "[i]f anything comes to mind, just let me know when you are called forward and we'll talk about it, but I want to talk about it in private." This inquiry was sufficient to ascertain whether the prospective jurors were free from bias after R.B.'s remarks. Finally, as noted above, a different jury determined penalty.

Defendant also contends that the record does not reflect that Prospective Juror J.D. was ever questioned in camera. However, J.D. did not serve on the jury, so any comment she may have had could not have affected the verdict.

## B. Guilt Phase Issues

### 1. Denial of mistrial motion

Defendant contends the trial court erred in denying defendant's motion for mistrial. We disagree.

During his opening statement, while discussing the Delbecq murder, the prosecutor said, "In fact, when [defendant] was ultimately arrested for this — when [defendant] was found to be involved," the police found certain evidence. After the prosecutor completed his opening statement, defendant moved for a mistrial outside the presence of the jury. Defense counsel stated, "Not 10 minutes before [the prosecutor] delivered his opening statement I asked him if he was going to mention the fact of the defendant's arrest in Hawaii . . . and [the prosecutor] said no . . . because [he did not] think that that is relevant to anything in this case. And as we all know, arrest is just one step away from conviction. And this jury is not going to hear about the conviction. And during the opening statement what does [the prosecutor] do? He mentions that the defendant was arrested." The court asked, "How would this jury not figure that out sooner or later?" Defense counsel replied that even if the jury figured it out, that was "a far

48

cry from someone telling them that."  The prosecutor said that he had in good faith told defense counsel he would not bring up defendant's arrest, and that his comment was inadvertent.  The court denied the mistrial motion.

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]'  [Citation.]  A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198.)  We conclude here that the prosecutor's use of the word "arrest" — even if erroneous — was not "so incurably prejudicial that a new trial was required." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.)

The prosecutor reference to defendant's arrest was brief and isolated.  Indeed, the prosecutor corrected himself midsentence and changed "arrested" to "involved."  Moreover, the prosecutor contended during his opening statement that defendant was linked to Delbecq's murder by the circumstance that his bloody footprint and palm prints were found inside her bedroom.  Hence, as the trial court observed, the jury would already surmise defendant had been arrested for that offense. (See *Dement*, *supra*, 53 Cal.4th at p. 40 [witness's improper comment "largely duplicative of evidence the jury properly received"].)  In addition, the jury had already been instructed that statements by the attorneys during the trial were not evidence.  Hence the trial court did not abuse its broad discretion in denying the mistrial motion.

## 2. Challenge to pathologist's testimony

Defendant contends the trial court prejudicially erred in allowing Dr. Richard Fukumoto, a pathologist who did not perform Marjorie Deeble's autopsy, to testify at the guilt and second penalty phase regarding the autopsy report and his opinions based on that report in violation of defendant's confrontation rights under the Sixth and Fourteenth Amendments to the federal Constitution. (See *ante*, at pp. 3-7.) He further contends that even if Dr. Fukumoto's testimony was not wholly inadmissible, his opinions lacked foundation, and were unduly prejudicial. (Evid. Code, § 352.) We conclude these claims are without merit.

### a. Factual background

Dr. Fukumoto worked at Richards, Fisher, Fukumoto Medical Group, Inc. The medical group had a contract with the Orange County Sheriff's Department to perform autopsies in Orange County. Dr. Richards, who had performed Deeble's 1986 autopsy and written an autopsy report, had since retired. The autopsy report was signed, but not sworn or certified. The report itself was not admitted into evidence. Dwight Reed, a criminalist who worked for Orange County Sheriff-Coroner Forensic Sciences Services, attended the autopsy. In addition to reviewing the report, Dr. Fukumoto reviewed about 100 photographs of Deeble's body, X-rays, and microscopic slides of organ tissues, generated as part of the autopsy.

### b. Analysis

#### 1) Asserted Confrontation Clause Violation

The Attorney General asserts that defendant has forfeited his confrontation clause claim because he failed to object on this ground at trial. We recently rejected a similar forfeiture claim, and for similar reasons do so again here. (*People v. Pearson* (2013) 56 Cal.4th 393, 461-462 [concluding that a defendant who failed at a 1996 trial to challenge as a violation of the confrontation clause the

50

testimony of a substitute pathologist did not forfeit the claim on appeal].) In *People v. Clark* (1992) 3 Cal.4th 41 (*Clark*), this court rejected a confrontation clause challenge to the testimony of one pathologist based on the autopsy report of a deceased pathologist. We held that the contents of the report "were admitted under a 'firmly rooted' exception to the hearsay rule that carries sufficient indicia of reliability to satisfy the requirements of the confrontation clause." (*Id.* at p. 159; *People v. Beeler* (1995) 9 Cal.4th 953, 978-980 [same] (*Beeler*).) In light of *Clark* and *Beeler*, defendant's failure to object during his 1996 trial "was excusable, since governing law at the time . . . afforded scant grounds for objection." (*People v. Johnson* (2004) 121 Cal.App.4th 1409, 1411, fn. 2.) " '[W]e have excused a failure to object where to require defense counsel to raise an objection "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal." ' " (*People v. Williams* (1976) 16 Cal.3d 663, 667, fn. 4 (*Williams*).) We therefore consider defendant's claim on the merits.

Since our decisions in *Clark*, *supra*, 3 Cal.4th 41 and *Beeler*, *supra*, 9 Cal.4th 953, the United States Supreme Court held in *Crawford v. Washington* (2004) 541 U.S. 36, 59-60 that admission of testimonial statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. More recently, in *Williams v. Illinois* (2012) __ U.S. __ [132 S.Ct. 2221], the high court in a fractured decision held the confrontation clause is not violated when an expert witness testifies about the results of DNA testing performed by nontestifying analysts whom the defendant has had no opportunity to confront.

51

Following *Williams v. Illinois*, we held that the confrontation clause was not violated when a testifying pathologist expressed forensic opinions on the basis of objective medical observations derived from a nontestifying pathologist's autopsy report and its accompanying photographs. (*People v. Dungo* (2012) 55 Cal.4th 608, 621 (*Dungo*).) In *Dungo*, neither the autopsy report nor its accompanying photographs were admitted into evidence. (*Id*. at p. 612.) We therefore concluded we need not decide whether the entire report was testimonial, but could focus on the testimonial nature of particular statements in the report, as described by the testifying pathologist. (*Id*. at pp. 618-619.)

We noted in *Dungo* that "[a]lthough the high court has not agreed on a definition of 'testimonial,' testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Dungo*, *supra*, 55 Cal.4th at p. 619.)

Applying these standards to the autopsy evidence in *Dungo*, we noted that autopsy reports typically contain two types of statements, those that "describ[e] the [autopsy] pathologist's anatomical and physiological observations about the condition of the body," and those that "set[ ] forth the [autopsy] pathologist's conclusions as to the cause of the victim's death." (*Dungo*, *supra*, 55 Cal.4th at p. 619.) The testifying pathologist in *Dungo*, we stressed, had described only autopsy statements in the first category, and had then supplied, on the basis of those statements and his own examination of autopsy photos, his independent forensic opinions about the cause of the victim's death. (*Id*. at pp. 618-619.) He had not described the conclusions in the autopsy report as to the cause of death. Thus, we had no occasion to "determine whether such testimony, if it had been

52

given, would have violated defendant's right to confront" the autopsy pathologist.**12** (*Id*. at p. 619.)

Autopsy statements that simply record anatomical and physiological observations, we indicated, are "less formal" than statements of the autopsy physician's expert forensic conclusion as to the cause of death. (*Dungo*, *supra*, 55 Cal.4th at p. 619.) Statements in the former category, we observed, are "comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature. [Citation.]" (*Id*. at pp. 619-620.) A majority in *Dungo* further pointed out that the autopsy statements at issue were neither sworn nor certified for accuracy, and for this additional reason they "lacked the solemnity and formality that characterize statements the high court deems testimonial." (*Id.* at p. 623 (conc. opn. of Werdegar, J.).)

We also found the anatomical observations in the *Dungo* autopsy report to be nontestimonial under the "primary purpose" test. (*Dungo*, *supra*, 55 Cal.4th at p. 621, italics omitted.) We noted that California statutes require an autopsy in certain types of death, only some of which are related to suspected criminal activity. (*Id*. at p. 620.) Regardless of the circumstances, we explained, "the scope of the coroner's statutory duty to investigate is the same" (*ibid*.), and the report serves both forensic and nonforensic uses (*id*. at pp. 620-621). Hence, we concluded, "criminal investigation was not the *primary* purpose for the . . . report's description of the condition of [the victim's] body; it was only one of

---

**12** Thus, although the concurring and dissenting opinion states that "[t]here is no debate that admission of testimony as to medical conclusions reached by a nontestifying expert would violate the confrontation clause," we have never decided this issue. (Conc. & dis. opn. of Corrigan, J., *post*, at p. 2.)

several purposes." (*Id.* at p. 621.) We pointed out that the report itself was, in essence, "simply an official explanation of an unusual death, and such official records are ordinarily not testimonial. [Citation.]" (*Ibid.*)

Here, as in *Dungo*, Dr. Fukumoto recounted objective medical observations derived from Dr. Richards's autopsy report and its accompanying photographs, microscopic slides, and X-rays, and expressed opinions based on those observations. Defendant implicitly concedes any confrontation clause challenge to this portion of Dr. Fukumoto's testimony is foreclosed by *Dungo*, and offers no persuasive reason for us to revisit our conclusion in that case.[13]

Defendant contends, however, that his rights under the confrontation clause were violated when Dr. Fukumoto recounted forensic opinions expressed by Dr. Richards in the autopsy report. At the guilt phase Dr. Fukumoto opined that the cause of Deeble's death was "asphyxiation due to ligature strangulation," and agreed with the prosecutor that this was consistent with Dr. Richards's opinion. Dr. Fukumoto also agreed with the prosecutor that an autopsy photograph appeared to show ligature marks on Deeble's ankles (Deeble's legs were not bound when her body was discovered), and said that Dr. Richards described nearby lacerations on the right ankle also visible in the photograph "as being caused by the wires probably coming together and inflicting the injury." The prosecutor asked if Dr. Fukumoto "personally disagree[d] with that at all," and Dr. Fukumoto replied: "No. It is consistent with that." At the second penalty phase, Dr. Fukumoto again opined that Deeble "died as a result of asphyxiation due to a

---

[13] The author of the concurring and dissenting opinion, who also dissented in *Dungo*, 55 Cal.4th at pages 633-649 (dis. opn. of Corrigan, J.), continues to urge here that *Dungo* was wrongly decided. (Conc. & dis. opn. of Corrigan, J., *post*, at pp. 1, 5, 10.) As indicated above, we are not persuaded to reconsider that recent case.

ligature strangulation," and agreed with the prosecutor this was consistent with Dr. Richards's opinion and that Dr. Fukumoto had formed his opinion independently.

Thus, even assuming these statements violated the confrontation clause, an issue we need not decide, no prejudice was possible under any standard. As can be seen, Dr. Fukumoto independently agreed with Dr. Richards's opinions, and neither the cause of death nor the source of the lacerations on Deeble's ankle was in dispute at trial.[14]

Defendant contends that at the guilt phase Dr. Fukumoto also erroneously recounted Dr. Richards's "opinions" that the injury to Deeble's left ear was "incisional," residue from adhesive tape was observed in an area from the mouth to the lower cheek, and Deeble's nose was fractured, and at the second penalty phase made similar statements regarding Dr. Richards's opinions of injury to Deeble's ear and the presence of adhesive tape. This testimony by Dr. Fukumoto did not, however, recount Dr. Richards's *forensic opinions* as to the cause of Deeble's injury or death, but rather his medical observations of objective fact. That a break appears "incisional," a nose appears to be broken, or residue appears

---

[14] The concurring and dissenting opinion asserts that Dr. Fukumoto also testified regarding Dr. Richards's forensic opinion that Deeble "had suffered an <u>incisional</u> tear in her left eardrum, <u>suggesting it had been caused by a sharp instrument</u>." (Conc. & dis. opn. of Corrigan, J., *post*, at pp. 2-3, underlining in original.) In fact, Dr. Fukumoto testified that Dr. Richards had described "a break on the left ear drum . . . as incisional in type." *Dr. Fukumoto* then explained: "[A]n incision to a forensic pathologist . . . . is not a tear. It is something that is caused by a sharp instrument or an instrument that has a point."

The concurring and dissenting opinion suggests generally that *Dungo's* distinction between an autopsy examiner's medical *observations* and the examiner's forensic *conclusions* is too indistinct to be workable. (Conc. & dis. opn. of Corrigan, J., *post*, at pp. 1-2, 10.) For the reasons stated in *Dungo*, and demonstrated here, we disagree.

to be from adhesive tape, are expert medical observations of the body's condition – assessments like those a doctor would make to determine the proper treatment of a live patient. (See *Dungo*, *supra*, 55 Cal.4th at p. 619.) Such testimony was no different than, for example, Dr. Fukumoto's testimony regarding statements in the autopsy report that Deeble's stomach contained food that was virtually untouched by digestion, and that there was bruising and tearing just inside the opening to the vagina. Moreover, Dr. Fukumoto independently reviewed X-rays of Deeble's nose and testified that one X-ray showed "somewhat flattening" that "may reflect fracturing at the bridge of [the] nose," and Dwight Reed, who attended the autopsy, testified that during the autopsy white adhesive material was observed on Deeble's left cheek.

### 2) Claim Dr. Fukumoto's testimony lacked foundation and was unduly prejudicial

Defendant contends that even if Dr. Fukumoto's testimony was not wholly inadmissible, his opinions that Deeble's injuries were extremely painful and occurred before death lacked foundation, were irrelevant, and were unduly prejudicial. (Evid. Code, §§ 352, 801.) This claim lacks merit.

Dr. Fukumoto opined that the ligature and struggling against it, the incisional injury to Deeble's ear, and an amount of pressure sufficient to tear the ear drums would all be extremely painful. He also agreed with the prosecutor that trauma to the vaginal and rectal areas is "highly painful," and opined that the injuries to the vaginal and rectal areas occurred before death.

Adequate foundation for Dr. Fukumoto's opinions was provided by Dr. Richards's autopsy report, photographs, and slides, as well as Dr. Fukumoto's more than 30 years' experience as a forensic pathologist. (See *People v. Taylor* (2010) 48 Cal.4th 574, 588 [recounting testimony by deputy medical examiner and treating cardiologist that elderly victim died from the extreme fear, pain, and stress

56

caused by the sexual assault]; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1606 [noting medical examiner had opined that strangulation victim "was acutely aware of the pain before her death"].) Contrary to defendant's assertion, Dr. Fukumoto was not required to be the pathologist who performed the autopsy or possess a neurology background in order to testify regarding the painfulness of Deeble's injuries. Moreover, the jury was instructed that it was not bound to accept Dr. Fukumoto's opinions as conclusive, but was free to determine the weight to which they were entitled and to disregard the opinions if the jury found them to be unreasonable. (§ 1127b.)

Defendant contends that Dr. Fukumoto's testimony was irrelevant because the jury could draw its own conclusions about the painfulness of Deeble's injuries, and received "no appreciable help from Dr. Fukumoto's opinion testimony." He did not object on this ground below, and the claim is therefore forfeited. (*Williams*, *supra*, 16 Cal.3d at p. 667, fn. 4 ["It is the general rule, of course, that questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection at trial on the ground sought to be urged on appeal."].) It also lacks merit. "Evidence Code section 801 qualifies a matter as the proper subject for expert testimony if it is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' That is not to say, however, that the jury need be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible. [Citation.] Rather, expert opinion testimony ' "will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness' " [citation]. ' " (*People v. Jones* (2012) 54 Cal.4th 1, 60 (*Jones*).) Here, Dr. Fukumoto's medical expertise provided additional insight

above and beyond the jury's general knowledge in the areas of whether the genital injuries occurred before death, and whether these and other injuries were painful.

Defendant further asserts that the probative value of Dr. Fukumoto's opinions was substantially outweighed by their prejudice or, phrased another way, that his opinions posed an intolerable risk to the fairness of the proceedings or the reliability of the outcome. (*People v. Riggs* (2008) 44 Cal.4th 248, 290 (*Riggs*).) Defendant has forfeited these claims by failing to raise them below. (*Williams*, *supra*, 16 Cal.3d at p. 667, fn. 4.) They are also meritless. As delineated below, Dr. Fukumoto's opinions were highly probative on the issues of identity, torture murder, and the torture-murder special-circumstance, as well as burglary murder and the burglary-murder special-circumstance based on entry with intent to penetrate with a foreign object. (See *post*, at pts. II.B.3., II.B.4., II.B.5.) Defendant does not even attempt to demonstrate how their admission "necessitate[d] undue consumption of time" or "create[d] [a] substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

### 3. Admission of evidence regarding Muriel Delbecq's murder

Defendant contends the trial court erred in admitting evidence about Delbecq's murder on the issues of identity, common plan, and intent in violation of Evidence Code sections 352 and 1101[15] and his rights under the Fifth, Eighth,

---

[15] Evidence Code section 1101 provides:

"(a) Except as provided in this section and in [other sections], evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some

and Fourteenth Amendments to the federal Constitution.  We conclude there was no error.

Before trial, the prosecutor sought the admission of evidence regarding Delbecq's murder.  The trial court ruled that evidence of the Delbecq murder was admissible on the issues of identification, common plan and scheme, and intent, and that admission of the evidence did not violate Evidence Code section 352.[16]

_(footnote continued from previous page)_
fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. . .) other than his or her disposition to commit such an act.

"(c)  Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

[16]  The jury was instructed:  "Evidence has been introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial.  Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes.  Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

"[T]he identity of the person who committed the crime, if any, of which the defendant is accused.

"A characteristic design or plan in the commission of criminal acts similar to the design or plan or scheme used in the commission of the offense in this case.

"The existence of the intent which is a necessary element of the crime charged.

"For the limited purpose for which you may consider such evidence you must weigh it in the same manner as you do all other evidence in the case.  You are not permitted to consider such evidence for any other purpose.

"For identity to be established, the uncharged misconduct and the charged offense must share common features which are sufficiently distinctive so as to support the inference that the same person committed both acts.

59

The court excluded evidence that Deeble and Delbecq shared the same three initials because Delbecq went by the nickname "Stevie Delbecq" in Hawaii, and there was no evidence defendant knew her real name. It also excluded evidence that both Deeble and Delbecq were real estate agents because Delbecq did not engage in that occupation when she visited Hawaii, and there was no evidence that defendant knew her occupation in Alaska. Finally, the court ruled that evidence Delbecq's pubic hair was cut would not be admissible absent a further showing of relevance.

"Subdivision (a) of [Evidence Code] section 1101prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition," such as identity, common plan, or intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, fn. omitted (*Ewoldt*).)" Evidence of uncharged crimes is admissible to prove identity, common plan, and intent "only if the charged and uncharged crimes are sufficiently similar to support a rational inference" on these issues. (*People v. Kipp* (1998) 18 Cal.4th 349, 369 (*Kipp*).) We review the trial

(footnote continued from previous page)
"Within the meaning of the preceding instruction, such other crime purportedly committed by defendant must be proved by a preponderance of the evidence. You must not consider such evidence for any other purpose unless you are satisfied that the defendant committed such other crime.

"The prosecution has the burden of proving these facts by a preponderance of the evidence."

court's determination for abuse of discretion, and view the evidence in the light most favorable to the trial court's ruling. (*Id.* at pp. 369-370.)

The "highest degree of similarity is required to prove identity." (*People v. Soper* (2009) 45 Cal.4th 759, 776, fn. omitted.) " 'For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." ' " (*People v. Lynch* (2010) 50 Cal.4th 693, 736 (*Lynch*).) "The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks." (*People v. Thornton* (1974) 11 Cal.3d 738, 756.) "The inference of identity, however, 'need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' " (*Lynch*, at p. 736.)

Here, evidence of the Delbecq murder was relevant to prove identity because the common features of that crime and Deeble's murder were "sufficiently distinctive so as to support the inference that the same person committed both acts." (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.) At the time the court ruled before trial, it was informed that there was evidence both Deeble and Delbecq were older[17] Caucasian women who lived alone on the first floor of an apartment building. Delbecq was murdered at night, and there was evidence Deeble was also murdered at night given that when her body was discovered she was wearing a nightgown. The cause of death for both women was strangulation. Delbecq had been

---

**17** In his trial brief regarding this issue, the prosecutor asserted that Deeble was 55 years old at the time of her death.

penetrated by a mousse can, and the evidence strongly suggested Deeble had been penetrated by a mousse can of similar diameter and length. It appeared that both penetrations occurred while the victims were alive. Both women also suffered broken noses and ligature marks on their wrists and ankles consistent with being bound by telephone cord. Defendant knew Deeble, and his bloody palm prints were found at the Delbecq murder scene. Both victims were found in their ransacked bedrooms, and had jewelry taken, and the prosecutor asserted entry into both homes was made by removing a window screen. Substantially similar evidence was presented at trial.

Thus, at the time the Hawaii evidence was admitted, the trial court was aware of numerous similarities between the Deeble and Delbecq murders. Most notably, mousse cans of similar diameter and length were present at both crime scenes, and there was evidence both victims had been sexually penetrated by the mousse cans. Moreover, "[t]o be highly distinctive, the charged and uncharged crimes need not be mirror images of each other." (*People v. Carter* (2005) 36 Cal.4th 1114, 1148.) Rather, dissimilarities between the crimes "went to the weight of the evidence and did not preclude the prosecution from introducing the evidence" regarding Delbecq's murder. (*Ibid.*)

The evidence of Delbecq's murder was also relevant to prove a common design or plan. "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual"; rather it "need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*Ewoldt*, *supra*, 7 Cal,4th at p. 403.) Here, the common features noted above indicate that when defendant committed the charged Deeble offenses and the uncharged Delbecq offenses he

62

was acting pursuant to a common design or plan to torture, murder, and rob the older women he had chosen as victims.  (*Kipp*, *supra*, 18 Cal.4th at p. 371.)

The evidence of Delbecq's murder was also relevant to prove intent, such as defendant's entry with the intent to penetrate with a foreign object or steal as to burglary murder, and possession of a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for a sadistic purpose as to torture murder.  (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)  Here, as set forth above, the evidence of Delbecq's murder was sufficiently similar to Deeble's murder to support the inference that defendant " ' "probably harbor[ed] the same intent in each instance." ' "  (*Ibid*.)

For these reasons, the trial court did not abuse its discretion when it ruled that evidence of the Delbecq murder was sufficiently similar to Deeble's murder to support an inference that defendant committed both murders, and did so pursuant to a common design or plan and while harboring the same intent.  (*Kipp*, *supra*, 18 Cal.4th at pp. 370-371.)

Nor did evidence of Delbecq's murder contravene Evidence Code section 352.**18**  (*Lynch*, *supra*, 50 Cal.4th at p. 757; *Ewoldt*, *supra*, 7 Cal.4th at p. 404.)  "Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time.  'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome

---

**18**  Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[citation]." ' " (*Riggs*, *supra*, 44 Cal.4th at p. 290.) We conclude no such intolerable risk was present here.

The tendency of the evidence to show identity, common design or plan, and intent, as set forth above, was strong. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 404.) Moreover, the evidence regarding Delbecq's murder was independent of the evidence of the charged crimes, involving witnesses and evidence from another state and a decedent who had no connection to Deeble. (*Id.* at pp. 404-405.)

Nor did admission of the evidence of Delbecq's murder create a substantial danger of undue prejudice. Although the jury could infer from the presence of defendant's palm prints and footprint that defendant had killed Delbecq, it could also infer from his testimony that he had been convicted of her 1993 murder. Thus, "the jury was not tempted to convict defendant of the charged offenses, regardless of his guilt, in order to assure that he would be punished for" any other murder. (*People v. Balcom* (1994) 7 Cal.4th 414, 427.) In addition, although the Delbecq murder involved greater brutality to the victim's genital area, the jury could reasonably infer that Deeble's genital area was also penetrated by a mousse can while she was alive, and that she suffered an agonizing death as she attempted to hold her head up so that she would not be strangled by the ligature. Thus, the Delbecq murder was not more inflammatory than the Deeble murder. (*Ewoldt*, *supra*, 7 Cal.4th at p. 405.) Moreover, the jury was properly instructed on the limited purposes for which it could consider evidence of Delbecq's murder. (*Kipp*, *supra*, 18 Cal.4th at p. 372.)

Defendant contends that "the key foundational fact" that Deeble was assaulted with a mousse can was not established at trial, and that the trial court erred in failing to exclude evidence Delbecq was penetrated by a mousse can. As we have observed, Dr. Fukumoto testified that Deeble suffered injury to her vaginal and rectal areas, and that the mousse can found in her bed was consistent

64

with an object that could have caused these injuries. In addition, there was circumstantial evidence that Deeble had been penetrated by the mousse can: A substance that appeared to be blood was present underneath the ridge around the top of the mousse can; this substance gave a positive response to a presumptive test for blood; a cap found on the ground next to Deeble appeared to be one that could fit the mousse can; a substance that appeared to be blood was observed on the cap; and the position of Deeble's nightgown, which was pushed up around her waist, the absence of panties, and the apparent semen stain on her thigh indicated a sexual assault. Although defendant offered to stipulate that Delbecq was penetrated by a mousse can without reference to the concomitant damage to her abdomen, " '[t]he general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness.' " (*People v. Scott* (2011) 52 Cal.4th 452, 471.)

Defendant contends that the trial court's admission of evidence of Delbecq's murder under the test in *Ewoldt*, *supra*, 7 Cal.4th 380, instead of the test under *People v. Tassell* (1984) 36 Cal.3d 77, which he claims was in effect at the time of the crimes, violated the prohibition against ex post facto laws. Defendant challenges the trial court's application of *Ewoldt*, not Evidence Code section 1101 itself, and hence his claim is more properly characterized as one invoking due process and not the ex post facto clause. (*People v. Brown* (2004) 33 Cal.4th 382, 394.) Defendant's claim is meritless under either provision. *Ewoldt* concerned the circumstances under which certain evidence was admissible at trial. It did not attach criminality to prior acts that were "innocent when done," provide for "greater punishment" of a crime "than was prescribed at the time of its commission," or "alter the degree" or measure of proof necessary to convict from that which was required at the time the crime was committed. (*Brown*, at p. 394

65

[applying the high court's analysis of ex post facto laws to a claim that admission of victim impact evidence violated the due process clause].) Hence, *Ewoldt's* principles may be applied to a trial occurring after it was decided, regardless of when the underlying crime was committed. (*People v. Sandoval* (2007) 41 Cal.4th 825, 845; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288-289.)

In sum, the trial court did not abuse its discretion in admitting evidence of Delbecq's murder to establish identity, common design or plan, and intent.

4) *Asserted insufficiency of evidence in support of a first degree murder conviction on a theory of torture murder, and of a torture-murder special circumstance*

The People advanced two theories of murder: murder by means of torture and felony-murder burglary. The jury was also instructed on two special circumstance allegations: murder involving the infliction of torture and murder while defendant was engaged in the commission of burglary. The jury found defendant guilty of first degree murder, but the verdict did not specify the theory on which it rested its verdict. It also found true the torture-murder and burglary-murder special-circumstance allegations.

Defendant contends that the evidence is insufficient to support the jury's finding of first degree murder on a theory of torture murder and true finding as to the torture-murder special-circumstance allegation. We disagree.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

66

found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings. (*People v. Chatman* (2006) 38 Cal.4th 344, 389 (*Chatman*).)

"All murder which is perpetrated by means of . . . torture . . . is murder of the first degree." (§ 189.) Murder by torture requires: 1) an act or acts causing death that involve a high degree of probability of death, 2) a causal relationship between the torturous act and death, 3) a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose, and 4) commission of the act or acts with such intent. (*Chatman*, *supra*, 38 Cal.4th at pp. 389-390 (*Chatman*); *People v. Davenport* (1985) 41 Cal.3d 247, 267, 294 (*Davenport*).) The circumstance that the murder is "perpetrated *by means of . . .* torture" (§ 189) indicates that a torturous act — that is, one done with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for a sadistic purpose — must occur before the victim dies. Thus, the perpetrator intends to " 'cause pain and suffering in addition to death,' " and " 'in the course, or as a result of inflicting pain and suffering, the victim dies.' " (*People v. Steger* (1976) 16 Cal.3d 539, 543.) The " 'finding of murder-by-torture encompasses the totality of the brutal acts and the circumstances which led to the victim's death. [Citation.] The acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death; rather it is the continuum of sadistic violence that constitutes the torture.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 643.)

67

"The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the body." (*Chatman*, *supra*, 38 Cal.4th at p. 390.) A perpetrator need not have any intent to kill (*Davenport*, *supra*, 41 Cal.3d at p. 267), and it need not be proven that the victim actually suffered pain (*Chatman*, at p. 389).

We have held that "[m]urder by strangulation indicates malice, but it does not by itself indicate an intent to make the victim suffer." (*People v. Caldwell* (1955) 43 Cal.2d 864, 865, 869 [no evidence that the defendant intended to make the victim suffer when he inflicted a long laceration on his wife's scalp, and then strangled her with two belts].) We have, however, considered evidence of an "unusually forcible strangulation attempt" together with other violent acts to conclude there was sufficient evidence of a premeditated intent to inflict extreme and prolonged pain. (*People v. Morales* (1989) 48 Cal.3d 527, 541, 559-560 [evidence that defendant told his girlfriend he was going to " 'hurt" a girl by strangling her with his belt," and thereafter attempted to strangle the victim "with his belt until it broke, beat her repeatedly on the head with a hammer until she was unconscious or dead, dragged her body into a field and completed an act of sexual intercourse, and finally stabbed her four times in the chest to assure her death" sufficient to sustain jury's implied finding of intent to inflict extreme pain].)

Here, Dr. Fukumoto testified that before Deeble's death her vagina was bruised and torn, there was bleeding beneath the surface lining of the vaginal wall, and her anus was dilated, bruised, and lacerated. He also opined that the injuries to Deeble's vaginal and rectal areas were consistent with penetration by the mousse can found on her bed, and that trauma to the vaginal and rectal areas is "highly painful." As noted above, there was strong circumstantial evidence that Deeble had been penetrated by the mousse can. (See *ante*, at p. 65.) The jury was also aware that defendant subsequently penetrated Muriel Delbecq with a mousse

68

can while she was alive, tearing the barrier between the vaginal and abdominal cavities.

Deeble died from ligature strangulation, and was found with her neck in a noose fashioned from a belt and suspended about eight inches above the floor. Dr. Fukumoto testified that one mark on Deeble's neck, a deep furrow, had features such as wrinkling and thickening that were consistent with Deeble struggling against the ligature to loosen it. When Deeble was found, blood was running out of her left ear and her mouth, and there was blood around her nose. Dr. Fukumoto testified that Deeble's left eardrum had been cut by a sharp or pointed instrument, her right ear drum was torn, and she had extensive hemorrhaging in her middle ears. He opined, "if the ear drums are torn, associated with massive bleeding in the middle ears, this could be due to a massive increase in pressure as a result of the struggle of the victim in his or her attempt to get a breath." He further testified that all of these injuries would have been extremely painful. Moreover, defendant inflicted blunt trauma injury that caused bleeding near Deeble's pancreas, an organ located deep within the body, and he also inflicted blunt trauma to her head.

Although there was no testimony that the injuries other than those to the genital area and the ligature were inflicted before death, there was evidence that Deeble had been bound and gagged, and had a hood — which was fashioned from a pillowcase — placed over her head. As noted above, these circumstances suggest a methodical and prolonged attack rather than an explosion of violence, and would be unnecessary measures if, as defendant suggests, the victim had already been rendered senseless by the blow to her head. (*People v. Bemore* (2000) 22 Cal.4th 809, 840 (*Bemore*) ["No restraint would have been necessary if [the victim] had perished at the start of the attack in the manner defendant now suggests."].) Moreover, because more blood was found inside the hood than

69

outside, and when Deeble was discovered she was not wearing a hood, the jury could reasonably infer that the cut to Deeble's eardrum, which Dr. Fukumoto testified would have been extremely painful, and the injuries to her nose and mouth, occurred while she was alive and either before or while she was wearing the hood.

The jury could reasonably infer from this totality of facts that defendant committed torturous acts before Deeble's death, these acts that had a high probability of killing Deeble and did kill her, and that he did so with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on Deeble for a sadistic purpose.

The evidence is also sufficient to support the jury's true finding of the torture-murder special-circumstance allegation. The torture-murder special-circumstance allegation requires an " 'intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose.' " (*People v. Elliot* (2005) 37 Cal.4th 453, 479.) Unlike torture murder, it also requires an intent to kill and, at the time of Deeble's murder, required "proof of the infliction of extreme physical pain no matter how long its duration" on a living victim. (§ 190.2, subd. (a)(18) as added by Prop. 7, § 6, approved by the voters, Gen. Elec. (Nov. 7, 1978); see *Chatman*, *supra*, 38 Cal.4th at p. 391; *Davenport*, *supra*, 41 Cal.3d at p. 271.) It does not require a premeditated and deliberate intent to torture (*People v. Cole* (2004) 33 Cal.4th 1158, 1226), a causal relationship between the torturous act and death (*People v. Crittenden* (1994) 9 Cal.4th 83, 141-142), or proof the victim subjectively experienced pain (*Davenport*, *supra*, 41 Cal.3d at p. 271). "Distilled, the statutory language requires intent to kill, intent to torture, and infliction of an extremely painful act upon a living victim." (*Bemore*, *supra*, 22 Cal.4th at p. 839.)

70

As we have explained, the evidence is sufficient to support the element of intent to inflict pain for a sadistic purpose. In addition, the nature of Deeble's injuries supports the jury's conclusion that defendant intended to kill her and that in doing so he inflicted extreme physical pain while she was alive.

> 5) *Asserted insufficiency of the evidence in support of first degree murder conviction on a theory of burglary murder and burglary-murder special circumstance*

The prosecutor proceeded on a theory of murder in the course of burglary based both on entry with intent to commit theft, and entry with intent to penetrate with a foreign object. Defendant asserts that the evidence in support of the burglary theory of murder and the burglary-murder-special-circumstance allegation was insufficient. We disagree.

"All murder which is . . . committed in the perpetration of, or attempt to perpetrate, . . . burglary . . . is murder of the first degree." (§ 189.) " 'The mental state required is simply the specific intent to commit the underlying felony; neither intent to kill, deliberation, premeditation, nor malice aforethought is needed. [Citations.] There is no requirement of a strict "causal" [citation] or "temporal" [citation] relationship between the "felony" and the "murder." All that is demanded is that the two "are parts of one continuous transaction." ' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140-1141.) When a defendant makes no admissions and relies on an alibi defense, "the jury [is] required to find his intent upon entry circumstantially," such as "from his conduct and statements after entry." (*People v. Failla* (1966) 64 Cal.2d 560, 564-565; 2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) § 156, p. 203 ["Acts or conduct on the premises after entry may be extremely persuasive as circumstantial evidence of intent to commit . . . a felony."]; see *People v. Abilez* (2007) 41 Cal.4th 472, 508 [" '[t]here

is no better proof that [defendant] entered the [victim's house] with intent to commit robbery than a showing he did in fact commit robbery after his entry' "].)

We conclude the evidence of entry with the intent to commit theft or penetration with a foreign object was sufficient. As to entry with the intent to commit theft, the bedroom in which Deeble's body was found had been ransacked, including dresser drawers that were open and the contents of a purse strewn on the floor. Valentine, Deeble's daughter, testified that following Deeble's death, Valentine never again saw certain identified pieces of Deeble's jewelry. Moreover, there was evidence from which the jury could infer defendant had subsequently stolen Delbecq's wedding ring. The jury could reasonably infer from this evidence that defendant entered Deeble's home with the intent to commit theft. (*Lynch*, *supra*, 50 Cal.4th at p. 764.)

As to entry with the intent to commit penetration with a foreign object, Deeble suffered injuries to her vaginal and rectal areas consistent with penetration by a mousse can found on her bed, and as recounted above, there was other circumstantial evidence that Deeble had been penetrated by the mousse can. The jury was also aware that defendant subsequently brutally penetrated Muriel Delbecq with a mousse can. The jury could reasonably infer from these circumstances that defendant entered Deeble's home with the intent to penetrate her with a foreign object.

The evidence is also sufficient to support the jury's true finding of the burglary-murder special-circumstance allegation. "The felony-murder special circumstance applies to a murder committed while the defendant was engaged in, or was an accomplice in the commission of, the attempted commission of, or the immediate flight after committing or attempting to commit, various enumerated felonies, including, as relevant here, burglary. (§ 190.2, subd. (a)(17).) A strict causal or temporal relationship between the felony and the murder is not required;

72

what is required is proof beyond a reasonable doubt that the defendant intended to commit the felony at the time he killed the victim and that the killing and the felony were part of one continuous transaction. [Citations.] Additionally, in this *Carlos*-era case, the prosecution was required to prove that defendant[] intended to kill the victim." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 87; see *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 135.) Here, as we have explained, the nature of the victim's wounds and the circumstances surrounding the killing support the conclusion that defendant intended to kill, and committed Deeble's murder while engaged in burglary.

### 6) *Challenge to testimony regarding key*

Defendant contends that the trial court's admission of Peggy Ventura's testimony regarding Muriel Delbecq's plans to hide a key outside her home violated Evidence Code section 1200, as well as his rights under the Fifth, Sixth, Seventh, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15, and 17 of the state Constitution. We disagree.

During direct examination, the prosecutor asked Ventura whether Delbecq kept a key outside of the apartment. Ventura replied, "Yes she did. She had been locked out once, and she had to call me at work and ask me if I had my spare key. And of course I did. And she went to the neighbor then who drove her up to go get the spare key, and she said then that she was never going to let that happen again because she hated bothering everybody. So she said she was going to hide a key. And even though I never asked her —" The trial court overruled the defense counsel's relevance objection. Ventura continued, "Even though I hadn't asked her the exact location, . . . there was a little planter area right at the front entrance there on the right-hand corner where the bathroom is . . . . [a]nd she said that she

73

was just going to hide it under a rock there." The prosecutor asked, "Did you ever find that key or see a key . . . afterwards?" Ventura replied, "No."

During cross-examination, defense counsel asked Ventura when her mother had locked herself out of the condominium, and Ventura replied December 1992. Counsel then asked, "Am I right that she commented on this to you, but . . . she never showed you where she was going to keep the key?" Ventura replied, "Right. She had said she was going to leave it under a rock." Defense counsel asked, "And did you see the key that she obtained?" Ventura replied, "No." Defense counsel asked, "All right. So if I have this right, you never saw the key, and you never saw the rock where she was going to keep it; is that correct?" Ventura replied, "No. We had talked about it, and I told her to be careful about where she kept it, that it wasn't obvious, but — " Defense counsel asked, "Ma'am, so if I have this right, the only thing you know about this as far as the obtaining a key or putting it under a rock, that is nothing you ever saw yourself; it is just something she stated to you; is that correct?" Ventura replied, ". . . That is correct." Defense counsel then moved to strike on grounds of hearsay and lack of personal knowledge. The trial court overruled the objection because counsel "did not object to the question or to the answer when it was given." Defense counsel continued to question Ventura about the key, establishing that she had never seen Delbecq take a key out from under a rock and use it, and that she had no personal knowledge whether Delbecq ever hid a key. Defendant subsequently filed, and the trial court denied, a motion to strike Ventura's testimony regarding the key.

Even assuming the court erred in failing to strike Ventura's testimony that her mother kept a key outside of the apartment, there was no prejudice under any standard. Ventura's testimony was of limited probative value because it was abundantly clear she had no personal knowledge whether there was a key outside her mother's condominium. Moreover, defendant was connected to Delbecq's

74

murder by the far more compelling evidence of his bloody palm prints and footprint in her bedroom.  In addition, the possibility that Delbecq had hidden a key outside — as had Deeble — was only one minor of many more significant similarities between the Delbecq and Deeble murders.

### 7)  *Challenge to impeachment evidence*

Defendant contends the trial erred in allowing his testimony to be impeached by his prior convictions in violation of Evidence Code section 352, and his rights under Fifth, Sixth, Eight and Fourteenth Amendments of the federal Constitution. Not so.

During cross-examination, the prosecutor asked defendant if on March 10, 1994 he had been convicted of the murder of Muriel Delbecq in Hawaii.  Defense counsel objected, and moved at sidebar to exclude reference to defendant's prior convictions.  In addition to the murder conviction, the prosecutor asserted, and defendant did not dispute, that defendant had suffered March 1994 convictions for kidnapping, sexual assault, robbery, and burglary, 1988 convictions for receiving stolen property and vehicle theft, a 1987 conviction for weapon possession, and an August 1984 vehicle burglary conviction.  The prosecutor also sought to ask defendant about the circumstances surrounding prior misdemeanors involving moral turpitude.

The trial court ruled that evidence of defendant's 1994 convictions for murder and burglary and his 1984 burglary conviction could be admitted.  It stated that nothing more than the fact of those convictions could be introduced, and excluded evidence of defendant's other convictions.  When cross-examination resumed, the prosecutor asked defendant if on March 10, 1994 he had been convicted in Hawaii of murder and felony burglary, and in August 1984 he had

been convicted in California of the felony of second degree burglary.  Defendant responded affirmatively.

" '[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude.' " (*People v. Clark* (2011) 52 Cal.4th 856, 931.)  Beyond this, the " 'trial courts have broad discretion to admit or exclude prior convictions for impeachment purposes.' " (*People v. Hinton* (2006) 37 Cal.4th 839, 887 (*Hinton*).)  "When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify." (*Clark*, at p. 931.)  The impeaching offense may postdate the charged offense.  (*Hinton*, at p. 887.)

Here, the trial court did not abuse its discretion.  Both murder and burglary are crimes involving moral turpitude.  (*Hinton*, *supra*, 37 Cal.4th at p. 888; *People v. Collins* (1986) 42 Cal.3d 378, 395.)  The 1994 murder and burglary convictions were not remote in time to defendant's 1996 trial.  Nor was defendant's 1984 second degree burglary conviction remote, because as the trial court observed, defendant "has continuously been in and out of trouble" based on the convictions in 1984, 1987, 1988, and 1994.  Defendant had already testified at the point counsel moved to exclude evidence of the prior convictions, so the trial court's ruling had no bearing on that decision.

"Although the similarity between the prior convictions and the charged offenses is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive." (*People v. Clark*, *supra*, 52 Cal.4th at p. 932.)  Here, defendant only testified that he had suffered 1994 Hawaii convictions for murder and burglary, not that he had been convicted of murdering

and burglarizing Delbecq. Thus, contrary to defendant's contention, the convictions did not "conclusively establish[] his guilt of those crimes." Even if the jury assumed that the 1994 convictions involved Delbecq's 1993 murder, it had already properly heard evidence regarding this murder under Evidence Code section 1101, subdivision (b), and the evidence that defendant committed the Hawaii murder was strong. Moreover, as noted above (see *ante*, at p. 64), the circumstance that defendant had been convicted of Delbecq's murder would serve to decrease the prejudice of the Hawaii evidence because "the jury was not tempted to convict defendant of the charged offenses, regardless of his guilt, in order to assure that he would be punished for" any subsequent murder. (*Balcom, supra*, 7 Cal.4th at p. 427.)

We further reject defendant's contention that evidence he "was guilty of the Hawaii crimes was the de facto equivalent of a directed verdict on the present charges, relieving the prosecution of its burden of proof and rendering the trial so fundamentally unfair as to deny [defendant] due process of law." As noted, evidence of defendant's guilt of Delbecq's murder — properly introduced as substantive evidence that he also killed Deeble (see *ante*, at pt. II.B.3.) — was strong. To the extent the jury inferred that his 1994 murder and burglary convictions were for the Delbecq killing, that circumstance operated to decrease, not increase, the prejudice of their introduction for impeachment. Moreover, even if the jury found by a preponderance of the evidence that defendant killed Delbecq, it was still required to determine if the similarities between the Delbecq and Deeble murders were sufficient to conclude defendant committed and possessed the requisite intent for the Deeble murder.

Defendant similarly contends that although the jury was instructed that it could only use the fact of defendant's conviction to assess his credibility, "it was undoubtedly used by the jury to . . . satisfy the prosecution's burden to prove

77

[defendant's] commission of the Delbecq murder by a preponderance of the evidence before it could consider that evidence to establish identity or intent,"[19] and "made it even more likely that the jury would ignore the limiting 'similar acts' instruction and conclude that since he was convicted of one brutal murder, he must also be guilty of the charged offense." We presume the jury followed the trial court's instructions. (*Dement*, *supra*, 53 Cal.4th at p. 36.) Moreover, once again, the evidence of defendant's guilt of the Hawaii murder was strong.

Defendant contends, relying on *People v. Rollo* (1977) 20 Cal.3d 109, 118, that " ' "[a]cts of violence . . . generally have little or no direct bearing on honesty and veracity." ' " However, in 1982, "section 28, subdivision (f) of article I of the California Constitution . . . was added by Proposition 8, and . . . provides in pertinent part that '[a]ny prior felony conviction . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding.' " (*Hinton*, *supra*, 37 Cal.4th at pp. 887-888.) We subsequently held " 'that—always subject to the trial court's discretion under [Evidence Code] section 352— [Proposition 8] authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty.' " (*Id.*, at p. 888, quoting *People v. Castro* (1985) 38 Cal.3d 301, 306.)

---

[19] The jury was instructed: "The fact that a witness has been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of such a conviction does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness."

The jury was also instructed: "Certain evidence was admitted for a limited purpose. At the time this evidence was admitted you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. Do not consider such evidence for any purpose except the limited purpose for which it was admitted."

Defendant also contends that the trial court "failed to engage in the weighing process required under Evidence Code section 352," and in particular admitted the murder conviction without consideration of all relevant factors, and "failed to consider the availability for impeachment of other felony convictions that were dissimilar to the murder charge and were more probative on the issue of [defendant's] credibility." " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing function under Evidence Code section 352.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285.) Here, the trial court expressly referred to the "weighing process," was clearly aware it had discretion to preclude admission of defendant's prior convictions, and did preclude admission of several of them. It also precluded evidence regarding defendant's misdemeanor convictions, observing that such evidence did not "prove that much and tends to take too much time and could end up confusing the jury."

As to the prior murder conviction, the court stated it was a "crime of . . . the worst type of moral turpitude," and "[h]ighly relevant on credibility." Although the Hawaii murder conviction was "an identical crime," the court stated that factor was offset by the admission of the evidence under Evidence Code section 1101, subdivision (b), and the strength of the evidence implicating defendant in the Hawaii murder. The trial court was not required to further articulate all of its considerations, such as the availability for impeachment of other prior felony convictions that were dissimilar to the murder charge, before admitting evidence of the murder conviction.

### 8. Assertedly erroneous exclusion of exculpatory evidence

Defendant contends the trial court erred in excluding certain exculpatory evidence in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal Constitution, and article I, sections 7 and 15 of the state Constitution. We conclude there was no prejudicial error.

### a. Dr. Wolf's testimony

Defendant first contends that the trial court erred in precluding defense expert witness Dr. Wolf from answering a line of questions regarding whether Deeble's injuries were consistent with consensual sexual intercourse after it allowed the prosecution's expert, Dr. Fukumoto, to opine that the mousse can found on Deeble's bed was consistent with an object that could have caused these injuries. Even assuming the trial court erred in precluding this line of testimony, there was no prejudice under any standard. Dr. Wolf described the injuries to Deeble's vagina and rectum as "[e]xtremely minor," and opined they could have been caused by a finger or a penis. He agreed with defense counsel that "taking all the references to the vaginal mucosa, labia and fourchette together, all of these can be aptly characterized by a pathologist as being trivial and merely consistent with sexual intercourse." He also testified that Deeble's vaginal mucosa was thin because she was menopausal, and that when the mucosa is thin, any kind of manipulation by a finger, penis, or other foreign object is more likely to cause microscopic lacerations. He further testified that 60 percent of women who have consensual sex, and 30 percent of women who suffer sexual assault, can have microscopic injury to the vagina. In addition, on cross-examination, Dr. Fukumoto opined that the dilation of the anus could have been caused by a finger, penis, or any number of other objects.

80

## b. *Evidence that defendant suffered from blackouts*

Defendant contends that the trial court erred in excluding testimony by Victor Portillo and Janice Hunt that that "could have circumstantially corroborated [defendant's] defense that he was in an unconscious state at the time of the [Deeble] murder." Portillo, defendant's cousin, lived on Maui for a month in 1991-1992. One night he, defendant, and defendant's girlfriend Brenda drank heavily. They got into a vehicle with defendant driving and Brenda in the passenger seat. Brenda and defendant argued, and Brenda hit defendant several times. Defendant did not hit her back, but blocked her hits to maintain control of the vehicle. The following day, defendant did not appear to be upset with Brenda over her behavior the night before. Portillo mentioned the incident to defendant. When defense counsel asked if defendant had replied "that he did not recall any of it," the prosecutor objected on hearsay grounds. Defense counsel asserted it was not hearsay, but circumstantial evidence of an alcoholic blackout" and cited Evidence Code section 1250. The prosecutor responded that there was no "foundation that ties into any kind of blackout," and the trial court sustained the objection.

Janice Hunt testified that she lived with defendant in Hawaii. In December 1992, defendant drank heavily, and at times became so intoxicated he had alcoholic blackouts. Hunt described two incidents, one when defendant left in his work truck at night, and the next morning she and defendant searched for the truck, and another when he apparently left a bag of groceries outside all night. After Hunt described the latter incident, defense counsel asked, "Did you tell [defendant] that you had found these things down there?" Hunt replied, "Yes." Counsel asked, "And what was his response?" The prosecutor objected on hearsay grounds, and defense counsel responded it was not offered for the truth, but for "state of mind." The trial court sustained the objection. Hunt then testified

81

that defendant appeared surprised when she showed him the items. Counsel made no offer of proof as to how Hunt would respond to the objected-to question, but here assumes she would have said whether defendant "recalled certain actions after drinking."

Even assuming the evidence defendant sought to elicit from Portillo and Hunt was admissible to show defendant's state of mind, state of mind evidence must nonetheless be relevant. It is not apparent how defendant's state of mind in 1991 or 1992 had any bearing on his mental state in May of 1986 when Deeble was killed. (Evid. Code, § 350.) Moreover, even assuming the trial court erred in sustaining the prosecutor's objections to this testimony, there was no possible prejudice. Both defendant and Hunt testified that defendant suffered from alcoholic blackouts, and Dr. Stalcup testified that anyone who drinks enough can have an alcoholic blackout.

Moreover, contrary to defendant's claim, the prosecutor did not argue that there was no corroboration of defendant's claim he suffered blackouts, and thus ask the jury to convict defendant because he failed to present evidence that was excluded by the prosecutor's objection. Rather, the prosecutor asserted that the circumstances of the murder were inconsistent with a perpetrator experiencing a blackout, and that defendant was the only person who actually knew if he had experienced a blackout. Thus, the prosecutor observed that Dr. Stalcup had not interviewed defendant, and stated "[S]o the only words you have, the only person that knows whether or not they had a blackout was [defendant]. And you are back to that same issue, why do you believe [defendant]? Why do you believe a wise, convicted burglar and a convicted murderer? . . . And even if you did believe him, what does it matter? Since even if you are in a blackout, even if you are under the influence of these drugs, it doesn't take away responsibility?" The prosecutor argued that "if there was a blackout," the jury still had to decide whether there is

82

"evidence that shows . . . he has formed the intent to kill, that he tortured, et cetera." He noted: "There had to be so much more decisions made. There had to be so much more things done that a drunk who . . . is stumbling and bumbling can't do" such as finding a key, pulling off a screen, taking control of the victims, putting a comforter over the window, cutting cords, finding mousse cans, and binding and penetrating the victims. "And that is why he isn't in a blackout . . . [d]espite what he tells us." "[I]t is too thought out, too planned."

### c. Evidence that Valentine stole Deeble's jewelry

Defendant contends that the trial court erred in excluding testimony about certain statements by Paul Roy, who dated Deeble sometime after August 1985. Roy was a reluctant witness, and the parties agreed that Sergeant Jessen and Robert Courtney, the senior investigator for the Orange County Public Defender's Office, could testify as to his statements to them. Before Jessen and Courtney testified, defense counsel made an offer of proof as to what testimony he anticipated, and the prosecutor lodged objections. As relevant here, counsel asserted, "[I]n relation to her state of mind near in time to her demise, Marge Deeble told Mr. Roy that Kathy [Valentine] would come into the apartment sometimes when Marge was not there and would take things out of the apartment which would upset the victim quite a bit." Counsel also asserted, "Again, as to her frame of mind near in time to her demise, she also told Mr. Roy that — or his impression, he feels that the victim finally removed the key from its hiding place in the drain pipe so that the kids could not get into the house while she was gone."

The prosecutor objected to admission of these statements. He stated that he did not "see those statements anywhere," but assuming they existed, he objected on the grounds they were hearsay and irrelevant. Defense counsel responded that the statements reflected an alternate explanation for Deeble's missing jewelry, and

were relevant to Kathryn Valentine's credibility as a witness. The prosecutor observed that defendant had never asked Valentine on cross-examination if she took any jewelry. The trial court sustained the objection. It also told counsel he could still put Roy on the stand and ask him questions, and said that whether Roy testified was a tactical decision for counsel to make. Counsel did not re-call Roy.

On appeal, defendant contends that Roy's "impression" that Deeble removed the key from its hiding place was admissible as a lay opinion under Evidence Code section 800. He did not assert this ground below, and the claim is therefore forfeited. It is also meritless. The opinion was wholly speculative, not "[r]ationally based on the perception of the witness." (Evid. Code, § 800.)

Defendant also contends that Deeble's statements to Roy fell into the hearsay exception for state of mind evidence. (Evid. Code, § 1250.) He did not assert this ground below, and the claim is therefore forfeited. It is also meritless. The second offer of proof clearly had nothing to do with Deeble's state of mind, but merely consisted of Roy's unfounded speculation. The first offer of proof was proffered not to show Deeble's state of mind, but to demonstrate that Valentine had taken items from Deeble's apartment without her permission. As defendant asserts here, it was evidence that "Valentine, and not [defendant], stole Mrs. Deeble's jewelry." The trial court therefore properly sustained the prosecutor's hearsay objection. Moreover, even if the first offer of proof could be characterized as evidence of Deeble's state of mind, nothing in counsel's offer indicated when before her death Deeble made the statement. Nor, even assuming the statement was made around the time of her death, was Deeble's state of mind toward her daughter relevant to any issue at trial.

Defendant further contends that the first offer of proof fell within the exception to the hearsay rule for declarations against interest. (Evid. Code, § 1230.) Nothing in Deeble's statement to Roy about her daughter "created such a

risk of making [her] an object of hatred, ridicule, or social disgrace in the community, that a reasonable [person] in [her] position would not have made the statement unless [she] believed it to be true." (*Ibid.*)

Defendant further contends that the trial court failed to "weigh the prejudice of excluding [the] testimony compared to its probative value." The proffered testimony was inadmissible hearsay and irrelevant. The trial court had no obligation to engage in any weighing process.

Finally, defendant summarily contends that even if the testimony was properly excluded under the Evidence Code, it "should have been admitted pursuant to [defendant's] constitutional right to present a defense." As " 'a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' " (*Dement*, *supra*, 53 Cal.4th at p. 52.) Defendant makes no effort to delineate why any exception would apply here.

### d.  *Evidence regarding defendant's reaction to news of Deeble's death*

During defendant's testimony, he recounted that when he learned of Deeble's death, he and Valentine were visiting his aunt and uncle. Valentine was told she had to go to the Los Alamitos Police Department because something had happened to her mother. Valentine and defendant drove to the police station. Defendant waited in the lobby, and after a few minutes he heard Valentine crying. Valentine then came out and told defendant Valentine's mother had died. Counsel asked if defendant remembered what Valentine had told him, and the prosecutor objected on grounds of hearsay and relevance. Counsel asserted the evidence went to "state of mind." The trial court sustained the objection. Counsel then asked defendant if he was "concerned at all about being at the Los Alamitos Police Department with [Valentine] on that date?" The trial court sustained the prosecutor's relevance objection. Counsel then asked, "When you left your aunt's residence to drive

85

[Valentine] to the Los Alamitos Police Department, what were you thinking?"
The trial court again sustained the prosecutor's relevance objection. Counsel then asked, "Did you have any fear about going to the Los Alamitos Police Department with her?" Defendant answered, "No, sir."

On appeal, defendant contends Valentine's statement to defendant was offered to explain defendant's reaction to news of the murder, which was "a relevant circumstance for the evaluation of guilt." Defendant had already testified that Valentine told him her mother had died; her exact words were irrelevant. Defendant was not asked about, and made no offer of proof regarding, what he said or did in response to her news. We therefore have no basis on which to evaluate the admissibility of evidence of his reaction.

Defendant further contends that his "innocent state of mind as he was driving to the police station" was also "a relevant circumstance for the evaluation of guilt." Even assuming the trial court erred in sustaining the prosecutor's relevance objections, there was no prejudice because defendant testified he had no fear about going to the Los Alamitos Police Department with Valentine.

### e.   *Evidence regarding Steven Deeble's interest in bondage*

Defendant sought admission of an envelope addressed to Deeble's son Steven and an enclosed flier found by Detective Vic Cantu in a trash can in the second bedroom in Deeble's apartment. On the flier were photographs of a woman in bondage and of Charles Manson, and several articles, including an article about a bondage murder. The trial court sustained the prosecutor's objection, stating that if the evidence was offered to show that Steven Deeble could have been the perpetrator, "you don't cross the threshold," the article on bondage was not "even remotely similar to the evidence in this case," and the evidence was "confusing" and not helpful to the defense.

86

" '[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352.' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 367-368.) Even assuming Steven Deeble ever saw the flier, defendant failed to demonstrate any link between the article and Deeble's murder, or that the evidence could raise a reasonable doubt as to defendant's guilt. Hence the trial court did not abuse its discretion in excluding the evidence.

### f. Cumulative Impact

Defendant contends that even if we determine none of the errors in excluding exculpatory evidence warrant reversal, the cumulative impact of these errors does. We have found no error in excluding any of the evidence, and where we have assumed error, we have found no prejudice. Nor do we discern cumulative prejudice.

### 9. Challenge to Sergeant Jessen's rebuttal testimony

Defendant contends that Sergeant Jessen's rebuttal testimony lacked foundation and violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.[20] We disagree.

---

[20] Defendant also makes related claims of prosecutorial misconduct and instructional error based on Sergeant Jessen's rebuttal testimony. (See *post*, at pts. II.B.10, II.B.12.)

### a.  Factual background

During the prosecution's case-in-chief, no DNA evidence was introduced, nor was any other evidence introduced demonstrating that suspects other than defendant had been eliminated by scientific evidence as donors of possible bodily fluids at the crime scene.  The prosecution introduced evidence that inside Deeble's thigh was a stain that could have been dried semen.  No evidence was introduced that the stain was subsequently tested and determined to be semen.

During the defense case, defendant presented evidence that none of the fingerprints lifted from Deeble's apartment matched his.  He also presented testimony from Richard Brown, a criminalist with the Orange County Sheriff's Office crime lab, that comparison of defendant's pubic hair to pubic hair found at the crime scene eliminated defendant as a source of the crime scene hair.  Brown was unable to compare the crime scene hair to that of seven men other than defendant because the hair standards submitted for those individuals contained too few hairs to make a comparison.  He sent a report to the Los Alamitos Police Department stating that the hair standards were inadequate.  He was never provided with adequate hair samples.  In addition, on approximately October 21, 1987, Sergeant Jessen spoke with Maggie Black of the Orange County Sheriff's Office crime lab regarding elimination prints.  Black was dissatisfied with the quality of the prints taken of five individuals other than defendant and said they would have to be redone.

On rebuttal, the prosecutor asked Sergeant Jessen if he recalled that during the defense case there was testimony that fingerprint exemplars and hair standards were inadequate and had to be redone, but that new samples were never submitted.  Jessen responded affirmatively.  After further colloquy, the prosecutor asked, "[Y]ou began to focus on [defendant] to the exclusion of the persons that the defense mentioned, correct?"  Jessen replied, "Correct."  The court overruled

88

defense counsel's relevance objection. The prosecutor asked, "And one of the reasons was, was it not, what has already come out that [defendant] refused to supply you with samples of hair, saliva and blood?" Jessen said, "Correct." The court again overruled defense counsel's relevance objection. The prosecutor subsequently asked, "Another reason, is it not true that these persons had been eliminated by DNA from providing the samples at the Deeble residence of semen and fluids, and [defendant] had not been eliminated, correct?" Defense counsel objected on the grounds of lack of foundation and speculation, and the trial court sustained the objection. The prosecutor asked to be heard at sidebar.

The prosecutor stated that the defense had "attacked the police for not following through and not doing certain things." He asserted that Sergeant Jessen's testimony "is only going to state of mind. This officer became aware of certain factors, including the DNA results and this is a reason why they didn't continue because these other people had been eliminated. So it is not being offered for the truth of the matter. It is being offered to rebut by his state of mind what the defense is trying to show."

Defense counsel responded that the testimony was hearsay and speculation in that Sergeant Jessen had "no basis to form the opinion as to whether these people were eliminated by DNA in the first place. And the second place, it is not true, and we can't . . . have a mini trial on evidence that was never noticed by the prosecution as being part of their case . . . . [N]either side has used DNA in this trial because [the prosecutor] represented before the trial that he was not going to put it on. Therefore, we had no [Evidence Code section] 402 [evidentiary hearing]. We did not prepare to rebut it because he was never going to use it." Defense counsel also observed that rebuttal was "limited to new matter brought up by the defense," and the defense case had not referred to DNA evidence. Hence, he argued that even if Jessen "had the foundation to talk about DNA, even if he

89

had done the tests, it would be impermissible rebuttal." He moved for a mistrial "based upon prosecutorial misconduct in bringing" inflammatory and untrue evidence "out in rebuttal." The prosecutor responded: "It is not being offered for the truth. It is being offered for his state of mind to show he didn't do a crappy job."

The trial court denied the mistrial motion, told the prosecutor to avoid the term "DNA" unless he put on the evidence, and said that Sergeant Jessen could testify that in his mind the other persons were eliminated as suspects. The prosecutor then inquired whether he could ask Jessen if "these other persons were eliminated" by "scientific testing." Defense counsel subsequently responded: "[T]his is bringing stuff in through the back door that was never presented in evidence. He never even verified that the darn stain was semen. . . .We're far off into the realm of speculation, and for stuff that is so inflammatory . . . . [T]he jury should not be allowed to hear it without an adequate foundation." The prosecutor asserted that defense counsel was correct "if it is being offered as substantive evidence. It is not." Defense counsel responded : "[T]he proper witnesses for this are the scientists. He is not the appropriate witness for this information. He is not even an expert who can bring it in as hearsay." The trial court noted that the other suspects were not eliminated by the DNA evidence, "[T]hey are just not tied into a semen stain. He therefore ordered the prosecutor not to use the word "DNA."

Immediately at the end of the sidebar conference, at defendant's request, the court admonished the jury to disregard the reference to DNA: "Earlier in the trial we told you that certain evidence was being offered for a limited purpose. Well, the last question by the way is stricken. The jury is ordered to disregard it. But these questions of this officer are being offered for a limited purpose, and the limited purpose is this officer's state of mind. And what that is relevant to, I think

90

will become obvious by the questions and by any cross-examination on those questions.  The letters 'DNA' were used in the last question.  Don't assume or think about it.  Those letters are stricken.  They are meaningless as far as your duty is concerned.  Is that understood?  You can all handle that all right?"[21]

The prosecutor then asked Sergeant Jessen, "[I]sn't it true that as a result of scientific testing that this group of names the defense had mentioned as persons who had supplied inadequate samples that I asked you about before were eliminated as the donors of the various semen and fluids at the crime scene?" Defense counsel objected on the grounds of lack of foundation and misstating the testimony, and the court told the prosecutor to rephrase the question.  The prosecutor asked, "Isn't it true that in your mind, based upon information you had received from other people, lab personnel, that this list of people that the defense had mentioned as people who had provided inadequate samples were eliminated as donors of semen and fluids at the crime scene?"  The trial court overruled defense counsel's foundation objection.  Jessen replied, "Yes."  The prosecutor asked, "And with that and other information that you had, then you focused on [defendant] . . . in your investigation, correct?"  Defense counsel objected, "irrelevant, vague as to time," and the court overruled the objection.  Jessen answered, "Correct."  The prosecutor asked, "But it wasn't until you received a phone call from Hawaii indicating a homicide that took place over there in 1993 that you felt you had enough evidence to actually arrest [defendant], true?"  Jessen replied, "Correct."  The prosecutor asked no further questions, defendant did not cross-examine Jessen, and the jury was excused for the day.

---

[21]  At the end of the guilt phase, the jury also received the instruction noted above that "Certain evidence was admitted for a limited purpose."  (See *ante*, at p. 78, fn. 16.)

91

The following morning, just before the prosecutor's closing argument, defense counsel asserted that not only had there never been an evidentiary hearing regarding the admissibility of DNA evidence, it appeared that no DNA testing had been performed.  He moved for further admonition because Sergeant Jessen had testified about DNA, the jury was then told to disregard the term DNA, and the jury was then told further testing was done and Jessen relied on that testing.  The prosecutor said there "was DNA testing," but even if defense counsel was "correct and it was other testing," the only question Jessen had answered was regarding "scientific testing."  The trial court denied the motion for further admonition because the issue was adequately addressed in the original admonition, and stated, "[t]here flat out wasn't any [prosecutorial] misconduct."

### b.  Analysis

"The trial court has broad discretion to determine the admissibility of rebuttal evidence and, absent palpable abuse, an appellate court may not disturb the trial court's exercise of that discretion.  (*People v. Gurule* (2002) 28 Cal.4th 557, 656.)" (*People v. Valdez* (2012) 55 Cal.4th 82, 170.)  Defendant contends, however, that the trial court erred in admitting Sergeant Jessen's testimony because it lacked foundation.  He is correct that there was no evidence that any scientific testing that eliminated suspects other than defendant as the donors of possible bodily fluids found at the crime scene was done, that the results of that testing had been communicated by lab personnel to Sergeant Jessen, or that the stain on Deeble's thigh was dried semen.  The purpose of Jessen's testimony, however, was not to establish that these circumstances were true, but to demonstrate why Jessen had not followed up on requests for further hair and fingerprint samples.  The testimony was admissible for this relevant nonhearsay purpose, and constituted proper rebuttal.  (*People v. McKinnon* (2011) 52 Cal.4th

610, 656 [purpose of testimony regarding rumors that fellow gang member had been killed by a rival gang was not to prove that the rumors were true, but to show the defendant believed what he heard, and thus had reason to kill the victim].)

Defendant further contends that the testimony violated the confrontation clause. Assuming the claim is preserved, there was no violation of the confrontation clause because Sergeant Jessen did not recount any statements by laboratory personnel. (See *Crawford v. Washington*, *supra*, 541 U.S. at pp. 59-60 [admission of testimonial statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation].)

Defendant contends that "through a leading question that ha[d] no basis in fact, the prosecutor was able to acquaint the jury with 'the results' of forensic testing that identified [defendant] as the only like[ly] perpetrator of the charged offense." The court struck the prosecutor's first question regarding DNA, and instructed the jury to disregard it, and in particular to disregard the term "DNA." It further instructed the jury that Sergeant Jessen's testimony was admitted for the limited purpose of demonstrating his state of mind, and that the jury could not consider evidence that was admitted for a limited purpose "for any purpose except the . . . purpose for which it was admitted." Moreover, the jury was aware no evidence had been introduced regarding such scientific testing, or demonstrating that the stain was semen, and was further aware that the police did not believe they had sufficient evidence to charge defendant with Deeble's murder until seven years later when Delbecq was killed.[22] Under these circumstances, the trial court

---

[22] In his written proposed supplemental admonition, defendant requested that the jury be instructed that testing other than DNA testing led Sergeant Jessen to believe that the seven named individuals "were not viable suspects in his mind," and that "[t]his evidence is not admitted for the truth of the matter as to whether

did not abuse its broad discretion to determine the admissibility of rebuttal evidence.

### 10. Asserted prosecutorial misconduct

Defendant contends the prosecutor engaged in misconduct on numerous occasions in violation of his rights under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution, and state law. "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711 (*Avila*).) In evaluating such a claim, we determine whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion. (*People v. Cash* (2002) 28 Cal.4th 703, 733 (*Cash*).) We conclude no prejudicial prosecutorial misconduct occurred.

#### a. Asserted misconduct during examination of witnesses

Defendant contends the prosecutor presented misleading evidence when he questioned Sergeant Jessen whether it was true that other suspects had been eliminated by DNA as donors of semen and other fluids at the murder scene, but

---

*(footnote continued from previous page)*
there was other testing or its results," but only "to explain the officer's state of mind in not completing hair comparisons of these men with hair from the scene." Such instruction would have clarified the purpose of Sergeant Jessen's testimony. Defendant did not, however, advance this argument during the hearing at which the proposed written instruction was presented, and indeed on appeal does not claim that the trial court erred in not giving this portion of the proposed supplemental instruction. He only asserts that the trial court erred in not instructing the jury with that portion of the proposed admonition which stated that Sergeant Jessen's "testi[mony]" that seven named individuals were eliminated by DNA testing was apparently false, and that no DNA testing was performed regarding these individuals. (See *post*, at pt. II.B.12.a.)

94

defendant had not been eliminated. (See *ante*, at pt. II.B.9.) Defendant's objection to the prosecutor's question was sustained, and Jessen did not answer the question. Moreover, the trial court subsequently admonished the jury that the question was struck, and they were to disregard the term "DNA." We presume the jury followed that instruction. (*People v. Avila* (2006) 38 Cal.4th 491, 574.) Under these circumstances, even assuming the prosecutor committed misconduct by asking the question, no prejudice was possible under any standard. (*People v. Pinholster* (1992) 1 Cal.4th 865, 943 [no prejudice since the defense objection was sustained, the court directed there be no further reference to the subject matter, the witness did not answer the question, and the jury was instructed to disregard the question].)

Defendant further contends that the prosecutor repeatedly ignored court rulings by referring to inadmissible and inflammatory matters in front of the jury. In particular, he asserts that the prosecutor repeatedly and improperly denigrated Dr. Wolf on cross-examination. In the challenged exchange, the prosecutor asked, "Now, from what I have heard you told us these women were really both pretty darn lucky because neither of them really suffered or felt any pain before they died?" The court sustained defense counsel's objection that the question was argumentative. The prosecutor asked, "Didn't you, in response to [defense counsel's] series of questions, basically have both of these women unconscious and not feeling any pain before they died?" Dr. Wolf replied, "Yes." The prosecutor asked, "And so if I were to show you then Exhibit[] 1, a photograph of Mrs. Deeble in death, and Exhibit 33, a photograph of Mrs. Delbecq in death, you are going to tell us, doctor, that these women did not feel any pain before they died?" Dr. Wolf answered, "Yes." The prosecutor asked, "They were fortunate, indeed, weren't they?" The court sustained defense counsel's objection that the question was argumentative. The circumstance that the prosecutor asked two

questions ruled argumentative does not demonstrate that he infected the trial with such unfairness as to render the subsequent conviction a denial of due process, or engaged in deceptive or reprehensible methods employed to persuade the trier of fact. (*Avila*, *supra*, 46 Cal.4th at p. 711.)

Defendant also contends that the prosecutor reminded the jury of his "improper attack on Dr. Wolf[]" during closing argument. The prosecutor said, "Exhibit 1 and Exhibit 33, these are the two . . . photographs I held up. You are telling us that these women did not feel any pain? And I was a little sarcastic, frankly, when I asked that. Do we have that much to be grateful for that they didn't feel . . . pain. He said, no, they did not feel pain. . . . That is ridiculous. That defies common sense." Defendant did not object below to the prosecutor's argument, no exception to the general requirement of an objection is applicable, and the claim is therefore forfeited. (*People v. Schmeck* (2005) 37 Cal.4th 240, 286 (*Schmeck*).) The claim is also meritless. The prosecutor's questions to Dr. Wolf on cross-examination were objectionable because they were argumentative, but argumentative statements are appropriate during closing argument. A prosecutor's "argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom." (*People v. Harrison* (2005) 35 Cal.4th 208, 244.) Here, the gravaman of the argument was simply that Dr. Wolf's opinion that neither Deeble nor Delbecq felt pain lacked credibility. To the extent there is a reasonable likelihood the jury construed the prosecutor's argument as referring to the questions for which defendant's objections were sustained, there is no possible prejudice given that at the same point in the questioning Dr. Wolf twice agreed with the prosecutor that in his opinion the victims had not felt pain.

Defendant further contends the prosecutor engaged in an "improperly argumentative style of examination" when cross-examining Janice Hunt and

defendant.  The prosecutor asked Hunt why she had exposed her "precious daughter to a heavy drug user like" defendant.  As defendant notes, his objection to this line of questioning was overruled.  Moreover, Hunt explained that she did not think defendant was using drugs at the time he lived with Hunt and her daughter.  Nor did the prosecutor commit misconduct during his cross-examination of defendant when — in response to defendant's testimony that his drug and alcohol use kept him from success as a father and husband and in holding down a job — he asked defendant if this lack of success was because he was not willing to take responsibility for his choices, or when he challenged defendant that he knew "darn well" that individuals who wanted to get help and recover from addiction are able to do that.  As defendant notes, the trial court overruled objections to these questions, and defendant fails to demonstrate how they constituted misconduct.

Defendant further asserts the prosecutor asked Hunt an argumentative question, and improperly challenged her credibility in front of the jury.  The prosecutor asked Hunt if she recalled giving defendant a "big wave and a big smile" at the lunch break.  Hunt replied, "Yes."  The prosecutor asked, "You still carry a little bit of a torch for him?"  Hunt replied, "I still feel he is innocent."  The prosecutor said, "That is not my question, ma'am."  Hunt said, "I am sorry."  The prosecutor then asked the question defendant challenges here:  "You wanted to say that, didn't you?"  The trial court sustained defense counsel's objection that the question was argumentative.  The prosecutor asked, "When I asked you if you still carried a torch for him, why did you talk about his innocence?"  The court overruled defense counsel's objection that the question was argumentative.  Hunt replied, "To me he seems like a decent human being."  The prosecutor asked, "That is not my question.  When I asked you . . . if you still carried a torch for him, why did you talk about his innocence instead of whether or not you still

carried a torch for him?"  Hunt replied that she did not understand what the prosecutor meant by "carry a torch."  The prosecutor asked, "You don't know what that phrase means, ma'am?"  Hunt replied, "No, sir."  The court overruled defense counsel's objection that the question was argumentative.  The prosecutor asked, "You have feelings for him still, do you not?"  Hunt replied, "As a friend, yes."

Defendant makes no attempt to demonstrate how the prosecutor's question infected the trial with such unfairness as to render the subsequent conviction a denial of due process, or constituted a deceptive or reprehensible method employed to persuade the trier of fact.  (*Avila*, *supra*, 46 Cal.4th at p. 711.)  Moreover, the prosecutor was entitled to explore the basis for any bias on Hunt's part for defendant.

Defendant further asserts that the prosecutor committed misconduct when he asked defendant if Kathryn Valentine was lying when she testified about how often she saw defendant drunk or using drugs, and that defendant was "aware of a key at her mother's residence and of a screen."  When defendant said as to each of these events that Valentine was lying, the prosecutor asked if defendant knew why she would lie, and defendant said he did not know the reason.  No misconduct occurred.  Defendant had personal knowledge both of these events, and of Valentine, and hence knew whether Valentine's testimony was accurate and what motivation she might have to lie.  (*Chatman*, *supra*, 38 Cal.4th at pp. 382-383.)

Defendant further contends that the prosecutor improperly asked defendant to comment on the testimony of Dr. Stalcup.  On cross-examination, defendant agreed with the prosecutor that Dr. Stalcup had testified that as one continues to drink alcohol, fine motor coordination is first affected, and eventually gross motor coordination.  The prosecutor asked, "Dr. Stalcup never said that you as an addict or a user of alcohol didn't go through those stages, did he?"  Defendant replied,

98

"No. . . . He doesn't know me." The prosecutor asked, "He doesn't know you?" Defendant replied, "Dr. Stalcup, he has never interviewed me." The prosecutor said, "[H]e talked about people in your condition, did he not?" Defendant replied, "Yes." In the now challenged question, the prosecutor asked, "That was the whole point of his testimony, wasn't it?" Defendant replied, "Yes." Defense counsel objected that the question called for speculation, and the trial court sustained the objection and struck the answer.

No misconduct is apparent. Contrary to defendant's assertion, the prosecutor's question was not a "sarcastic aside[]," but simply stated the reasonable inference that Dr. Stalcup had been called to testify about drug and alcohol addiction. The jury, who had heard Dr. Stalcup's testimony, would reasonably draw the same inference.

### b. Asserted denigration of defense counsel

Defendant contends the prosecutor committed misconduct during closing argument by denigrating defense counsel. "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." (*People v. Hill* (1998) 17 Cal.4th 800, 832; *People v. Frye* (1998) 18 Cal.4th 894, 978 (*Frye*) [a prosecutor's argument that denigrates defense counsel "directs the jury's attention away from the evidence and is therefore improper"].) "In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks" (*People v. Young* (2005) 34 Cal.4th 1149, 1189 (*Young*)), and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion (*Cash*, *supra*, 28 Cal.4th at p. 733).

During defense counsel's closing argument, he observed that to convict defendant of torture murder, the jury was required to find that the perpetrator

"intended to inflict prolonged pain, something that lasts a long time." He then argued that "[i]f the first thing that happened was that [Deeble] was strangled, she would be unconscious in less than a minute," if she received a knock-out blow, she would be unconscious immediately, and "Dr. Fukumoto isn't going to say anything different from" Dr. Wolf. The prosecutor interrupted, and said "That is not true, your honor, and in fact . . . unconsciousness is irrelevant and [defense counsel] knows it." Defense counsel said, "I object to the constant objections." The trial court sustained the prosecutor's objection. Defendant asserts that the prosecutor "voiced [an] opinion to the jury that defense counsel had intentionally sought to mislead them." There is no reasonable likelihood the jury construed the prosecutor's comment that defense counsel "knows it" as an attack on counsel's integrity. Even if the comment could be so construed, it was fleeting, and therefore harmless. (See *Young*, *supra*, 34 Cal.4th at p. 1190.)

Defendant contends the prosecutor interrupted defense counsel's closing argument twice with the complaint that he had been personally attacked. In the first instance, defense counsel argued that whatever the substance was that was on the ridge of the mousse can, it could not have come from Deeble's vagina or rectum because there was no blood in those orifices. In so doing, he said, "[Y]ou know why [the prosecutor] wanted to ride through his false front western town real fast." The prosecutor objected "to the repeated personal attacks that [defense counsel] feels necessary to go after me." The trial court stated, "Stick with the evidence, [defense counsel], if you don't mind." In the second instance, defense counsel observed that "it is not only the L.A. Narcotics officers who want [Dr. Stalcup] to tell them about drugs, but Janet Reno, the Attorney General of this country. And if the prosecutor is going to pooh pooh that because [Reno] is a Democrat, then Dan Lungren who is the Attorney General of the state who is a Republican —" The prosecutor objected, "Why does [defense counsel] have to

100

bring me into every argument?"  The trial court stated, "I don't know what politics have to do with this particular case, [defense counsel]."  Defense counsel replied, "Nothing at all, your honor."  The court said, "Then stay away from it."  It is not apparent, and defendant does not explain, how the prosecutor's objections improperly denigrated defense counsel.

Defendant further contends that the prosecutor denigrated defense counsel when he responded to defense counsel's use of the word "derisory."  Defense counsel called the prosecutor's implication that Dr. Wolf had not performed "enough trauma autopsies," and was "underqualified" because he did not work for a sheriff, "derisory."  On rebuttal, the prosecutor asserted:  "[T]here is a word [defense counsel] used in describing me twice yesterday, a word called 'derisory.' . . . And he was in the middle of attacking me personally over and over and over again when he was using that word."  The trial court overruled defense counsel's objection that the argument was improper.  The prosecutor said:  "So I figured it had to be some kind of a snap at me, 'derisory.' . . . I got a copy of it out of the dictionary . . . [and] [t]hat didn't help me very much. . . . Well, I looked up 'derision,' . . . and it says an object of ridicule or scorn, a laughing stock.  That is what they think of me.  That is what they think of this case."  Contrary to defendant's claim, the prosecutor's statements were fair rebuttal.

Nor did the prosecutor impermissibly attack defense counsel on rebuttal when he argued:  "I was attacked for cheating — let's see what did [defense counsel] say.  Fake fronts, western towns."  The prosecutor recalled a "Western analogy" of individuals lighting fires outside around a home in an effort to get the occupants of the home to leave "and try to put the fire out."  He subsequently argued:  "They try to create fires by never really responding to the other challenge I made.  What is the defense, I asked? . . . Is your defense that your client didn't do it, or is your defense that your client did it but there was no crime, there was no

torture? . . . Or is your defense that because of alcohol, you had a blackout and, therefore, you aren't responsible? What was the response to my question? Ladies and gentlemen, we don't know what you are going to believe. We don't know which fire you are going to go out and chase. So we give you all of these, and you make up your mind. They don't know what the defense is. They are defending the defendant without knowing the defense. They are hoping that by attacking the police, by attacking the crime scene, by attacking me, that is the old . . . law school deal . . . 'If the facts are on your side, you argue the facts. If the law is on your side, you argue the law. If neither is on your side, you attack your opponent.' That is the only way I can explain. . . . So I don't know why [defense counsel] had to get up here and start this attack." Defense counsel said, "I am going to object to the personal attacks, improper argument." The court overruled the objection. The prosecutor continued: "The only thing I can think of is trying to light a fire, hoping that I would run out trying to put it out and hoping you would run out and chase it, but I won't do that. What did I finish with . . . yesterday? These are honorable men. I don't know why [defense counsel] felt he had to do that. I am not going to change my opinion that they are honorable men. . . . I am not going to go after them that way. I will not do it."

As can be seen, other than to the comment "I don't know why [defense counsel] had to get up here and start this attack," defendant did not object to the prosecutor's argument, no exception to the general requirement of an objection is applicable, and his claim is therefore forfeited on appeal. (*Schmeck*, *supra*, 37 Cal.4th at p. 286.) Moreover, his claim as to all portions of the argument is meritless. The prosecutor's comments were fair rebuttal to defense counsel's characterization of the prosecution evidence as a "false front western town." They were also supported by evidence at trial of varying defenses of alibi, insufficient evidence of torture, and lessened culpability because of a blackout. "We accord

102

the prosecutor wide latitude in describing the factual deficiencies of the defense case." (*Cash, supra*, 28 Cal.4th at p. 733.) Contrary to defendant's assertion, nothing in the argument "carried the clear implication that defense counsel did not believe in [defendant's] innocence" or believe their own client.

### c. *Additional asserted misconduct during closing argument*

Defendant contends that the prosecutor lessened the People's burden of proof beyond a reasonable doubt during his closing argument. The prosecutor theorized that either defendant had graduated to a more sadistic level when he killed Delbecq, or that Deeble had died too quickly so he did not have a chance to penetrate her with the mousse can "all the way up." He then argued: "Would you give him . . . the benefit of the doubt on that? Would you think it was - now I am talking about something different than proof beyond a reasonable doubt, okay? I am talking about knowing this man as you know him, is there a reason that a person who is brutally torturing women, are you going to give him a benefit as to his motivation? Are you going to say he probably did it differently because it is not the same guy? [O]r are you going to assume the worst? Would it be fair in this case to assume the worst that the motivation, that the reason he couldn't get more sexually involved with these mousse cans was because he killed her too fast? I say it would be fair. You will ultimately determine whether it would be fair or not; it is true or not. I submit under these facts it is fair. I submit it is . . fair not to give him the benefit of any factual or mental, anything to his benefit." Defense counsel objected, "[T]his is an improper lessening of the burden of proof on the prosecution," and asked that the prosecutor be admonished. The trial court stated: "I am going to instruct the jury. You are going to get a chance to rebut, and the jury will follow the court's instructions." The prosecutor continued: "You understand what I am saying? I want to repeat it. I don't want the defense to be

[accusing me of] doing something I shouldn't be. I am not talking about the burden of proof."

During the defense closing argument, counsel asserted that the prosecutor "did a nice job when he tries to make you think that what you are doing here is easy. It is not easy. . . . And when he tells you at the tail end of his argument that he is not asking you to decide this case on less than beyond a reasonable doubt, well, you know, you can all remember . . . 15 minutes ago in the core of his argument, you know, he said exactly that. . . . He said don't give this man the benefit of the doubt, and he said as to issues of specific intent and mental state, don't give him the benefit of the doubt. He said that —" The prosecutor objected, "Your Honor, that is not what I said." The court replied: "Well, it is in the record and it is in your memories. If you need help, my reporter will find it for you. Okay? The People have the burden of proof. I don't recall anybody trying to lessen that. And if somebody did, ignore it. You will get the law. I will read it to you very carefully, and I am going to give it to you in writing. And what I tell you about the law is what counts." Defense counsel continued, "Ladies and gentlemen, when [the prosecutor] asked you to decide the case against [defendant] on a less than reasonable doubt, which that is what he means when he says don't give him the benefit of the doubt —" The prosecutor said: "That is not what it means. That is not what I said, and I am going to object. It is improper. It is misstating my argument." The trial court sustained the objection.

Viewing the prosecutor's comments in context, he argued that differences between the Deeble and Delbecq murders did not mean they were not committed by the same perpetrator. Moreover, during this portion of his argument the prosecutor twice reminded the jury he was not talking about his burden of proof beyond a reasonable doubt. The trial court subsequently instructed the jury that the prosecutor had the burden of proof, to ignore any contrary statements by

104

counsel, and that what the court said about the law "is what counts."  In addition, the prosecutor vehemently denied he had asserted the jury should decide the case on a standard less than proof beyond a reasonable doubt, and the jury was properly instructed on the standard of proof.  There is thus no reasonable likelihood the jury construed the prosecutor's remarks as properly suggesting that the burden of proof was not guilt beyond a reasonable doubt.

Defendant further contends the prosecutor improperly suggested that if the Deeble and Delbecq murders were not uniquely similar, the defense would have introduced contrary evidence.  The prosecutor said:  "[D]id you hear any of the defense witnesses . . . come in here and tell you how these mousse cans got in both places?  Did they have an explanation for you at any point along the way?  None.  It cannot be explained.  Do they have access to show us all the other murders out there that happened this same way?  Of course they do.  There aren't any."  The trial court sustained defense counsel's objection that the argument assumed facts not in evidence, and struck the comment.  Thus, even assuming the prosecutor's comment rose to the level of misconduct, there was no possible prejudice given the trial court immediately sustained defendant's objection and struck the comment.

Defendant further contends that the prosecutor committed misconduct by expressing a personal belief in defendant's guilt when he referred to defendant as the "killer."  The prosecutor argued:  "[W]ith all these similarities" between the Deeble and Delbecq murders, "so sick, so similar, so telling, the whole sexual motivation of both, how is it possible with all of that that this defendant is not the killer? . . . And none of you will be able to walk out of that room . .  and say, well, yeah, yeah, you know, these mousse cans and all this other stuff, well, they didn't really tell us that much.  You know . . . any killer that knew both had access to these women, one knew her, one he lived by, that is just what any killer would

have done. See, when you come to that conclusion, when you arrive there, then whether or not pubic hairs got left or not or blown around or whatever doesn't mean very much. Because you know that, whereas maybe that evidence would be in a crime scene or maybe it wouldn't. You know it wasn't here, legitimately wasn't here. And that is just the way it was. Because he is the killer, and it just didn't happen. I hope you see what I am saying by that. The possibilities of interpretation go away when you know what happened."

"[P]rosecutors should not purport to rely in jury argument on their outside experience or personal beliefs based on facts not in evidence." (*People v. Medina* (1995) 11 Cal.4th 694, 776.) Here, however, the prosecutor simply asserted based on the evidence that defendant was the murderer of Deeble and Delbecq. No misconduct occurred.

### d. Cumulative prejudice

Defendant contends that the "cumulative prejudice of overall misconduct requires a new trial." We have found no misconduct, and where we have assumed misconduct, we have found no prejudice under any standard. Nor do we discern any cumulative prejudice.

### 11. Limitation of defense counsel's closing argument

Defendant contends that the trial court improperly limited defense counsel's closing argument on two occasions. A trial court "is given great latitude in controlling the duration and limiting the scope of closing" argument. (*Herring v. New York* (1975) 422 U.S. 853, 862.) It "may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." (*Ibid.*; § 1044 ["It shall be the duty of the judge to . . . limit the . . . argument of counsel to relevant and material matters"].) We conclude the trial court did not abuse its broad discretion here.

During defense counsel's closing argument, he argued that "[i]f the first thing that happened was that [Deeble] was strangled, she would be unconscious in less than a minute," if she received a knock-out blow, she would be unconscious immediately, and "Dr. Fukumoto isn't going to say anything different from" Dr. Wolf. The prosecutor interrupted, and said "That is not true, your honor, and in fact . . . unconsciousness is irrelevant and [defense counsel] knows it." Defense counsel said, "I object to the constant objections." The trial court sustained the prosecutor's objection. Defense counsel continued his argument, and observed: "The intention of the perpetrator to cause prolonged pain is critical. Nobody intending to cause prolonged pain would knock out their victim. It defeats the purpose. No one intending to cause prolonged pain would ligature strangle their victims so fast that their brain swells up and they lose consciousness in less than a minute. Look, this isn't as complicated as [the prosecutor] makes it want to seem. Every time you have seen any TV trauma, anything with torture in it, what is the common feature? The people doing the torturing want the people getting tortured to stay awake. When they pass out, they throw a bucket of water on them. If you look at torture down through history . . . they never wanted anybody to lose consciousness. They wanted them to answer the question . . . . When torture is used in time of war, it is to get the unfortunate person being . . . tortured to give up the information he has, not to make him pass out. That is crazy. You defeat the purpose. The purpose is what the statute says, . . . the intent to inflict prolonged pain on someone else. . . . No doubt in the case of Miss Deeble a couple of blows were struck very quickly. . . . Probably one to the nose first. One to the abdomen damaging the pancreas, boom, boom, subdue the victim and then what? And then strangle her. . . . This woman was not tortured."

Defendant contends that unconsciousness was not irrelevant because "an assailant's decision to render his victim quickly insensible to pain is powerful

circumstantial evidence that he did not intend to cause" extreme and prolonged pain. As can be seen, counsel was not precluded from making such an argument, and ably did so.

Defendant also contends that the trial court improperly limited closing argument when it precluded him from playing a four- or five-minute television story. During argument, defense counsel asserted that "[m]any times in life similarities are coincidences." He recalled seeing a recent news story about a couple in Illinois who won about $2,500,000 in the state lottery and learned that the previous owners of their home had also won a large amount in the state lottery. He also recounted numerous similarities between President Kennedy and President Lincoln, and observed that if one added the numbers in the date on which the murders in the O. J. Simpson case occurred, they equaled 32, which was Simpson's number when he played professional football. He also noted that if one added the numbers in the date on which Deeble was killed they also equaled 32, and wondered where O. J. Simpson was on May 12, 1986.

Counsel then began to describe a television story that had been broadcast several months earlier about two women who had never met, but shared numerous similarities including the same name and date of birth, and said he was going to play the four- or five-minute video. The prosecutor objected, and a hearing was held at sidebar. The court sustained the objection under Evidence Code section 352 and for lack of foundation, but permitted defense counsel to describe the similarities between the two women to the jury.

The trial court acted well within its discretion in excluding the videotape. Contrary to defendant's assertion, the court was entitled to rely on counsel's description of the tape, and was not required to personally view the tape before ruling. Here, counsel's central point was that there can be similarities between events or individuals without those individuals or events being related, and hence,

similarities between the Deeble and Delbecq murders did not mean that defendant committed both murders.  Counsel was given considerable leeway to make this point including informing the jury of all of the similarities from the videotape that counsel deemed relevant.

### 12. Asserted instructional error

#### a.  Failure to give requested defense instructions

Defendant contends the trial court erred in declining to instruct the jury in the language of his proposed special instruction in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.  Not so.

Defendant first claims that the trial court erroneously refused proposed defense instructions on the issue of other crimes evidence to show identity.  The first proposed instruction read:  "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.  For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.  [Citation.]  'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.'  [Citation.]"  This instruction was properly refused.  The first sentence was confusing, because the instructions elsewhere did not address the degree of similarity required for common plan or intent.  The second sentence was already contained in the jury instructions.  (*People v. Gurule*, *supra*, 28 Cal.4th at p. 659 [the trial court need not give duplicative instructions].)  The trial court properly refused to give the third sentence on the ground that it was too vague to assist the jury, and gave adequate instructions to the jury on the standard to apply

109

when determining whether Delbecq's uncharged murder was sufficiently similar to Debble's charged murder to demonstrate identity.

The second proposed instruction provided: "If you have no doubt that the perpetrator of the Los Alamitos homicide was Mr. Edwards, then you may consider the evidence of the Hawaii homicide on the issue of intent in the Los Alamitos homicide." The court properly refused to give this instruction "as written" on the ground that it was an incorrect statement of the law. (*Ewoldt*, *supra*, 7 Cal.4th at p. 393.) Although defendant contends the trial court should have modified the instruction to conform to the law, no modification was suggested below.

Defendant further contends that the trial court erred in refusing his request for further admonishment the day after Sergeant Jessen's rebuttal testimony. (See *ante*, at pt. II.B.9.) In particular, he claims the court should have instructed the jury with the following portion of the proposed further admonishment: "A statement was made yesterday that requires a further admonition. Sergeant Jessen testified that the seven named individuals were eliminated by 'DNA testing.' After consultation with the attorneys it appears that statement was false. There never was DNA testing done regarding the seven named individuals. Other testing led Sergeant Jessen to believe that they were not viable suspects in his mind."

No error in refusing the request for further admonition is apparent. Sergeant Jessen did not answer the question about DNA. Moreover, the trial court's admonishment the previous day informed the jury that the question regarding "DNA" was struck, and it was to disregard the term "DNA." We presume the jury followed that instruction. (*People v. Avila*, *supra*, 38 Cal.4th at p. 574.)

110

## b. *Omission during oral jury instructions*

During the oral jury instructions, the trial court omitted the word "living" from the murder by torture and torture-murder special-circumstance instructions. However, the written instructions, which the jury received, used the word "living." In addition, the prosecutor used the word "living" when he read the murder by torture instruction to the jury during closing argument, and defense counsel did so on two occasions when reading a portion of the torture-murder special-circumstance instruction.

Moreover, immediately after the court instructed the jury, defense counsel told the court he did not recall hearing the word "living." Counsel then said he was satisfied if the word "living" appeared in the written instructions. No request to further instruct the jury was made.

"We of course presume 'that jurors understand and follow the court's instructions.' [Citation.] This presumption includes the written instructions. [Citation.] To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) Here, the written instructions contained the word "living," and both counsel used the word "living" during argument. There is therefore no "reasonable likelihood the jury applied the challenged instructions in an impermissible manner." (*Ibid.*)

## 13. *Asserted cumulative error*

Defendant contends that cumulative guilt phase error requires reversal. We have found no error, and where we have assumed error, we have found no prejudice. Nor do we discern cumulative prejudice.

## C. Second Penalty Phase Issues

### 1. *Asserted restrictions on voir dire*

Defendant contends the trial court improperly restricted voir dire as to two jurors who sat on his jury, and two prospective jurors, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. He asserts the inadequate voir dire gave counsel insufficient information to appropriately determine challenges for cause. This claim borders on the specious.

As to the prospective jurors who did not sit on defendant's jury, even assuming error, no prejudice could have resulted from any limitation on voir dire. (*People v. Roldan* (2005) 35 Cal.4th 646, 692.)

As to Prospective Jurors Nos. 212 and 166, who did serve on defendant's jury, defendant contends that the trial court "repeatedly refused to allow" trial counsel to ask these prospective jurors "whether they would automatically return a verdict of death in a case involving generalized facts likely to be presented by the prosecutor (a brutal double homicide)." He asserts that although counsel was permitted to ask Prospective Juror No. 166 whether he "would automatically vote for death in a double homicide case," he should have been permitted to add to his hypothetical the generalized facts that the double homicides involved torture, burglary, sexual assault, and strangulation. The record demonstrates no such limitations on voir dire.

After the hardship excusals, and before death qualification voir dire began, the court read the information to the prospective jurors, including Prospective Jurors Nos. 212 and 166. The prospective jurors thereby learned that defendant had been convicted of murdering Deeble while engaged in the commission of burglary, and that the murder was intentional and involved the infliction of torture. Moreover, voir dire was not sequestered. At the beginning of voir dire,

112

Prospective Juror No. 212 was placed in the box, and Prospective Juror No. 166 was in the courtroom. The court told the prospective jurors: "For those of you in the audience, I would appreciate it if you listen very carefully to all of my questions, all of the responses given by the jurors in the box, and please do the same when the attorneys are asking questions." The trial court subsequently told the prospective jurors while Prospective Juror No. 212 was in the box: "You will hear evidence of a sexual nature. . . . I am not telling you that there is going to be evidence that these things occurred. . . I am just wanting you to think about it to see if you will be able to evaluate evidence. Rape, sodomy. Can you objectively evaluate evidence concerning sexual acts such as those I just mentioned? Anybody with a negative answer? The record does not reflect that Prospective Juror No. 212 responded. The court also said: "[Y]ou also heard that one of the special circumstances in this case involved torture. And I am assuming that when I said that, you probably thought of something; is that a fair statement? Probably thought of pain? Can you objectively discuss torture or things that the prosecution for sure would refer to torture and you may or may not agree, but can you discuss those things?" No response from any prospective juror is reflected in the record.

In addition, defense counsel described the crimes to the prospective jurors, saying, "[Y]ou are going to hear evidence . . . . about a murder that involves a strangulation; it involves a sexual assault with a foreign object; it involves blows to the head; a second murder that involves sexual assault with a foreign object, blows to the head and strangulation." A short time later, when questioning Prospective Juror No. 212, defense counsel noted: "[Y]ou heard a little factual scenario that I have given. Those are really awful crimes." Prospective Juror No. 212 replied, "Yes." Defense counsel asked, "And is that the kind of crime where you think that the death penalty is always going to be warranted?" The prosecutor objected to the question "as phrased" because it asked the prospective

113

juror to "prejudge," and the trial court sustained the objection. Defense counsel then asked, "Is that the kind of case where the death penalty would always be warranted in your mind without listening to any other evidence?" Prospective Juror No. 212 replied, "To answer your question, I don't think the death penalty is always warranted in any case."

Defense counsel then began questioning a different prospective juror, and in so doing asked: "Now, specifically you heard the description I gave of some acts that involve strangulation, sex with foreign objects, intentional torture on two occasions, are those the kinds of crimes . . . that when you hear them, you will no longer be open to listening to anything mitigating or any evidence in mitigation about [defendant]?" Likewise, when questioning yet another prospective juror, defense counsel said: "As you know, when you came in here and his honor told you this morning, [defendant] has already been convicted of first degree murder with a torture special circumstance, intentional torture, and with doing that murder in the commission of a burglary. Okay? He's already been convicted beyond a reasonable doubt. And you also will hear circumstances about in 1993 in Hawaii, there's a similar murder that involves torture and murder. And both the crimes involved the use of sex with foreign object . . . either anally or vaginally, okay?" Defense counsel subsequently returned to questioning Prospective Juror No. 212, and said: "You heard me describe in more detail this afternoon, you've had the lunch hour to think about it, some facts that have been described by some of the jurors as being heinous. . . . [A]s you sit there now and think about those facts, have you made up your mind that this is the kind of case that should automatically receive the death penalty?" Prospective Juror No. 212 replied, "No."

Two days later, Prospective Juror No. 166 was questioned by a different member of the defense team, who asked: "[Y]ou sat through the entire process the last couple of days that we have been going through, have you not?" Prospective

114

Juror No. 166 replied, "Absolutely." Defense counsel subsequently asked, "Can you, sir, see yourself returning a verdict of life without the possibility of parole for a person who has been convicted of first degree premeditated, intentional murder, torture, burglary, sexual assault, strangulation and there is another homicide in Hawaii of a similar nature that you as a juror, I am just telling you factually, have found to be true that he is responsible for as well?" The court sustained the prosecutor's objection that the question "calls for prejudgment and speculation as phrased." Defense counsel then asked, "Can you see yourself returning a verdict of life without the possibility of parole, depending upon the evidence that has been presented to you for a person who has been convicted of first degree murder, torture and burglary and that that homicide involved a sexual assault, strangulation, and you find as a juror that [defendant] is also responsible for a similar type of homicide in Hawaii?" The court again sustained the prosecutor's objection. Defense counsel then asked, "Are you open to considering the evidence in this case, mitigating factors that may be presented to you in this case and having the possibility of returning a verdict of life without the possibility of parole?" Prospective Juror No. 166 replied, "I am definitely open to considering all the facts before I render any type of decision." Defense counsel asked, "Would you vote for the death penalty in every case in a situation where you have found a person guilty of more than one homicide?" Prospective Juror No. 166 replied, "No, I would not."

"Our decisions have explained that death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence

115

likely to be presented." (*Cash*, *supra*, 28 Cal.4th at pp. 721-722.)  As can be seen, contrary to defendant's claim, the prospective jurors here were well aware of the generalized facts regarding the two homicides, including the circumstance that they involved torture, burglary, sexual assault with a foreign object, and strangulation.  On this record, the circumstance that the court sustained the prosecutor's objection to two questions to Prospective Juror No. 166, and one question to Prospective Juror No. 212, because they were deemed to improperly seek prejudgment of the facts, does not demonstrate that voir dire was improperly limited.

### 2. Asserted error in ruling on challenges for cause

#### a. Prosecution challenge for cause

Defendant contends that the trial court erroneously excused Prospective Juror No. 180 because of her views regarding the death penalty in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 1, 7, and 15-17 of the state Constitution.  We disagree.

##### 1) Factual background

In her questionnaire, in response to a question about Prospective Juror No. 180's general feelings regarding the death penalty, she stated:  "I think the death penalty satisfies an emotional need to dramatically express the seriousness of the crime.  I think it is unnecessary and not a deterrent to crime.  I think it is not given equally.  I would not want the burden of knowing my decision put a person to death."  In response to a question about whether the death penalty was used too often, too seldom, or randomly, she stated, "I do think it is used randomly, and in some places innocent people are put to death to 'send a message.' "  When asked whether she had such a conscientious opinion concerning the death penalty that

116

she would automatically refuse to vote for the death penalty in any case regardless of the evidence, she wrote, "No, but I lean strongly in that direction and would not want [to] make that choice for death."

During voir dire, the trial court asked the prospective jurors "if any of you have strong personal feelings concerning these possible penalties."  Prospective Juror No. 180 said, "As I expressed in my questionnaire, I feel I would have a great deal of difficulty selecting the death penalty for a person."  The court said that it had read her questionnaire, and asked if she had "anything in addition to what you wrote there?"  Prospective Juror No. 180 said, "The more I think about it the less I think I could vote for the death penalty."  After further colloquy with the court, she added, "[P]ersonally I just feel that I shouldn't . . . be the one to decide that somebody should die and other considerations that I put in the questionnaire."  The court subsequently asked, "Could you ever vote for a penalty of death depending upon the evidence and the law that I read to you?"  Prospective Juror No. 180 replied, "I really think I would have a very hard time living with that vote."  The court said, "Okay.  That really wasn't my question.  Okay.  We'll get back to you."  Prospective Juror No. 180 said, "Then I will say no."  The court said, "I don't want you to say anything.  I want you to tell me what your thoughts are."

During sequestered voir dire, the trial court noted Prospective Juror No. 180 had been through the process of voir dire with other jurors, and asked, "Has your position changed at all as to an appropriate penalty as to your ability to come up with a penalty in this case?"  Prospective Juror No. 180 answered, "I don't think so."  The court asked, "You would vote for a penalty of life without possibility of parole?"  She answered, "I think that is probably as high as I could go."  After further colloquy, the court asked, "Could you ever vote for a penalty of death?"  Prospective Juror No. 180 said, "What I feel is . . . I might feel that the person

117

deserves that, but at the same time, I would feel that it is not for me to judge – it is not for me to decide that. And that there are cases where it is not even handed. And I feel being in the situation, being forced to choose in the jury situation, that I would find that extremely stressful. . . . I really don't think that in my conscience I would want to vote for death. I think I might come to a place where . . . I could not make any decision." The court asked, "Are you saying that you would either vote for life without possibility of parole or not even vote at all?" Prospective Juror No. 180 replied, "I am saying that sometimes I find decision making extremely stressful. And it may be it might come to that. Sometime I get very depressed when I have to make hard decisions." The court asked, "Your views on the death penalty have not changed at all from the moment you came in until now?" Prospective Juror No. 180 replied, "No."

Defense counsel gave Prospective Juror No. 180 background on the weighing process at the penalty phase, and said that a juror was never required to vote for death. She then asked, "In that framework . . . will you consider both of those penalties in making your decision, will you consider them both?" Prospective Juror No. 180 replied, "I don't think I can." Defense counsel urged Prospective Juror No. 180 not to get upset, and asked, "[C]an you even consider both penalties before you make a decision?" She answered, "I think, no, I can't." Defense counsel subsequently asked, "Can you see yourself weighing aggravating and mitigating factors and finding the aggravating outweighing mitigating and considering death as a potential penalty?" Prospective Juror No. 180 replied, "I could consider it, but I don't want to vote for it."

The prosecutor asked Prospective Juror No. 180, "Before you came in the other week, had you spent a lot of time thinking about [this issue] or not?" She replied, "I think about it. It is one thing to sit home and read about a crime and say that person deserves to die, and it is another thing to sit there and be one of the

118

12 people who says this person will die." The prosecutor said, "Right." Prospective Juror No. 180 said, "And I think I am pretty clear where I stand on that." After further colloquy, the prosecutor asked, "The bottom line, Juror Number 180, if you are back in the jury room, and even in your own mind you are saying you know what, under the law this is a case that does deserve the death penalty, but you are not going to vote for the death penalty are you? That is the bottom line here, correct? Isn't that what you have been saying here all along?" She replied, "I think so."

The prosecutor challenged Prospective Juror No. 180, and the defense attorney argued she was "very, very equivocal," and cause had not been established. The trial court sustained the challenge: "See, that is the problem, [defense counsel], we know where it lies. We can play with words on the record all we want. Here is where it lies: This lady was very emotional and was to my questions, to [defense counsel's] questions and to [the prosecutor's] questions, very emotional. And if you watched her walk back to the jury room, she was near tears. We are talking about a stressful event. There is no way, no matter what the evidence, no matter what the law, that this lady could ever vote for a penalty of death. No way. Or vote at all. That is another problem. She indicated or vote at all. Not in those words, but that is the concept."

### 2) Analysis

"The federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment is ' "[w]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 56, quoting *Uttecht v. Brown* (2007) 551 U.S. 1, 7; see *Wainwright v. Witt* (1985) 469 U.S. 412.) " 'On appeal, we will uphold the trial

119

court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1114.)

No error appears in excusing Prospective Juror No. 180 for cause. The record demonstrates that this prospective juror's responses were consistent with respect to her ability to follow the law concerning imposition of the death penalty, and substantial evidence supports the court's ruling. Prospective Juror No. 180 said she "would not want the burden of knowing my decision put a person to death," she could not consider both penalties before making a decision, and when asked if she could ever "vote for a penalty of death depending upon the evidence and the law" she ultimately said "[N]o." Moreover, even if her responses could be deemed equivocal, the trial court was in a position, which we are not, to view her demeanor. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown*, *supra*, 551 U.S. at p. 9.) The court observed that Prospective Juror No. 180 was very emotional during questioning and near tears when she returned to the jury room, and concluded there was "no way" she could ever vote for the death penalty. This determination of her state of mind is binding.

### b. Defense challenges for cause

Defendant contends the trial court erred in denying a defense challenge to Prospective Juror No. 254 for cause, in violation of his right to an impartial jury under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Following the court's refusal to excuse Prospective Juror No. 254 for cause, defendant used a peremptory challenge to excuse her.

Defendant has not preserved this claim on appeal because, as he concedes, he did not use all of his peremptory challenges. (*People v. Farley* (2009) 46 Cal.4th 1053, 1095-1096.) Defendant asserts that "trial counsel had no reason to believe that the exercise of additional peremptory challenges would produce a jury that was more fairly disposed" because the trial court had improperly restricted voir dire, and consequently "his ability to judge the qualifications of the panel was fatally impaired." We have concluded above that the trial court did not improperly restrict voir dire. (See *ante*, at pt. II.C.1.) Moreover, even assuming the trial court erred in denying the challenge for cause, defendant does not claim that any sitting juror was biased. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." (*Ross v. Oklahoma* (1988) 487 U.S. 81, 88; *People v. Gordon* (1990) 50 Cal.3d 1223, 1248, fn. 4 [finding the high court's reasoning in *Ross* persuasive and "applicable to the state constitutional analogues to the federal constitutional rights" to due process and an impartial jury considered in *Ross*].)

### 3. Admission of other crimes evidence

#### a. Testimony of N.T.

Defendant contends the trial court erred in admitting the testimony of N.T. Not so.

At the first penalty trial, N.T. testified in a manner substantially similar to her testimony at the second penalty phase trial. (See *ante*, at p. 24.) Before her testimony at the retrial, defendant asserted that N.T.'s testimony that she awoke to find defendant trying to penetrate her vaginally and anally with a bottle did not demonstrate a crime within the meaning of section 190.3, factor (b), and was unduly prejudicial because of its similarities to the circumstances of the capital

121

crime. The court, which had heard and since reread N.T.'s testimony at the first penalty phase trial, admitted the evidence.

In determining whether to admit challenged other-crimes evidence, the trial court considers whether the prosecution has adduced substantial evidence to prove each element of the other crime activity. (*People v. Griffin* (2004) 33 Cal.4th 536, 584; *People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25.) "Substantial evidence of other violent criminal activity is evidence that would allow a rational trier of fact to find the existence of such activity beyond a reasonable doubt." (*Griffin*, at p. 584.) "[A] trial court's decision to admit 'other crimes' evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found, where, in fact, the evidence in question was legally sufficient." (*People v. Boyer*, *supra*, 38 Cal.4th at p. 477, fn. 51.)

Here, defendant does not advance any reason why N.T.'s testimony did not describe criminal activity, but merely asserts that no rational trier of fact would have found N.T.'s testimony true beyond a reasonable doubt. He relies on the circumstances that her testimony was uncorroborated, no testimony was elicited from defendant that the incident ever took place, N.T. did not contemporaneously file a complaint with law enforcement, and she had a motive to fabricate the incident because she was defendant's former girlfriend and "displayed obvious disdain and anger towards [defendant] during her testimony." These circumstances, however, merely demonstrate weaknesses in the testimony, not its insufficiency.

### b. *Alleged jail misconduct*

Defendant contends the trial court erred in admitting evidence defendant possessed a shank in the Orange County jail. " 'It is settled that a defendant's knowing possession of a potentially dangerous weapon in custody is admissible

122

under [section 190.3,] factor (b). Such conduct is unlawful and involves an implied threat of violence even where there is no evidence defendant used or displayed it in a provocative or threatening manner.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 1002 (*Smithey*).) Defendant asserts, however, that we should reach a different result here because his possession of the shank was transitory, and "his spotless disciplinary record in prison was utterly inconsistent" with any finding other than "he intended to use it, if at all, for self-defense and not to engage in criminal activity." Neither defendant's explanation at trial that he did not intend to use the weapon, but merely thought others would be less likely to attack him if they knew he was armed, nor the circumstance that defendant was not cited for weapon possession on any other occasion, affects the admissibility of the evidence. (*Id.*, at pp. 1002-1003.)

### 4. *Admission of victim impact testimony*

Defendant contends the trial court erred in admitting victim impact testimony in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and analogous provisions of the state Constitution. We disagree.

"Prior to 1991, evidence of a murder's impact on a victim and the victim's family and friends was not admissible in the penalty phase of a capital trial. (*Booth v. Maryland* (1987) 482 U.S. 496, 501-502; *People v. Ochoa* (1998) 19 Cal.4th 353, 455, fn. 9.) The federal high court later reversed itself in *Payne v. Tennessee* (1991) 501 U.S. 808 (*Payne*), deciding that '[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question' (*id.* at p. 825) and was thus admissible evidence. We have followed the high court's lead [citation] and have also found such victim impact evidence admissible as a circumstance of the crime

123

pursuant to section 190.3, factor (a)." (*People v. Boyette* (2002) 29 Cal.4th 381, 443-444.)

Here, defendant's crime but not his trial occurred before *Payne v. Tennessee*, *supra*, 501 U.S. 808. Contrary to defendant's assertion, we have repeatedly held that "retroactively applying the high court's decision in *Payne v. Tennessee* does not violate the prohibition against ex post facto laws." (*People v. Famalaro* (2011) 52 Cal.4th 1, 38.)

Nor did the trial court erred in admitting photographs of Deeble and her family. We have reviewed the photographs, and conclude they were "relevant to humanize the victim and provide some sense of the loss suffered by [her] family and society." (*People v. Dykes* (2009) 46 Cal.4th 731, 785 (*Dykes*).) The photographs are typical of those taken at family gatherings, and contrary to defendant's assertion, the circumstance that not every family member who appeared in the photographs testified would not "inflame the jury with speculative imaginings."

Defendant also contends that the testimony of Lorraine Johnson that she felt like a mother to Deeble, and that Deeble was the younger sister she had always wanted, and Kathryn Valentine's testimony that she felt she contributed to her mother's death by introducing her to defendant, fell "outside the parameters of admissible [victim] impact testimony." We disagree. " '[U]nless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim and the community is relevant and admissible under section 190.3, factor (a) as a circumstance of the crime. [Citation.] The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair.' " (*People v. Vines* (2011) 51 Cal.4th 830, 889.) Here, the challenged testimony fell well within these bounds and was

124

similar to that we have previously upheld.  (See *People v. Murtishaw* (2011)

51 Cal.4th 574, 579, 581, 595; *Dykes*, *supra*, 46 Cal.4th at pp. 780-782.)

### 5. *Admission of expert testimony regarding blackouts and defendant's mental state*

Defendant contends the trial court erred in admitting the expert testimony of Dr. Dietz on rebuttal in violation of his rights under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15, 17, and 24 of the state Constitution.  We disagree.

During the defense penalty case, defendant testified he did not recall committing the murders, and defendant, Janice Hunt, and William Farmer testified to occasions on which defendant could not later remember events that occurred while he was drinking.  In addition, Dr. Stalcup testified that during a blackout, an individual generally has immediate memory or awareness of what he or she is doing, but alcohol, tranquilizers, and barbiturates block the transfer of the memory to long-term memory.  In moderate blackouts, individuals wake up the next day and cannot remember what they did the previous day, and in severe blackouts, individuals cannot remember what they are doing at that moment.  Father McAndrew testified that blackouts are often symptomatic of the disease of addiction, and that he had experienced alcoholic blackouts, and was ashamed of the things he was told he had done during them.  Linda Lauer, a registered nurse and certified substance abuse counselor, testified that alcoholic blackouts are a hallmark symptom of alcoholism, and did not involve passing out, but more of a "walking amnesia."

On rebuttal, the prosecutor called Dr. Park Dietz, a clinical professor of psychiatry and biobehavioral sciences at the University of California at Los Angeles School of Medicine.  Defendant objected to Dr. Dietz's testimony, and the court held an evidentiary hearing at which Dr. Dietz testified outside the

125

presence of the jury. The court ruled that Dr. Dietz could testify as to what a blackout is, and that an individual in a blackout state would have a present memory and act consciously, intentionally, and meaningfully in making choices. The court precluded testimony regarding sexual sadism and the circumstance that some individuals later reacquire memory of events that occurred while they were intoxicated. Although the record is unclear, the court also appeared to rule that Dr. Dietz could not opine that based upon the crime scenes in this case the perpetrator's acts were voluntary and intentional. Dr. Dietz then testified before the jury. (See *ante*, at pp. 39-40.)

Defendant contends that Dr. Dietz's testimony was inadmissible under Evidence Code section 801, subdivision (a), because the jury could easily draw the same conclusions without an expert's testimony. As noted above, "Evidence Code section 801 qualifies a matter as the proper subject for expert testimony if it is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' That is not to say, however, that the jury need be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible. [Citation.] Rather, expert opinion testimony ' "will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness' " [citation].' " (*Jones*, *supra*, 54 Cal.4th at p. 60.) Here, Dr. Dietz's testimony regarding what a blackout is, and what an individual is aware of during an event that he or she cannot later remember, was beyond the common experience of the jury and assisted it in determining defendant's culpability for his actions.

Defendant further contends that because no defense expert testified defendant was in a blackout state during the crimes, Dr. Dietz's testimony was improper rebuttal. We disagree. As can be seen, during the defense case numerous lay and

126

expert witnesses testified regarding blackouts and defendant's apparent experience of such a phenomenon.

Defendant also contends that Dr. Dietz's testimony was substantially more prejudicial than probative or, phrased another way, that his testimony posed an intolerable risk to the fairness of the proceedings or the reliability of the outcome. (*Riggs*, *supra*, 44 Cal.4th at p. 290.) In particular, defendant contends the jury's function as the trier of fact on the issue of intent was usurped by Dr. Dietz's impermissible expert opinion that defendant was in a conscious and deliberate frame of mind at the time of the homicide. Although defendant does not cite to the record, we assume he is referring to Dr. Dietz's testimony: "[A]s he is committing the homicides, . . . he is behaving intentionally [and] voluntarily. He knows where he is, what he is doing, who he is with, why he is engaging in each action, what he wants to do next, which things please him and which things don't. . . . Now, he may not know what he did five minutes ago or ten minutes ago. He may be in a blackout already for those. But for what he just did and what he is going to do next, he is not in any blackout at all. He is right there in the present tense in the moment doing as he pleases." The testimony was relevant to rebut the apparent defense that because defendant was experiencing a blackout when he committed the offenses, he was less culpable. Nor was it unduly prejudicial. Contrary to defendant's assertion, the testimony was in response to a hypothetical question by the prosecutor, and hence was not an expert opinion regarding defendant's state of mind. Moreover, at the penalty phase the jury was no longer making factual determinations regarding defendant's intent, but rather was determining his appropriate sentence.

### 6. Exclusion of evidence of remorse and mitigating victim impact testimony

Defendant contends the trial court erred in excluding testimony regarding defendant's remorse, and testimony from Deeble's son that he did not want defendant executed, in violation of his rights under the Eighth and Fourteenth Amendment to the federal Constitution. Not so.

### a. Evidence of remorse

During the defense penalty case, Sergeant Morris testified that in 1993, while defendant was at the Maui Community Correctional Facility, there were two escape attempts from defendant's housing area. As to the first escape, Morris testified: "There was an escape, and he wasn't even involved. He could have gone with them, I guess, but he chose not to." Counsel asked, "[D]id you find [defendant] still to be there and the other people gone?" Morris replied, "Yes." Counsel asked, "Did you ever discuss that with him?" Morris replied, "I talked to him. He says, I am going to do my time." The prosecutor's hearsay objection was sustained. As to the second escape, counsel asked, "And the second time did [defendant] go?" Morris said, "No." Counsel asked, "Other inmates left the facility?" Morris replied, "Yes, they did." The individuals who escaped were recovered on both occasions.

Sergeant Aguiar similarly testified that in 1993 four inmates escaped from defendant's module. Aguiar found defendant sitting in his cell with the door locked. Counsel asked, "Did he say anything at that time?" The trial court sustained the prosecutor's objection on grounds of relevance and hearsay. Aguiar subsequently testified that at the time he saw defendant after the escape there were no guards in defendant's area. Defense counsel asked, "So, in essence, there was nobody to stop [defendant] from leaving?" Aguiar replied, "No, ma'am." Counsel asked, "But he remained behind?" Aguiar said, "Yes, ma'am."

Defendant testified that he now believed he had killed Deeble and Delbecq, although he had no recollection of their murders. Defendant felt "horrible," fasted, meditated, and prayed on the dates of the murders, and "always pray[ed] for the families."

Family friend Bridget Briggs testified that when defendant arrived at the Orange County jail in 1994, he told Briggs that he "didn't remember doing any of the things that they were saying that he did. But if he did, . . . he should be punished accordingly."

Over the prosecutor's objection, Reverend Winter testified that sometimes defendant would break down and cry because he said he did not remember what he had done. Defendant said that if he had killed Delbecq, he was a "monster." He also said, "if I had done that . . . it is horrible, I shouldn't be allowed to live in society." Defendant would ask Winter "to pray for the family," and "we would pray together, and he would cry." Defendant took full responsibility for his addiction, and did not offer drugs and alcohol as an excuse for his situation.

Later that same day, William Farmer, a friend of defendant's, testified that shortly after defendant's arrest in Hawaii he spoke with defendant by telephone. Defense counsel asked, "[W]hat was it that he told you in that conversation?" The prosecutor's hearsay objection was sustained. Counsel argued that the testimony went to defendant's state of mind. The court said, "It's redundant." Counsel then asked Farmer about a conversation he had with defendant while visiting him in jail. Farmer asked defendant "if he knew that he committed these crimes." Counsel asked, "And what was his response?" The court sustained the prosecutor's objection that the question called for hearsay and was cumulative. Counsel asserted that this was "the same issue we had this morning" on defendant's state of mind. The court said, "But you got it in this morning."

129

Counsel said, "This is a different witness." The court said, "The objection is sustained."

Lynn Pendzik subsequently testified that once while defendant was on trial in Hawaii he refused a visit with her. Defendant subsequently wrote to her: "Remember during the trial when it was at the most horrible testimony? You came up that weekend and I refused your visit. Do you know why I did that? I did it because I was utterly appalled by what they had shown in court and that I was responsible for it. And I hated myself, and I felt that you certainly must hate me. I was ashamed and I did not want to face you."

Defendant's sister Elena testified that after defendant was arrested in Hawaii, she visited him in jail every weekend. During one visit, defendant looked down and told Elena, "[I]f I did do this, I don't ever want to get out."

Near the end of the defense penalty case, Father McAndrew was asked by defense counsel, "In the conversations that you had with [defendant], did he ever express to you any remorse for the homicide that he was in custody here on?" The prosecutor's objection that the question called for hearsay and was cumulative was sustained. Counsel asked, "Just with respect to the homicide in Los Alamitos that occurred in 1986, did he ever express any remorse to you?" The prosecutor's objection on the same grounds was again sustained.

"The Eighth and Fourteenth Amendments require that the sentencer in a capital case not be precluded from considering any relevant mitigating evidence, that is, evidence regarding 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " (*Frye*, *supra*, 18 Cal.4th at p. 1015.) Nonetheless, "the United States Supreme Court never has suggested that this right precludes the state from applying ordinary rules of evidence to determine whether such evidence is admissible." (*Smithey*, *supra*, 20 Cal.4th at p. 995; see *Romano v. Oklahoma*

130

(1994) 512 U.S. 1, 12 ["The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings"].)

Here, defendant relies on *Green v. Georgia* (1979) 442 U.S. 95, 97 which, as we have described it, "held that a defendant's due process rights are violated when hearsay testimony at the penalty phase of a capital trial is excluded, if both of the following conditions are present: (1) the excluded testimony is 'highly relevant to a critical issue in the punishment phase of the trial,' and (2) there are substantial reasons to assume the reliability of the evidence." (*People v. Kaurish* (1990) 52 Cal.3d 648, 704.) In *Green*, the evidence was "highly probative of the defendant's innocence." (*Smithey*, *supra*, 20 Cal.4th at p. 996.) "By contrast, we have held that if the exculpatory value of the excluded evidence is tangential, or cumulative of other evidence admitted at trial, exclusion of the evidence does not deny the accused due process of law." (*Ibid*.) Here, even assuming reliability, the mitigating value of the excluded testimony was cumulative to the ample evidence of defendant's remorse adduced through the testimony of defendant, Bridget Briggs, Reverend Winter, Elena Edwards, and Lynn Pendzik. Hence, exclusion of this testimony "did not violate the Eighth Amendment or deprive defendant of due process of law." (*Id.*, at p. 997.)

b. *Scott Deeble's testimony*

Scott Deeble, Marjorie Deeble's son, testified that in the 12 years since his mother's death, he had learned that "I cannot appreciate the ecstasy of my joy if I do not embrace the depth of my grief. I have learned the big lesson in forgiveness." Counsel then asked Scott what he meant by forgiveness, and whether he felt forgiveness for defendant, and after each question the court sustained the prosecutor's relevance objection. Scott subsequently was asked how

131

he had personally been affected by his mother's death. He replied that it was a huge loss, "[b]ut I've had to search for . . . meaning. I've had to . . . find what I need in life. I need compassion and I need forgiveness. And I'm only entitled if I don't deny someone else the same." The prosecutor objected, and the last portion of Scott's response was stricken. Counsel then asked if Scott felt "sympathy or compassion" for defendant. The prosecutor's objection was overruled, and Scott replied, "I do feel compassion."

Defendant contends that the trial court improperly precluded him from introducing "mitigating victim impact testimony." The trial court's rulings did not prevent defendant from showing the jury the effect of the murder on Scott Deeble, which is all defendant was entitled to do under Penal Code section 190, factor (a).

### 7. Asserted prosecutorial misconduct

Defendant contends that the prosecutor committed prejudicial misconduct in violation of his federal and state rights to a fair trial and reliable determination of penalty. We disagree. As noted above, "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*Avila*, *supra*, 46 Cal.4th at p. 711.) In evaluating such a claim, we determine whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion. (*Cash*, *supra*, 28 Cal.4th at p. 733.) We conclude no prejudicial prosecutorial misconduct occurred.

#### a. Dr. Dietz's testimony

As noted above, the trial court allowed Dr. Dietz to testify on rebuttal regarding what a blackout is, and that an individual in a blackout state would have a present memory and act consciously, intentionally, and meaningfully in making

132

choices. The court precluded testimony regarding sexual sadism and the circumstance that some individuals later reacquire memory of events that occurred while they were intoxicated. Although the record is unclear, the court also appeared to rule that Dr. Dietz could not opine that based upon the crime scenes in this case the perpetrator's acts were voluntary and intentional.

The prosecutor asked Dr. Dietz to consider the two murder scenes and the acts that were committed on the victims, and "assuming that the defendant in this case . . . is the perpetrator of both those crimes, has been found guilty by a jury beyond a reasonable doubt, how would an alcoholic blackout, if he had been in one, . . . have affected what he did during those murders?" After the court overruled defense counsel's foundation objection, Dr. Dietz answered that assuming defendant committed both homicides, and "assuming that he now has no memory whatsoever of either homicide" because of the effects of alcohol, "that would mean that he is now in a blackout for both homicides. But it doesn't tell us anything about his mental state at the time of the homicides except that he was drunk." Dr. Dietz continued, "And looking at what happened in each homicide, we learn a lot about his mental state at the time of the homicides that shows if intoxicated he wasn't too intoxicated to engage in a very orderly sequence of complicated behaviors."

The prosecutor subsequently asked, "When you talk about the sequence of events, you are referring to the various things . . . that were done to the two victims, correct?" After the court overruled defendant's objection, Dr. Dietz replied: "The things done to gain access to each victim, to do things to the victims and their property and to leave the scene. The whole sequence of events." The prosecutor then asked, "[A]ssuming . . . that the defendant was in an actual — when he says he doesn't remember, assuming that that is truthful, you have said that . . . the blackout does not affect his mental state while he was perpetuating the

133

acts?" Dr. Dietz replied, "Correct, the blackout doesn't begin until later." He explained, "[It] begins at least seconds after each action, maybe minutes, but the blackout is what he is later in. It is not something he is in while he is doing it."

The prosecutor subsequently asked, "[S]o as he is committing the various acts during the homicide, how do we characterize his mental state at this point?" Dr. Dietz replied, "Well as he is committing the homicides, I think it is fair to say that he is behaving intentionally voluntarily. He knows where he is, what he is doing, who he is with, why he is engaging in each action, what he wants to do next, which things please him and which things don't. . . . Now, he may not know what he did five minutes ago or ten minutes ago, He may be in a blackout already for those. But for what he just did and what he is going to do next, he is not in any blackout at all. He is right there . . . in the moment doing as he pleases."

At about this point, the prosecutor asked Dr. Dietz the two questions defendant challenges on appeal. He first asked, "[A]ssuming that the defendant later suffered a blackout of these murders and as you mentioned that doesn't affect him knowing what he is doing, an example of that would be . . . in the Maui homicide, that there was a comforter placed up over the window that — so whether he ever suffered a blackout or not, clearly at that moment he knows what he is doing is wrong. He is trying to hide it from the outside world, correct?" The court overruled defense counsel's objection that the question called for speculation and lacked foundation. Dr. Dietz replied, "Yes, that is correct."

The prosecutor then asked, "Was there evidence that actually indicated to you that this defendant did not suffer [a] blackout?" Dr. Dietz answered, "Yes," and the prosecutor asked, "[C]ould you tell us what that is?" Defense counsel objected that the question was "outside the scope." At sidebar, the prosecutor explained that he sought to elicit testimony apparently about the circumstance that defendant was not in possession of any jewelry nor did he have any blood on him

134

when he woke up the morning after the Deeble murder. The court ruled that the inquiry was "highly speculative" because defendant could have disposed of these items at or immediately after the murder and "still have no memory of them," and therefore the inquiry sought information precluded by its earlier order.

Defendant contends that the prosecutor violated the court's order when he asked whether there was evidence defendant knew what he was doing when he placed the comforter over the window. Defendant did not object on the ground that the question sought information precluded by the court's order, and that claim is therefore forfeited on appeal. (See *Schmeck*, *supra*, 37 Cal.4th at p. 286.) Moreover, the question was simply a continuation of a line of questioning regarding a set of assumed facts that was proper under the court's ruling.

Defendant further contends that the prosecutor violated the court's order when he asked Dr. Dietz whether there was "evidence that actually indicated to you that this defendant did not suffer [a] blackout?" Contrary to defendant's assertion, Dr. Dietz did not opine that defendant did not suffer a blackout. Rather, he testified that there was evidence to that effect, but never delineated what that evidence was or its relative strength. In any event, the court's order did not preclude opinion testimony that defendant was not in a blackout. Rather, it precluded Dr. Dietz from testifying regarding "reacquired memory" and how such a phenomenon would demonstrate defendant did not experience a blackout. No misconduct is apparent.

Defendant further contends that the prosecutor "made extensive use of Dr. Dietz's impermissible testimony during his closing argument." We have concluded the testimony was not impermissible. To the extent defendant also challenges the prosecutor's argument that defendant's assertion he did not remember the crimes should not be credited, such argument was fair comment on the state of the evidence and fell well "within the bounds of the 'wide latitude'

135

given to prosecutors during closing argument" at the penalty phase. (*People v. Welch* (1999) 20 Cal.4th 701, 763; see *Schmeck*, *supra*, 37 Cal.4th at p. 298 [no misconduct in referring to defendant as a " **'**dope dealing lying rat' "]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [the prosecutor's argument that defendant was a " 'snake in the jungle,' " " 'slick,' " " 'tricky,' " a " 'pathological liar,' " and " 'one of the greatest liars in the history of Fresno County' " was not misconduct].)

### b. Claim prosecutor stated he had undisclosed knowledge of defendant's guilt

Defendant contends the prosecutor committed misconduct when he explicitly told the second penalty phase jury he had undisclosed knowledge of defendant's guilt. Not so.

In the challenged comment, the prosecutor said during his opening statement: "[T]here is not evidence at the [Deeble] crime scene that indicated the killer. The police knew who the defendant was. They knew that he had dated the victim's daughter, but at that point in time nothing linked him to the case. And I am telling you this for a couple of reasons. Number one, I am not going to retry, as I mentioned to you folks early on, I am not going to retry the guilt phase of this case. And you have accepted that he has been proven guilty. I am not going to bring in every bit of evidence. But I don't want to mislead you either, and I won't do that. So although I am not bringing in all the evidence, I am not going to tell you that there was something there that wasn't or leave you with that inference. I don't want you to infer that either because all these years I mentioned to you that case was unsolved."

Defendant did not object to this portion of the prosecutor's opening statement, no exception to the general requirement of an objection is applicable, and his claim is therefore forfeited on appeal. (*Schmeck*, *supra*, 37 Cal.4th at

136

p. 286.)  The claim is also meritless.  Nothing in the challenged comment indicates any "undisclosed" knowledge of guilt.  The prosecutor simply asserted that the jury should not infer holes in the guilt phase evidence just because the prosecutor was not presenting all of the guilt phase evidence, and that no physical evidence tied defendant to the crime scene.  Moreover, the issue of defendant's guilt for the capital crime was not before the jury.

### c.  Claim the prosecutor told the jury that Hawaii did not have the death penalty

During cross-examination of Jimmy Ekstrom, the prosecutor established that Ekstrom had served only about six months in jail in Hawaii for vehicular manslaughter.  The prosecutor then asked Ekstrom, "There's no death penalty in Hawaii, is there?"  The court sustained defense counsel's relevance objection.  Contrary to defendant's assertion, the prosecutor did not tell the jury that Hawaii did not have a death penalty statute.  The jury was instructed that statements by the attorneys during the trial were not evidence, and that "[i]f an objection was sustained to a question, do not guess what the answer might have been."  We presume it followed these instructions.  (*Dement*, *supra*, 53 Cal.4th at p. 36.)

### d.  Additional asserted misconduct during closing argument

Defendant asserts that the prosecutor made impermissibly inflammatory remarks during closing argument.  Defendant did not object to these portions of the prosecutor's argument, no exception to the general requirement of an objection is applicable, and his claim is therefore forfeited on appeal.  (*Schmeck*, *supra*, 37 Cal.4th at p. 286.)

Moreover, "[t]here is a wide range of permissible argument at the penalty phase.  [Citation.]  Argument may include opprobrious epithets warranted by the evidence.  [Citation.]  Where they are so supported, we have condoned a wide range of epithets to describe the egregious nature of the defendant's conduct.

137

(E.g., [*People v.*] *Farnam* [(2002)] 28 Cal.4th 107, 168 [defendant is 'monstrous,' 'cold-blooded,' vicious, and a 'predator'; evidence is 'horrifying' and ' "more horrifying than your worst nightmare" ']; *People v. Thomas* (1992) 2 Cal.4th 489, 537 [defendant is ' "mass murderer, rapist," ' ' "perverted murderous cancer," ' and ' "walking depraved cancer" ']; [*People v.*] *Sully* [1991] 53 Cal.3d 1195, 1249 [based on facts of crime, defendant is ' "human monster" ' and 'mutation'].)" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1172.)

Here, the prosecutor's challenged comments such as calling defendant a "monster" and an "animal," asserting that Delbecq was "vulnerable and weak," "couldn't fight back," "couldn't plead properly for mercy," "did nothing to deserve what happened to her," experienced a "cat and mouse game" during a "night of terror" and "unimaginable terror" when she was assaulted with the mousse can, and asking the jury to imagine her terror, and his assertions that Deeble was not "given a penalty phase" or "allowed to present mitigating evidence," was shown "no sympathy," but was "brutally raped and murdered" and left lying there "like so much garbage," were warranted by the evidence and fell well within permissible bounds.

Defendant further asserts that the prosecutor committed misconduct when he urged the jury to consider defendant's future dangerousness based on his possession of a shank in jail. This argument was based on evidence of defendant's conduct and therefore proper. (*People v. Ervin* (2000) 22 Cal.4th 48, 99.)

### 8. *Asserted instructional error*

#### a. *Lingering doubt instruction*

Defendant contends the trial court erred in refusing to give a lingering doubt instruction. There is no federal or state right to such an instruction. (*People v. Thomas* (2012) 53 Cal.4th 771, 826; *People v. Hartsch* (2010) 49 Cal.4th 472,

513.) Rather, we have held that "the standard instructions on capital sentencing factors, together with counsel's closing argument, are sufficient to convey the lingering doubt concept to the jury." (*Hartsch*, at p. 513; see *Thomas*, at p. 826.) Defendant cites no persuasive reason to revisit this conclusion.

### b. *Circumstantial evidence instruction*

Defendant requested, and the court gave, instruction in the modified language of CALJIC No. 2.02, which addresses the sufficiency of circumstantial evidence to prove a defendant's specific intent or mental state. Defendant did not request and the jury was not instructed in the language of CALJIC No. 2.01, which generally addresses the sufficiency of circumstantial evidence to prove a defendant's guilt of a crime. Defendant here contends the trial court erred in failing to so instruct the jury sua sponte. Not so.

"CALJIC No. 2.01 is required only where the prosecution substantially relies on circumstantial evidence. '[W]here circumstantial inference is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given.' " (*People v. Brown* (2003) 31 Cal.4th 518, 563.) Here, at the penalty phase, neither the sexual assault of N.T., nor the observation of defendant with a shank in jail, relied on circumstantial evidence.

To the extent defendant claims the trial court should have instructed in the language of CALJIC No. 2.01 because counsel argued a lingering doubt theory with regard to the murder of Deeble, for which the evidence was circumstantial, that assertion is also meritless. Because there is no federal or state right to an instruction on lingering doubt (see *ante*, at pt. II.C.8.a.), there is similarly no federal or state right to an instruction on circumstantial guilt phase evidence in aid of a penalty phase lingering doubt argument.

### c. *Instruction that certain factors are only mitigating*

Defendant contends that the trial court erred when it refused to instruct that section 190.3, factors (d), (h), and (k) could only be considered as evidence in mitigation.[23] " 'The trial court did not commit constitutional error by failing to instruct that statutory mitigating factors were relevant only in mitigation. [Citations.] Moreover, "the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors. [Citations.]" ' " (*People v. Parson* (2008) 44 Cal.4th 332, 369.) In addition, here the court instructed the jury that "all evidence related to [section 190.3,] factors (d), (h), and (k) cannot be considered as aggravating circumstances." It further instructed that, "[i]n considering factors in mitigation, you may consider but are not limited to any of the following which you find to have been established by the evidence: Whether the defendant suffered extreme child abuse[,] [w]hether the defendant has displayed any acts of kindness or performed any good deeds on behalf of others[,] [w]hether the defendant shares any love and concern for his family and others[, and] [w]hether the defendant behaved well while incarcerated in the past."

### 9. *Asserted cumulative error*

Defendant contends that cumulative guilt and penalty phase error requires reversal. We have found no error, and where we assumed error, we have found no prejudice. Nor do we discern cumulative prejudice.

---

[23] The court did not instruct on section 190.3, factors (e), (f), (g), and (j) because they were deemed inapplicable.

### 10. Constitutionality of California's death penalty statute

Defendant contends that California's death penalty statute is constitutionally invalid in numerous respects. We have repeatedly rejected similar claims, and should do so again here.

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*Dykes*, *supra*, 46 Cal.4th at p. 813.) We further "reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975-976, 978.)

Contrary to defendant's assertion, the death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant of the right to a jury trial, or constitute cruel and unusual punishment because it does not require unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factors (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. (*People v. Whalen* (2013) 56 Cal.4th 1, 90; *Dykes*, *supra*, 46 Cal.4th at p. 814; *Avila*, *supra*, 46 Cal.4th at p. 724.) "Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard." (*Dement*, *supra*, 53 Cal.4th at p. 55.) "Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.) The jury may properly consider a defendant's unadjudicated criminal activity. (*People v. Martinez* (2010) 47 Cal.4th 911, 968.) "Use of the adjectives 'extreme' and 'substantial' in section 190.3, factors (d) and (g) is constitutional." (*Dement*, at p. 57.)

"The failure to require intercase proportionality does not guarantee 'arbitrary, discriminatory, or disproportionate impositions of the death penalty.' " (*People v. Stevens* (2007) 41 Cal.4th 182, 212; see *Pulley v. Harris* (1984) 465 U.S. 37, 50-51.)  Moreover, "capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws," due process of law, or the cruel and unusual punishment clause.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 590; see *Dement*, *supra*, 53 Cal.4th at pp. 55-56, 58.)

Defendant contends that his death sentence violates international law and therefore his rights under the Eighth and Fourteenth Amendments to the federal Constitution.  Defendant points to no authority that "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements."  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511.)

## III. Disposition

We affirm the judgment.

BAXTER, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.

**CONCURRING AND DISSENTING OPINION OF CORRIGAN, J.**


In *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), a majority of this court held that a pathologist giving an opinion about a victim's cause of death may recount "objective facts" that he did not observe, derived from an autopsy report he did not write, without running afoul of the confrontation clause. (*Dungo,* at p. 621.) This case demonstrates why the *Dungo* rule is unworkable.

In *Dungo*, as here, a witness described findings made by a nontestifying pathologist. Both the majority and Justice Werdegar's concurring opinion in *Dungo* emphasized that the statements attributable to the absent pathologist were limited to "anatomical and physiological observations" of the victim's body at the autopsy. (*Dungo, supra,* 55 Cal.4th at p. 619; *id*. at p. 621 (conc. opn. of Werdegar, J.).) Justice Werdegar suggested, "[t]he process of systematically examining the decedent's body and recording the resulting observations is . . . governed primarily by *medical* standards rather than by legal requirements of formality or solemnity" and that such observations do not "resemble the ex parte examinations of historical example or the structured police interrogations of *Crawford* [*v. Washington* (2004) 541 U.S. 36] and *Davis* [*v. Washington* (2006) 547 U.S. 813]." (*Dungo,* at p. 624 (conc. opn. of Werdegar, J.).) The suggestion is that the recordation of medical observations is purely objective and mechanical. My colleagues contrast them with medical *conclusions*, which result from applying a pathologist's expertise to a set of objective facts, in order to draw

1

particular conclusions. There is no debate that admission of testimony as to medical conclusions reached by a nontestifying expert would violate the confrontation clause. The *Dungo* majority and concurrences concluded, however, that hearsay statements about medical observations may be admissible.

The line between an inadmissible statement amounting to a *conclusion*, and an admissible statement about an *observation*, is not as bright as *Dungo* suggests. This case further blurs that distinction. As examples, Dr. Fukumoto testified regarding the following statements Dr. Richards made in his report. The victim (a) had suffered an incisional tear in her left eardrum, suggesting it had been caused by a sharp instrument; (b) had ankle lacerations "going in an upward direction," suggesting it was caused by a ligature; (c) had a "crescent" on the bridge of her nose consistent with a fracture, even though Richards saw no indication of a fracture on an x-ray; and (d) had residue near her mouth consistent with adhesive tape.

The defense contested all of these statements. Its expert, Dr. Wolf, testified the victim's eardrums could have been torn from increased pressure during strangulation, rather than incised by an instrument. Wolf concluded one could not determine whether a tear was "incisional" without a microscopic examination, which Dr. Richards did not perform. Defense counsel argued that defendant could not have had the intent to torture because he immediately rendered the victim unconscious by delivering a blow hard enough to break her nose. This scenario was inconsistent with defendant binding the victim's ankles. Regarding the nose injury, Dr. Fukumoto testified that Richards did not see a fracture on the X-ray. Yet, Fukumoto testified *he* saw one, thus augmenting Richards's credibility. Richards had failed to obtain microscopic slides of the area or to make an incision that might have confirmed a break. Finally, the defense noted that Richards never tested the substance on the victim's face to confirm the presence of an adhesive.

2

Even if some of Richards's statements can be accurately described as mere observations, the underlined portions are clearly opinions or conclusions drawn from observations. The extensive testimony[1] and argument[2] regarding the

---

[1] At the guilt phase, the prosecutor began his questioning of Dr. Fukumoto regarding the autopsy by stating, "I would like to go through with you some of Dr. Richards['s] specific findings, and I wanted to ask you some questions as well." The prosecutor then repeatedly asked Fukumoto about *Richards's* findings and conclusions. For example, Fukumoto testified that the victim had "a break on the left ear drum which was described by Dr. Richards as incisional in type. . . . It is not a tear. It is something that is caused by a sharp instrument or an instrument that has a point." When asked how Richards described the victim's ankle lacerations, Fukumoto answered, "He described them as being caused by the wires probably coming together and inflicting the injury." As to the victim's nose, Fukumoto testified that "[t]here was a crescent, in other words, in the area of the bridge of the nose, which was consistent to him [i.e., Richards] as fracturing of the bridge of the nose." Fukumoto described Richards's findings as to the genital region, noting "the area of the vagina shows bruises primarily on the labia and also the vaginal vault" and "[t]here was hemorrhage as well as a laceration in the area of the posterior fourchette." Fukumoto also recounted that Richards found "mucosal lacerations of the rectum" and that the anus was dilated, though Richards "did not measure it."

On cross-examination, Dr. Fukumoto confirmed that Dr. Richards did not see in an X-ray that the victim's nose was broken. Defense counsel inquired how Fukumoto would have performed the autopsy differently from Richards, eliciting that Fukumoto would have taken more measurements, produced more slide samples, and made an incision in the victim's nose to confirm a break. Defense counsel asked about a notation by Richards on one slide reflecting his finding of an " 'underlying submucosal hemorrhage' " in the victim's vagina. Defense counsel elicited that Richards made no notation regarding blood in the vagina or rectum, or damage to the victim's breasts. Defense counsel also sought clarification regarding Richards's findings as to the tear of the victim's eardrum and injuries to her vagina.

On redirect examination, the prosecutor sought to clarify that "Dr. Richards in his summary doesn't say that there is maybe a fractured nose. He says there is a fractured nose; is that correct?" Dr. Fukumoto agreed. Fukumoto also agreed that Richards's report "noted an area extending from the mouth over to the lower left cheek that appeared as a residual of adhesive tape."

[2] The prosecutor expressly relied upon Dr. Richards's credibility throughout jury argument. For example, the prosecutor belittled the opinion of defense expert

credibility of the absent Richards shows how an application of *Dungo* can run afoul of the core purpose behind the confrontation clause. " 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " (*Davis v. Alaska* (1974) 415 U.S. 308, 315-316.) "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." (*Id*. at p. 316.)

In *Crawford v. Washington, supra,* 541 U.S. 36, the Supreme Court overruled *Ohio v. Roberts* (1980) 448 U.S. 56. Under the *Roberts* rule, hearsay could be admitted if it bore "adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Id*. at p. 66.) The *Crawford* majority stated, "we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' " (*Crawford, supra,* 541 U.S. at p. 61.)

---

*(footnote continued from previous page)*
Dr. Wolf regarding the victim's vaginal injuries. The prosecutor stated Wolf was "quoting literature" in forming his opinions and did not "hav[e] any experience." The prosecutor noted that "it came out very clearly that he is not a sheriff-coroner, not working for the coroner's office," and argued that "[h]e hasn't seen what Dr. Fukumoto had seen or what Dr. Richards had seen before he retired." Similarly, with respect to Wolf's opinion that it could not be determined whether the victim suffered an incision to the eardrum, the prosecutor argued: "Well, the autopsy surgeon who did the autopsy, who is experienced in violent death autopsies says it is not. He talks about other injuries to the ears being tearing. He differentiates between the two. But he said the one injury was from a sharp instrument." In addressing Wolf's assertion that the victim's vaginal injuries could not have been visible to the eye, the prosecutor argued: "When asked then what about the injuries that were visible to Dr. Richards' eyes? Well, there weren't any of those. Dr. Richards is wrong. That is the best [the defense] can do on this."

4

"Reliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable . . . . Whether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them." (*Id*. at p. 63.)

The majority here and in *Dungo* appear to return to a *Roberts*-like rule in which an "objective" observation is sufficiently reliable to avoid the requirement of confrontation. The majority here similarly rejects defendant's claim that Dr. Fukumoto improperly recounted Dr. Richards's opinions about the "incisional" tear in the eardrum, the fractured nose, and the presence of adhesive tape residue on the victim's face. The majority reasons: "This testimony by Dr. Fukumoto did not, however, recount Dr. Richards' *opinions*, but rather [Richards's] objective medical observations." (Maj. opn., *ante*, at p. 55.) The majority does not explain the difference between "objective medical observations" and "opinions." To do so undermines the analysis. That some substance is present on the face may be an observation. That it is *adhesive residue* is a conclusion. That the eardrum is ruptured may be an observation. That the wound was *caused by a sharp instrument* is an opinion based on interpretation.

In light of *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, *Bullcoming v. New Mexico* (2011) 564 U.S. __ [131 S.Ct. 2705], and *Williams v. Illinois* (2012) __ U.S. __ [132 S.Ct. 2221], it is by no means clear that the majority's distinction between observations and conclusions would survive constitutional scrutiny. (See *Bullcoming, supra,* 564 U.S. at p. __ [131 S.Ct. at p. 2715 ["the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar"]; *Melendez-Diaz, supra,* 557 U.S. at p. 318 ["Nor is it evident that what respondent calls 'neutral scientific testing' is as neutral or as reliable as respondent suggests. Forensic evidence is not uniquely immune from the risk of manipulation."];

5

*Dungo, supra,* 55 Cal.4th at pp. 639-640 (dis. opn. of Corrigan, J.).)  But even if the distinction is permitted, Dr. Fukumoto repeatedly testified to Dr. Richards's hearsay statements recounting his observations.  Defendant had the right to cross-examine *Richards* on the methods and reasoning *he* used.  It is ultimately the jury's role to evaluate the credibility of the person who drew the conclusions and decide for itself whether to accept them.  (See *Commonwealth v. Rivera* (Mass. 2013) 981 N.E.2d 171, 189 [decided after *Dungo*; " '[A] testifying medical examiner called by the Commonwealth is not permitted to testify, on direct examination, to the underlying factual findings contained in the autopsy report prepared by a different medical examiner, because such testimony would violate a defendant's confrontation rights.'  [Citations.]"].)

In a decision after *Dungo*, the New Mexico Supreme Court recently reached a similar conclusion:  "[I]n material respects, the autopsy findings do not involve objective markers that any third party can examine in order to express an independent opinion as to the existence or non-existence of soot or stippling.  Such observations are not based on any scientific technique that produces raw data, but depend entirely on the subjective interpretation of the observer, who in this case was [the nontestifying] Dr. Dudley.  How Dr. Dudley reached the conclusion that there was no evidence of soot or stippling on Reynaldo's body or clothing should have been the subject of cross-examination.  Inquiry into her training, the equipment used to arrive at her subjective conclusion, whether the evidence of soot or stippling might have been masked by blood, or any other variables that would influence her decision should have been tested in the crucible of cross-examination." (*State v. Navarette* (N.M. 2013) 294 P.3d 435, 443.)  Likewise, *U.S. v. Ignasiak* (11th Cir. 2012) 667 F.3d 1217, reasoned:  "Medical examiners are not mere scriveners reporting machine generated raw-data. . . .  [T]he observational data and conclusions contained in the autopsy reports are the

6

product of the skill, methodology, and judgment of the highly trained examiners who actually performed the autopsy." (*Id*. at p. 1232, fn. omitted.) Similarly, Dr. Richards's conclusions here depended on his skill and interpretation of what he saw.

The majority acknowledges that Dr. Fukumoto recounted some of Dr. Richards's opinions, including that the victim was strangled to death and that her ankle lacerations were caused by a wire ligature. However, the majority concludes "no prejudice was possible under any standard" because "Dr. Fukumoto independently agreed with Dr. Richards's opinions, and neither the cause of death nor the source of the lacerations on Deeble's ankle was in dispute at trial." (Maj. opn., *ante*, at p. 55.) Such reasoning misses the mark. That Fukumoto reviewed microscopic slides and autopsy photographs *in addition to Richards's autopsy report* hardly establishes that Fukumoto derived his opinions "independently" of Richards. As the West Virginia Supreme Court reasoned under similar circumstances: "[T]o the extent that Dr. Sabet served as a 'transmitter' for Dr. Livingston's opinions regarding cause of death by reading or reiterating the conclusions contained from the report, such testimony is precisely the type of 'surrogate' testimony that is violative of the Confrontation Clause per *Bullcoming*. Dr. Sabet's seeming concurrence with the cause of death, does not transform it into his own opinion, capable of cross-examination sufficient for Confrontation Clause purposes." (*State v. Kennedy* (W.Va. 2012) 735 S.E.2d 905, 920-921.) Photos and X-rays are not hearsay. (See Evid. Code, §§ 225 [defining "statement"]; 1200 [defining "hearsay evidence"].) Fukumoto could have examined photos and X-rays and given his *own* opinion about their significance. What he could not do is tell the jury what the absent Richards concluded. Fukumoto's testimony that his opinions were "consistent" with Richards's served to bolster his own credibility based on hearsay not subject to cross-examination.

7

For the reasons set out in my *Dungo* dissent, Dr. Fukumoto's testimony violated the confrontation clause because he relayed to the jury the observations and conclusions of the nontestifying autopsy pathologist. Dr. Richards's statements were recorded in a six-page autopsy record and a two-page histology report. Each page of both documents bears the letterhead of the Orange County Sheriff's Department, and names Brad Gates as the sheriff-coroner. Each page bears the victim's name, the case number, and Richards's signature. The autopsy was attended by a criminalist employed by the Orange County Sheriff-Coroner, as well as two members each from the Orange County Sheriff's Department and the Los Angeles Police Department. These documents and the circumstances under which they were created indicate they were sufficiently formal and made with the primary purpose of establishing facts for possible use in a criminal trial. Accordingly, they are testimonial hearsay. (*Dungo, supra,* 55 Cal.4th at pp. 634-646 (dis. opn. of Corrigan, J.).)

Dr. Fukumoto's testimony was prejudicial with respect to the torture-murder special circumstance. " 'Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24.' " (*People v. Loy* (2011) 52 Cal.4th 46, 69.) " 'The beyond-a-reasonable-doubt standard of *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citation.] "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403.) Thus, the focus is on what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the . . . verdict actually rendered in this trial was

8

surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)' [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

We cannot determine on this record whether the nonhearsay autopsy photographs and the microscopic slides "would have independently supported [Dr. Fukumoto's] testimony." (*Dungo, supra,* 55 Cal.4th at p. 647 (dis. opn. of Corrigan, J.).) Nor did Fukumoto so limit his testimony. "To prove a torture-murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." (*People v. Streeter* (2012) 54 Cal.4th 205, 237.) The prosecutor argued that defendant achieved sexual pleasure from his victim's suffering, while the defense vigorously urged that defendant did not intend to torture. According to the prosecution, the victim's injuries reflected that she suffered extreme pain, including the "incisional" tear to her eardrum, the deep furrows in her neck caused by struggling against the ligature, and bruising deep within the body cavity. The defense urged that the evidence reflected the victim was struck in the face and rendered unconscious shortly after strangulation. The defense argued a person intending to torture would not immediately render his victim unconscious and impervious to pain. The condition of the victim's body was critical evidence. Fukumoto repeatedly recounted Dr. Richards's statements. As a result, deciding between the prosecution and defense theories depended in great measure on the credibility and accuracy of Richards's reports.

However, the error is harmless beyond a reasonable doubt in all other respects. The defense did not contest that the victim had been strangled, instead arguing defendant was not the killer or, alternatively, that he did not act with an intent to torture. Ample evidence aside from Dr. Fukumoto's testimony supported both first degree felony murder based upon burglary and the burglary-murder

9

special circumstance. The jury could have found burglary based upon an entry with intent to steal or to commit sexual assault. Deeble's daughter identified jewelry missing after Deeble's death, supporting an inference that defendant, who knew Deeble and had been in her home, entered the house with intent to steal. Deeble's body was found without underwear, with her legs spread apart, and her nightgown pushed above her waist. A mousse can was found nearby with apparent blood on it, and a substance found on Deeble's leg could have been dried semen. These circumstances suggest a sexual assault. Further, defendant's undisputed commission of a similar murder in Hawaii strongly supported a finding that defendant entered Deeble's home with a similar intent.

In sum, this case illustrates the difficulty of applying *Dungo*'s rule allowing admission of testimony regarding "objective facts" derived from an autopsy report by a pathologist who does not testify. The distinction between an admissible statement of objective "fact" and an inadmissible medical "conclusion" is too amorphous to be workable. Application of the confrontation clause should not depend upon a court's judgment about which side of that blurry line a statement falls. For the foregoing reasons, I would reverse the torture-murder special circumstance and affirm the convictions in all other respects.

**CORRIGAN, J.**

**I CONCUR:**

**LIU, J.**

10

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Edwards

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S073316
**Date Filed:** August 22, 2013

_____

**Court:** Superior
**County:** Orange
**Judge:** John J. Ryan

_____

**Counsel:**

Quin Denvir and Michael D. Abzug, under appointments by the Supreme Court, for Defendant and     Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Adrianne S. Denault and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Quin Denvir
1614 Orange Lane
Davis, CA  95616
(916) 307-9108

Arlene A. Sevidal
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2276